**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Seahawk Drilling Inc., | § | Case No.: 11-_____ |
| | § | |
| Seahawk Mexico Holdings LLC, | § | Case No.:  11-_____ |
| | § | |
| Seahawk Drilling Management LLC, | § | Case No.:  11-_____ |
| | § | |
| Seahawk Offshore Management LLC, | § | Case No.:  11-_____ |
| | § | |
| Energy Supply International LLC, | § | Case No.:  11-_____ |
| | § | |
| Seahawk Drilling LLC, | § | Case No.:  11-_____ |
| | § | |
| Seahawk Global Holdings LLC, | § | Case No.:  11-_____ |
| | § | |
| Seahawk Drilling USA LLC, | § | Case No.:  11-_____ |
| | § | |
| Debtors. | § | Motion for Joint Administration Pending |

**EMERGENCY MOTION FOR AN ORDER APPROVING THE PAYMENT OF**
**CONTINGENT TERMINATION FEE PAYABLE TO HERCULES OFFSHORE, INC.**
**AS AN ADMINISTRATIVE EXPENSE OF THE DEBTORS' ESTATES IN ACCORDANCE**
**WITH THE TERMS OF THE ASSET PURCHASE AGREEMENT**

**NOTICE UNDER BLR 9013(b) and 9013(i)**

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY.  YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU.  IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING.  UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING. EMERGENCY RELIEF HAS BEEN REQUESTED.   IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL

90364954.6

HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED; YOU SHOULD FILE AN IMMEDIATE RESPONSE.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Seahawk Drilling, Inc. ("**Seahawk**" or the "**Company**") and its above-captioned affiliated debtors (collectively, the "**Debtors**"), file this Emergency Motion For An Order Approving the Payment of a Contingent Termination Fee Payable to Hercules Offshore, Inc. as an Administrative Expense of the Debtors' Estates in accordance with the terms of the Asset Purchase Agreement with Hercules Offshore, Inc. (the "**Motion**"). In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND PROCEDURAL STATUS

1.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of the Debtors' chapter 11 cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.     On the date hereof (the "**Petition Date**"), the Debtors filed their respective voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). Contemporaneously herewith, the Debtors have sought joint administration of these chapter 11 cases.

3.     The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or creditors' committee has been appointed in these cases.

90364954.6

## FACTUAL BACKGROUND

### A.      Events Leading To The Debtors' Petitions

4.      Seahawk is a Delaware corporation formed in 2008 and headquartered in Houston, Texas, with operations throughout the U.S. Gulf of Mexico.  Each of the other debtors is a direct or indirect subsidiary of Seahawk.[1]  As of the Petition Date, Seahawk's stock is publicly traded on the NASDAQ Exchange under the ticker symbol, "HAWK."

5.      Seahawk operates a jackup rig business that provides contract drilling services to the oil and natural gas exploration and production industry throughout the U.S. Gulf of Mexico.[2] The Debtors contract with their customers on a dayrate basis to provide rigs and drilling crews. The Debtors' fleet of mobile offshore drilling rigs consists of twenty (20) shallow water jackup rigs.  Three (3) of the Debtors' six (6) rigs in Texas are located at Matagorda Island 721 in Aransas County.  Two rigs are located at Sabine Pass, Texas, and one rig is located at High Island 176 in Galveston County.  The remainder of Seahawk's rigs are currently located in Louisiana.

6.      Seahawk is a former subsidiary of Pride International, Inc. ("**Pride**").   On August 4, 2009, the Board of Directors of Pride approved a plan to separate Pride into two independent, publicly-traded companies (the "**Spin-Off**").   The separation occurred through the distribution to Pride stockholders of all of the shares of common stock of Seahawk that held, directly or indirectly, the assets and liabilities of Pride's jackup rig business.

7.      On August 24, 2009 (the "**Spin-Off Date**"), each Pride stockholder received one-fifteenth (1/15) of a share of Seahawk's common stock for each share of Pride common stock held

---

[1] The debtor-subsidiaries of Seahawk are:  Seahawk Drilling LLC, Energy Supply International LLC, Seahawk Global Holdings LLC, Seahawk Mexico Holdings LLC, Seahawk Drilling Management LLC, Seahawk Offshore Management LLC and Seahawk Drilling USA LLC.  The subsidiaries of Seahawk that are incorporated in Mexico or have branches in Mexico are not a part of this chapter 11 proceeding.
[2] Jackup rigs are mobile, self-elevating drilling platforms equipped with legs that can be lowered to the ocean floor until a foundation is established to support the drilling platform.  The Debtors' rigs work in water depths up to 300 feet and can drill to a depth of 25,000 feet.

90364954.6

at the close of business on August 14, 2009.  After the Spin-Off, Seahawk became an independent public company.  Pride no longer retains any ownership interest in Seahawk, although the two companies are parties to various agreements entered into in connection with the Spin-Off (collectively, the "**Pride Agreements**").

8.      Since mid-2008, the demand for drilling services has declined dramatically, principally as a result of the global financial crisis, declining prices of crude oil and natural gas and deteriorating worldwide economic conditions.  The decline in the United States jackup rig market since 2009 has been one of the sharpest downturns for domestic jackup rig activity over the past thirty (30) years.  In addition, the regulatory and financial uncertainties regarding a former customer, PEMEX, have had a significant effect on Seahawk's business.[3]  Finally, from August 2009 to March 2010, the Debtors' active rig count averaged five (5) to seven (7) working rigs at any given time.

9.      On April 20, 2010, the demand for offshore drilling services in the Gulf of Mexico was further negatively impacted by the Macondo well blowout, prompting, among other things, the United States Government to issue a moratorium on all U.S. offshore drilling.  On May 26, 2010, the moratorium on Gulf of Mexico drilling in waters less than 500 feet deep was lifted. Subsequently, in November 2010, the deep water moratorium was lifted.  However, since the Macondo incident, notwithstanding the termination of the Government-imposed drilling prohibitions, the Debtors' customers are experiencing significant delays in the issuance of drilling permits and very few new drilling permits have been issued.  In addition, there is an increasingly uncertain regulatory and cost environment which continues to adversely affect the Debtors' business.

---

[3] Pemex Exploración y Producción ("**PEMEX**") is the exploration and production subsidiary of the national oil company of Mexico.
90364954.6

10.     As a result of all of these factors, Debtors' active rig count declined to three (3) working rigs during October 2010. While there has been some recent marginal improvement in market conditions (seven (7) rigs are currently working), the combined impact of all of these events, together with negative cash flows throughout 2009 and 2010, has severely stressed and exhausted the Debtors' liquidity and even the current operating level results continue to produce negative cash flows for the Debtors. Seahawk's Board of Directors (the "**Board**") and its management have closely monitored the impact of these conditions and evaluated potential alternatives to address and improve these circumstances with the assistance of various professionals and outside advisors, including Alvarez & Marsal North America, LLC ("**A&M**").

11.     In November 2010, Seahawk publicly announced that its Board had initiated a process to explore and consider possible strategic alternatives, including, but not limited to transactions involving additional funding, recapitalizations, sales of assets, or a sale or merger of Seahawk. Seahawk's Board, through its finance committee (the "**Finance Committee**"), with regular and substantial Board and independent directors' participation, supervised the process and were managed by Simmons & Company International ("**Simmons**") and other advisors.

12.     In February 2011, after evaluating the indications of interest and potential offers received from a number of interested parties, the Board authorized the Debtors to enter into an Asset Purchase Agreement (the "**APA**") with Hercules Offshore, Inc. ("**Hercules**").[4] The executed APA contemplates the acquisition by Hercules or one or more of its subsidiaries ("**Purchaser**") of substantially all of the assets and jackup rigs of the Debtors (the "**Purchased Assets**") through a sale pursuant to section 363 of the Bankruptcy Code (the "**Transaction**"). The aggregate consideration for the Purchased Assets (defined in the APA as the "**Base Aggregate**

---

[4] The summary description of the APA set forth herein is qualified in its entirety by reference to the terms of the APA itself.

90364954.6

Consideration") is (a) 22,321,425 shares of Hercules Common Stock (the "**Hercules Shares**")

plus (b) cash in an amount equal to $25,000,012 (the "**Cash Payment**"), subject to certain

adjustments.  Using the closing stock price of Hercules' stock as of February 10, 2011, the Base

Aggregate Consideration would be valued at approximately $105 million before any adjustments.

The Base Aggregate Consideration is to be payable at closing by Purchaser to Sellers.

13.     The Debtors have sought chapter 11 protection in order to protect and preserve

their going concern value and to facilitate a prompt sale of substantially all of their assets to

Hercules for the benefit of all creditors and stakeholders.  The Debtors have determined in the

prudent exercise of their business judgment that the proposed course of action is the best

alternative to ensure that the maximum value of Seahawk's assets will inure to the benefit of all of

their creditors and interestholders.

14.     Additional information regarding the Debtors' business, capital structure, the

circumstances and events leading to these chapter 11 cases, and the reasons why emergency

consideration of this Motion is requested are contained in the Declaration of Randall D. Stilley in

Support of First Day Motions, filed contemporaneously herewith and incorporated herein by

reference.

**B.     The Proposed Sale**

15.     Contemporaneously herewith, the Debtors filed a motion (the "**Sale Motion**")

seeking to effectuate the terms and provisions of the APA by and between the Debtors and

Purchaser.

16.     The Debtors submit that the sale of the Purchased Assets is essential to preserve

the going concern value of Debtors' businesses.  The Debtors assert that each day the Purchased

Assets are subject to the market, and the bankruptcy process will cause further losses in operating

90364954.6

revenue, diminish the value of the Purchased Assets and threaten the viability of projected creditor and stakeholder recoveries.  Accordingly, from the Debtors' perspective, the APA represents a reasonable exercise of the Board's and management's business judgment and an expedited sale is in the best interests of the Debtors and all of their economic claim and interestholders.

17.     As described in the Sale Motion, the Debtors and their transaction advisors, Simmons, have expended substantial time and resources soliciting potential purchasers of the Debtors' assets pre-petition and, accordingly, are of the opinion that the APA with the Purchaser represents the best terms the Debtors can reasonably anticipate to obtain and that the process they have implemented is comprehensive, fulsome and appropriate in every respect.  In the opinion of Simmons and the Board, further marketing efforts would not likely result in any offers superior to the terms embodied in the Hercules APA.

18.     The Debtors believe that, because Hercules' offer is the highest and best offer the Debtors have been able to obtain, the APA is in the best interests of the Debtors and all parties-in-interest, and accordingly, should ultimately be approved.

## RELIEF REQUESTED

19.     Section 11.2 of the APA provides for the payment of termination fees in the event that the APA is terminated by one of the parties for certain enumerated reasons.

20.     With respect to the Purchasers, section 11.2(d) of the APA states:

If (i) Sellers terminate this Agreement pursuant to Section 11.1(c)(ii) or (ii) Purchasers terminate this Agreement pursuant to Section 11.1(b)(i) as a result of a breach by Sellers of Section 6.5 or Section 6.6 or (iii) Purchasers terminate this Agreement pursuant to Section 11.1(b)(ii)-(ix), **then Sellers shall pay to Purchasers an aggregate amount equal to the Termination Fee and Purchasers' Reimbursable Expenses**, which aggregate payment shall be treated in accordance with the Order entered approving the Termination Fee Motion, or if no such Order has been entered, then by wire transfer of immediately available funds no later than the second (2nd) Business Day following such termination of this Agreement.  **Sellers' payment of the Termination Fee and Purchasers'**

90364954.6

> **Reimbursable Expenses pursuant to this Section 11.2(d) shall be the sole and exclusive remedy of Purchasers with respect to the occurrences giving rise to such payment**.

APA at § 11.2(d) (emphasis added).

21.     Section 11.2(d) refers to a termination by Sellers under Section 6.5 of the APA,

which provides:

> Notwithstanding anything herein to the contrary, prior to entering into an agreement in connection with any Competing Transaction, (A) Sellers shall provide prior written notice to Purchasers, at least 48 hours in advance (the "***Notice Period***"), of its intention to take such action with respect to such Competing Transaction, specifying the material terms and conditions of any such Competing Transaction (including the identity of the party proposing to effect such Competing Transaction) and furnishing to Purchasers a copy of the relevant proposed transaction agreements with the party proposing to effect such Competing Transaction and other material documents and (B) during the Notice Period, and in any event prior to taking such action, Sellers shall negotiate, and shall cause its financial and legal advisors to negotiate, with Purchasers in good faith (to the extent Purchasers desire to negotiate) to make such adjustments in the terms and conditions of this Agreement so that such proposal or offer for a Competing Transaction ceases to constitute a Superior Proposal.

> At any time prior to the Transfer Order, **Sellers may terminate this Agreement and concurrently with such termination, upon payment to Purchasers of the Termination Fee and Purchasers' Reimbursable Expenses pursuant to <u>Section 11.2</u>**, enter into a definitive agreement with respect to a Superior Proposal if the Board of Directors of Seahawk Parent determines in good faith, after consultation with Seahawk Parent's outside legal counsel, that in light of such Superior Proposal such action is required in order for Seahawk Parent's Board of Directors to comply with its fiduciary obligations under applicable Law, provided that Sellers have otherwise strictly complied with all of their obligations in this <u>Section 6.5</u>. **Such agreement to pay the Termination Fee and Purchaser's Reimbursable Expenses is, in part, based on Sellers' recognizing Purchasers' expenditure of time, energy, and resources in connection with this Agreement. The payment of the Termination Fee and Expense Reimbursement shall be governed by the provisions of this Agreement and any related Bankruptcy Court Orders**.  Except as may be negotiated as part of a Superior Proposal, under no circumstances will a break-up fee, expense reimbursement or other similar bid protections be provided by Sellers to any potential bidder or bidders for any portion of the Business or the Purchased Assets, other than Purchasers.

APA at § 6.5 (d) and (e) (emphasis added).

90364954.6

22.     Section 6.3 of the APA requires that, on the Petition Date, the Debtors file a

Termination Fee Motion, which is defined in the APA as "the motion to be filed by Sellers

pursuant to Section 6.3 seeking to approve the payment of the Termination Fee and Reimbursable

Expenses to Purchasers as an administrative expense of the Bankruptcy Cases."  Accordingly, by

this Motion, the Debtors request the entry of an order approving the payment of the Termination

Fee to the Purchasers, if triggered under the APA, as an administrative expense of the Debtors'

estates.

## APPLICABLE AUTHORITY

23.     Courts recognize that termination fees are a valuable means of avoiding costs

associated with proving damages.  *See Global Octanes Tex., L.P. v. BP Exploration & Oil Inc.*,

154 F.3d 518, 521 (5th Cir. 1998) (contracting parties have broad authority to "limit their liability

in damages to a specified amount."); *Vallance & Co. v. DeAnda*, 595 S.W.2d 587 590  (Tex. Civ.

App. — San Antonio 1980, no writ) ("In the absence of a controlling public policy to the contrary,

contracting parties can limit their liability in damages to a specified amount.").

24.     Accordingly, courts within and outside the Fifth Circuit have approved termination

and break-up fees where the proposed fees are consistent with market practices, good faith, and an

honest judgment under the "business judgment rule."  *In re Redwine Res., Inc.*, No. 10-34041,

2010 WL 5209287 (Bankr. N.D. Tex. Jun. 24, 2010) (approving termination fee equal to 2.5% of

the purchase price); *In re Galveston Bay Biodiesel, LP*, No. 10-80278, 2010 WL 5186603, at *1

(Bankr. S.D. Tex. Sept. 10, 2010) (approving termination fee and expenses); *see also Consumer

News & Bus. Channel P'ship v. Fin. News Network, Inc. (In re Fin. News Network, Inc.)*, 980 F.2d

165, 167 (2d Cir. 1992) (noting that an $8.2 million break-up fee had been awarded on a $149.3

million transaction (5.5%) without discussion); *LTV Aerospace & Defense Co. v. Thomson-CSF,*

90364954.6

—

*S.A. (In re Chateugay Corp.)*, 198 B.R. 848, 861 (S.D.N.Y. 1996) (enforcing a $20 million "reverse breakup fee" payable on a $450 million offer (4.4%)); *In re Datavon, Inc.*, Case No. 02-38600-SAF-11 (Bankr. N.D. Tex. 2002) [Doc. No. 224] (approving a 3% fee); *In re Mirant Corp.*, Case No. 03-46590 (DML) (Bankr. N.D. Tex. 2004) [Doc. No. 6092] (approving a 3% fee).

25.     The negotiated Termination Fee payable to the Purchasers under the APA is reasonable and consistent with the Debtors' business judgment.  The Purchasers have represented that that the proposed Termination Fee fairly represents the damages the Purchasers will incur upon any breach by the Debtors, and it is within the range of termination and break-up fees approved by courts in other cases, was negotiated in good faith and at arms' length, and will enable the Debtors to secure the Purchasers' cooperation in completing the Transactions.

26.     The Debtors request that the Court approve the payment of the Termination Fee to Purchasers, if triggered, as an administrative expense under section 503(b) of the Bankruptcy Code.  Courts consistently recognize that termination, break-up, and similar fees as necessary costs of an estate entitled to administrative expense status.  *See, e.g., In re Tridimension Energy, L.P., et al.*, No. 10-33565, 2010 WL 5209233, at *5 (Bankr. N.D. Tex. Oct. 29, 2010) (approving break-up fee as a section 503(b) administrative expense); *In re Lincolnshire Campus, LLC*, No. 10-34176, 2010 WL 5269706, at *1 (Bankr. N.D. Tex. July 23, 2010) (approving break-up fee and proposed purchaser's expenses as a section 503(b) administrative expense); *In re Redwine Res., Inc.*, 2010 WL 5209287 at *5 (approving a termination fee as a section 503(b) administrative expense); *In re Saint Vincents Catholic Med. Ctrs. of N.Y.*, No. 10-11963, 2010 WL 3638139, at *2 (Bankr. S.D.N.Y. Aug. 20, 2010) (approving a break-up fee as a section 503(b) administrative expense); *In re Ray Realty Fulton, Inc.*, No. 09-41225, 2009 WL 2600760, at *1 (Bankr. E.D.N.Y. Aug. 21, 2009) (approving a break-up fee as a section 503(b) administrative expense); *In re*

90364954.6

*Chrysler LLC*, No. 09-50002, 2009 WL 1360869, at \*8 (Bankr. S.D.N.Y. May 7, 2009) (approving a break-up fee as a section 503(b) administrative expense); *In re Steve & Barry's Manhattan LLC*, No. 08-12579, 2008 WL 8168312, at \*2 (Bankr. S.D.N.Y. Aug. 5, 2008) (approving a termination fee and expenses of a stalking horse bidder as section 503(b) administrative expenses).

## NOTICE

27.     Notice of this Motion has been provided by overnight delivery and e-mail or facsimile to:  (a) Natixis, New York Branch, as Administrative Agent for the Lenders; (b) the 30 largest unsecured creditors of the Debtors on a consolidated basis; (c) Pride International, Inc.; (d) Hercules Offshore, Inc.; (e) D.E. Shaw Direct Capital Portfolios, L.L.C.; (f) the U.S. Trustee's Office; (g) the United States Attorney's Office; (h) the Securities and Exchange Commission; and (i) the Internal Revenue Service.  The Debtors believe that the notice provided for herein is fair and adequate and no other or further notice is necessary.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, the Debtors respectfully request the entry of an order approving the payment of the Termination Fee and Purchasers' Reimbursable Expenses, if triggered under the APA, as an administrative expense of the Debtors' estates, and for all such other and further relief as may be just and proper, either at law or in equity.

Dated:  February 11, 2011.

Respectfully submitted,

**FULBRIGHT & JAWORSKI L.L.P.**

By: /s/ *Berry D. Spears*

Berry D. Spears
State Bar No. 18893300
Johnathan C. Bolton
State Bar No. 24025260
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone: (713) 651-5151
Facsimile:  (713) 651-5246
bspears@fulbright.com
jbolton@fulbright.com

and

**JORDAN, HYDEN, WOMBLE,
CULBRETH & HOLZER P.C.**
Shelby A. Jordan
State Bar No. 11016700
Nathanial Peter Holzer
State Bar No. 00793971
500 N. Shoreline Blvd., Suite 900
Corpus Christi, Texas 78401-0341
Telephone: (361) 653-6624
Facsimile:  (361) 888-5555
sjordan@jhwclaw.com
pholzer@jhwclaw.com

**PROPOSED ATTORNEYS FOR THE
DEBTORS AND DEBTORS-IN-POSSESSION**

90364954.6