# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Seahawk Drilling, Inc., | § | Case No.: 11-20089 |
| | § | |
| Seahawk Drilling LLC, | § | Case No.: 11-20088 |
| | § | |
| Energy Supply International LLC, | § | Case No.: 11-20093 |
| | § | |
| Seahawk Global Holdings LLC, | § | Case No.: 11-20094 |
| | § | |
| Seahawk Mexico Holdings LLC, | § | Case No.: 11-20090 |
| | § | |
| Seahawk Drilling Management, LLC, | § | Case No.: 11-20091 |
| | § | |
| Seahawk Offshore Management LLC, | § | Case No.: 11-20092 |
| | § | |
| Seahawk Drilling USA LLC, | § | Case No.: 11-20095 |
| | § | |
| Debtors. | § | Motion for Joint Administration Pending |
| | § | |

## DECLARATION OF DEAN E. SWICK

I, Dean E. Swick, declare:

1.  Except as otherwise indicated, all statements in this declaration are based on my personal knowledge, information and belief, my review of relevant documents or my opinion based upon my experience and my knowledge. To the extent this declaration contains conclusions or statements of law, such statements are based upon advice of counsel and are not intended to be evidentiary, but rather are included for purposes of clarity. If called to testify, I would testify to each of the facts set forth herein.

## II.   BACKGROUND AND OVERVIEW

2.   I am a Managing Director with Alvarez & Marsal North America, LLC (together with employees of its affiliates (all of which are wholly-owned by its parent company and employees), its wholly owned subsidiaries, and independent contractors, "**A&M**"), a restructuring advisory services firm with numerous offices throughout the country. I submit this declaration on behalf of Seahawk Drilling, Inc. ("**Seahawk**" or the "**Company**") and its above-captioned direct and indirect subsidiaries (collectively, the "**Debtors**"),[1] in support of their Emergency Motion (the "**DIP Financing Motion**") seeking interim and final orders, pursuant to sections 105(a), 362, 364(c), 503, and 507 of the Bankruptcy Code, authorizing the Debtors to, among other things, obtain post-petition financing on an interim and final basis in the aggregate amount of up to $35,000,000 (the "**DIP Credit Facility**"), subject to the terms and conditions of the Debtor-in-Possession Credit Agreement (the "**DIP Credit Agreement**" and collectively with all agreements, documents, and instruments delivered or executed in connection therewith, the "**Financing Documents**") between the Debtors and D.E. Shaw Direct Capital Portfolios, L.L.C. ("**Direct Capital**") or its affiliates or designees selected in its sole discretion (the "**DIP Lenders**"). *See* Dkt. No. 9.

3.   I also submit this declaration in support of the Debtors' Emergency Motion Pursuant To Sections 105, 363 and 365 of the Bankruptcy Code And Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules Of Bankruptcy Procedure, for an Order (i) Scheduling an Expedited Hearing To Approve The Sale of Substantially All of the Debtors' Assets; (ii) Setting Deadlines for Filing Objections To (1) the Proposed Sale and (2) the Proposed Assumption and

---

[1] The debtor-subsidiaries of Seahawk are: Seahawk Drilling LLC, Energy Supply International LLC, Seahawk Global Holdings LLC, Seahawk Mexico Holdings LLC, Seahawk Drilling Management LLC, Seahawk Offshore Management LLC and Seahawk Drilling USA LLC. The subsidiaries of Seahawk that are incorporated in Mexico or have branches in Mexico are not a part of this chapter 11 proceeding.

3

Assignment of Executory Contracts and the Payment of Cure Claims in Connection Therewith; and (iii) Approving the Form and Manner of Notice Thereof (the "**Sale Motion**"). *See* Dkt. No. 19.

### III.   A&M'S INVOLVEMENT

4.   In consideration of the size and complexity of their businesses, as well as the exigent circumstances, the Debtors determined that the services of experienced restructuring advisors would substantially enhance their attempts to maximize the value of their estates.

5.   Since A&M's initial engagement on September 2, 2010, the A&M personnel providing services to the Debtors (the "**A&M Professionals**") have worked closely with the Debtors' board, management and other professionals in evaluating operations and assisting with the myriad requirements of these chapter 11 cases. Moreover, in connection with the Transaction (defined below), A&M Professionals have worked closely with Simmons & Company International, together with its wholly owned subsidiaries, agents and independent contractors (collectively "**Simmons & Company**"), the Debtors' proposed Transaction Advisors (the "**Application**").

### IV.   DIP FINANCING MOTION

6.   The DIP Credit Facility is necessary to provide working capital support for the Debtors' drilling operations to demonstrate to customers, vendors and employees that the Debtors have the liquidity to support on-going operations without disruption and to fund fees and expenses associated with the sale and the bankruptcy.

7.   Seahawk has been cash flow negative at the operating level and is forecasted to remain so for the immediate future.

8. The Debtors' representatives sought debtor-in-possession financing from seven (7) sources. Five (5) of the seven (7) sources declined to provide debtor-in-possession financing to the Debtors due to concerns regarding the contract drilling industry, uncertain permitting conditions in the Gulf of Mexico and the Debtors' negative cash flow condition. While one source indicated that it might be interested in evaluating the prospects of providing the Debtors with debtor-in-possession financing, that source ultimately could not respond to Seahawk within a reasonable time.

9. The DIP Lenders responded to A&M's request with a proposal to provide $35 million of debtor-in-possession financing to support the Transaction or for the Debtors' use in the event that they had to file for bankruptcy relief in the absence of a prospective buyer. This flexibility is important to the Debtors as the APA was not signed until Friday, February 11, 2001, and the Debtors needed to file for bankruptcy relief on or about that date to avoid exhausting its liquidity.

10. The terms of the DIP Credit Facility are commensurate with the risk and flexibility that the DIP Credit Facility provides. The terms and conditions of the DIP Credit Facility are fair and reasonable and were negotiated by the parties in good faith and at arms' length, with all parties represented by counsel.

11. No other lender would provide comparable financing on similar, let alone better, terms.

12. The Debtors have exercised sound business judgment and have satisfied the legal prerequisites to borrow under the terms and conditions of the DIP Credit Facility.

13. The financing contemplated by the DIP Credit Facility benefits these estates. Without the financing furnished by the DIP Credit Facility, the entire reorganization, refinancing, and/or sale effort will be jeopardized. .

### V. TERMINATION FEE MOTION

14. In February 2011, after evaluating the indications of interest and potential offers received from a number of interested parties, the Debtors' Board of Directors authorized the Debtors to enter into an Asset Purchase Agreement (the "**APA**") with Hercules Offshore, Inc. ("**Hercules**"). The executed APA contemplates the acquisition by Hercules or one or more of its subsidiaries ("**Purchaser**") of substantially all of the assets and jackup rigs of the Debtors (the "**Purchased Assets**") through a sale pursuant to section 363 of the Bankruptcy Code (the "**Transaction**"). The aggregate consideration for the Purchased Assets (defined in the APA as the "**Base Aggregate Consideration**") is (a) 22,321,425 shares of Hercules Common Stock (the "**Hercules Shares**") plus (b) cash in an amount equal to $25,000,012 (the "**Cash Payment**"), subject to certain adjustments. Using the closing stock price of Hercules' stock as of February 10, 2011, the Base Aggregate Consideration would be valued at approximately $105 million before any adjustments. The Base Aggregate Consideration is to be payable at closing by Purchaser to Sellers.

15. With respect to the Transaction, Hercules, has provided a real and substantial benefit of preserving the Debtors' estates. First, the protection afforded to Hercules by the Termination Fee was a material inducement for, and express condition of, Hercules's willingness to enter into the APA. Moreover, the Termination Fee induced Hercules to conduct due diligence with respect to the Transaction. Hercules provided a further benefit to the Debtors' estates by increasing the likelihood that the price would reflect their true value.

16. The negotiated Termination Fee payable to Hercules under the APA is reasonable and consistent with the Debtors' business judgment. Hercules has represented that that the proposed Termination Fee fairly represents the damages that Hercules will incur upon any breach by the Debtors, and it is within the range of termination and break-up fees approved by courts in other cases, was negotiated in good faith and at arms' length, and will enable the Debtors to secure the Purchasers' cooperation in completing the Transactions.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on February 14, 2011 at Corpus Christi, Texas.

_____
Dean E. Swick

SUBSCRIBED AND SWORN TO before me by the said Dean E. Swick, affiant, on this 14th day of February, 2011, to certify which witness my hand and seal of office.

_____
NOTARY PUBLIC, STATE OF TEXAS

LINDA SALYERS
Notary Public
STATE OF TEXAS
My Comm. Exp. 04-06-2013

_____
(Printed or Stamped Name of Notary)

My commission expires:

_____

7