# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

**ENTERED**
**02/15/2011**

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **Seahawk Drilling, Inc.,** | § | **Case No.: 11-20089** |
| | § | |
| **Seahawk Drilling LLC,** | § | **Case No.: 11-20088** |
| | § | |
| **Energy Supply International LLC,** | § | **Case No.: 11-20093** |
| | § | |
| **Seahawk Global Holdings LLC,** | § | **Case No.: 11-20094** |
| | § | |
| **Seahawk Mexico Holdings LLC,** | § | **Case No.: 11-20090** |
| | § | |
| **Seahawk Drilling Management, LLC,** | § | **Case No.: 11-20091** |
| | § | |
| **Seahawk Offshore Management LLC,** | § | **Case No.: 11-20092** |
| | § | |
| **Seahawk Drilling USA LLC,** | § | **Case No.: 11-20095** |
| | § | |
| Debtors. | § | **Motion for Joint Administration** |
| | § | **Pending** |

**INTERIM ORDER PURSUANT TO SECTIONS 105, 361, 362, 363, AND 364 OF THE BANKRUPTCY CODE (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING AND USE CASH COLLATERAL, AND (II) GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS**

Seahawk Drilling, Inc. ("Seahawk"), and certain of its direct and indirect subsidiaries (collectively, the "Debtors"),[1] having moved on February 11, 2011 (the "DIP Financing Motion") for an order authorizing them to incur post-petition secured indebtedness, to grant liens, security interests and superpriority claims pursuant to sections 105(a), 362, 363 and 364(c) and (d) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code")

---

[1] Collectively, the Debtors are: Seahawk, Seahawk Drilling LLC; Energy Supply International LLC; Seahawk Global Holdings LLC; Seahawk Mexico Holdings LLC; Seahawk Drilling Management LLC; Seahawk Offshore Management LLC and Seahawk Drilling USA LLC.

and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and having sought the following relief:

(a)     the Court's authorization, pursuant to sections 105(a), 362, 363 and 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014, for Seahawk, as the Borrower, and each of the other Debtors, as Guarantors, to obtain a post-petition secured financing facility (the "DIP Credit Facility") upon the terms set forth in that certain Debtor-In-Possession Credit Agreement (the "DIP Credit Agreement")[2] by and among Seahawk, as the Borrower, the Lenders party thereto (each a "DIP Lender," and collectively, the "DIP Lenders") (with the only DIP Lender as of date of the initial funding thereunder being D. E. Shaw Direct Capital Portfolios, L.L.C.), and D. E. Shaw Direct Capital Portfolios, L.L.C. ("Direct Capital") as the administrative agent for the Lenders (in such capacity, the "Administrative Agent" or "DIP Agent"), to obtain cash advances, and other extensions of credit in an aggregate principal amount of up to $35.0 million at any one time outstanding (the "DIP Loans"), on the terms and conditions of the DIP Credit Agreement (together with all documents, agreements, and instruments to be executed or to be filed in connection therewith, the "DIP Loan Documents"), to, among other things, (i) pay all principal, accrued interest and all other obligations (totaling approximately $18.1 million) due under the Pre-Petition Secured Credit Agreement (as such term is defined in paragraph C. below), which shall be paid in full and terminated; (ii)  provide general working capital in accordance with the Budget (as defined in the DIP Credit Agreement), which shall be subject to the Variances (as defined in the DIP Credit Agreement); (iii) pay ordinary operating costs and expenses (including, without limitation, the costs of administration of the Chapter 11 bankruptcy cases) in accordance with the Budget (which shall be subject to the

---

[2]  A copy of the form of the DIP Credit Agreement is attached as Exhibit A to the Motion.

Variances); (iv) pay, in accordance with the Budget (which shall be subject to the Variances), (1) certain severance payments (including cash LTIP and change in control payments) for employees that are terminated within fifteen (15) days following the Petition Date and (2) certain LTIP incentive payments to employees under the 2009 Long Term Incentive Program, as previously approved by Seahawk's Board of Directors (the "Board") (subject to an aggregate amount of $2.2 million); and (v) pay certain fees and expenses of professionals, provided that the funding of the amounts described in the immediately preceding clauses (i) through (v) shall be subject to the terms of the DIP Credit Agreement and, in regard to (v), provisions regarding a certain sale of assets;

(b)     the Court's ordering, pursuant to sections 364(c)(1), (2), (3) and 364(d) of the Bankruptcy Code, that the obligations of the Debtors under the DIP Loan Documents (collectively, the "DIP Obligations") are:

(i)     granted superpriority administrative claim status, having priority over any and all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726 and 1114 of the Bankruptcy Code, subject only to the payment of the Carve-Out (as defined in paragraph 11 hereof) on the terms and conditions set forth herein;

(ii)     secured under section 364(c)(2) by a fully perfected, first priority lien on and senior security interest in all of the property, assets or interests in property or assets of each Debtor, of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created, including, without limitation, all property of the "estate" (within the meaning of the Bankruptcy Code) of each such Debtor, including all mobile offshore drilling rigs, asset purchase agreements, accounts, deposit accounts, inventory, equipment, goods,

contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, general intangibles, payment intangibles, tax or other refunds, insurance policies, contracts of insurance, insurance proceeds, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property (including all facilities), fixtures, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock entitled to vote and all of the issued and outstanding capital stock not entitled to vote of each such subsidiary of such Debtor, all capital stock in third parties directly owned by each such Debtor, money, investment property, deposit accounts, all commercial tort claims and all causes of action arising under the Bankruptcy Code or otherwise, including, without limitation, all avoidance actions under chapter 5 of the Bankruptcy Code and the proceeds thereof and all avoided payments (provided, however, that, the liens on and security interests in avoidance actions and the proceeds and all avoided payments resulting therefrom shall be effective upon entry of the Final Order (as defined below)), Cash Collateral as defined in paragraph 5 hereof, and all cash and non-cash proceeds, rents, products and profits of any collateral described above, but excluding certain Excluded Contract Collateral and Excluded Equity (as each such term is defined in the Security Agreement, as such term "Security Agreement" is defined in the DIP Credit Agreement) (collectively, the "Collateral"), subject only to (a) any Excepted Liens (as defined in the DIP Credit Agreement, herein referred to as the "Excepted Liens") and (b) the payment of the Carve-Out;

(iii)      secured under section 364(d)(1) of the Bankruptcy Code by a fully perfected, first priority priming lien on and senior security interest in all of the property, assets or interests in property or assets, now existing or hereafter acquired or created, including, without limitation, all property of the "estate" (within the meaning of the Bankruptcy Code) of each such

Debtor but excluding certain Excluded Contract Collateral and Excluded Equity (as each such term is defined in the Security Agreement, as such term "Security Agreement" is defined in the DIP Credit Agreement) (the "First Priority"), subject only to (a) any Excepted Liens and (b) payment of the Carve-Out as provided in, and limited by the DIP Credit Agreement and this Interim Order;

(c)      the Court's scheduling an interim hearing (the "Interim Hearing") pursuant to Bankruptcy Rule 4001(c)(2) to consider entry of an interim order in the form hereof (this "Interim Order") which, among other things, (i) approves, on an interim basis, the post-petition financing to be made pursuant to the DIP Credit Agreement, (ii) authorizes the Debtors to obtain, on an interim basis in accordance with the DIP Credit Agreement, DIP Loans following the entry of the Interim Order in an amount not to exceed $25.8 million (the "Initial Draw"), including, without limitation, DIP Loans in the amount of approximately $18.1 million to pay off principal, accrued interest, and all other obligations due under the Pre-Petition Secured Credit Agreement (as defined below in paragraph C. below), which shall be paid in full and terminated;

(d)      the Court's scheduling, pursuant to Bankruptcy Rule 4001(c)(2), a hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") which, among other things, authorizes, on a final basis, the post-petition financing under the DIP Loan Documents in an aggregate principal amount at any one time outstanding up to $35,000,000; and

(e)      the Court's finding, pursuant to Bankruptcy Rule 4001(c)(1), that notice of the Interim Hearing is sufficient having been given to (i) the United States Trustee for the Southern District of Texas (the "U.S. Trustee"), (ii) counsel for the DIP Lenders, (iii) counsel for any known secured creditors of record, and (iv) the thirty aggregate largest unsecured creditors

of the Debtors, (collectively, the "Notice Parties") and no other or further notice is or shall be required.

The Interim Hearing having been held on February ___, 2011; and based upon all of the pleadings filed with the Court, the evidence presented at the Interim Hearing and the entire record herein; and the Court having heard and resolved or overruled all objections to the interim relief requested in the Motion; and the Court having noted the appearances of all parties in interest; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates and creditors; and after due deliberation and consideration, and sufficient cause appearing therefor:

**IT IS HEREBY FOUND:**[3]

A.      Petition Date.    On February 11, 2011 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under the Bankruptcy Code.   The debtors are operating their businesses and managing their affairs as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or committee has been appointed in any of the Chapter 11 Cases.

B.      Jurisdiction; Venue.  The Court has jurisdiction over these Chapter 11 Cases, the parties and the Debtors' property pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D). Venue of the Chapter 11 Cases and the Motion is proper under 28 U.S.C. §§ 1408 and 1409.

C.      Pre-Petition Loan Documents.  Seahawk is the borrower and the other Debtors are guarantors under that certain Revolving Credit Agreement, dated as of August 4, 2009 (as heretofore amended, supplemented or otherwise modified) (the "Pre-Petition Secured Credit

---

[3]  Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

Agreement"), among the various financial institutions party thereto, as lenders (the "Existing Senior Lenders"), and Natixis, New York Branch, in its capacity as the administrative agent to the Existing Senior Lenders (in such capacity, the "Existing Senior Agent").  Pursuant to the Pre-Petition Secured Credit Agreement and all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination agreements, instruments and any other agreements delivered pursuant thereto or in connection therewith (collectively with Pre-Petition Secured Credit Agreement, the "Pre-Petition Secured Loan Documents"), the Existing Senior Lenders provided Seahawk with revolving credit loans, and, as of the Petition Date, the aggregate outstanding principal amount of such revolving credit loans is approximately $18.1 million.

D.     Pre-Petition Indebtedness.  For purposes of this Order, the term "Existing Pre-Petition Secured Indebtedness" shall mean all amounts (including, without limitation, principal, interest and fees) owed to the Existing Senior Agent and the Existing Senior Lenders under the Pre-Petition Secured Loan Documents as of the Petition Date, and any interest, fees, charges and other costs may continue to accrue after the Petition Date and be allowed as part of the Existing Pre-Petition Secured Indebtedness.

E.     Prepetition Liens.

       Existing Senior Lender Liens.  To secure the Existing Pre-Petition Secured Indebtedness under the Pre-Petition Secured Loan Documents, the Debtors granted the Existing Senior Agent, for the benefit of the Existing Senior Lenders, valid senior security interests in and first priority liens on (collectively, the "Existing Pre-Petition Liens") certain mobile drilling rigs and other assets of the Debtors (the "Pre-Petition Collateral").

F.      Debtors' Stipulations.  In requesting post-petition financing under the DIP Loan Documents, the Debtors acknowledge, represent, stipulate and agree that:

(i)      all of the Debtors have obtained all authorizations, consents and approvals necessary from, and have made all filings with and given all notices to, all federal, state and local governmental agencies, authorities and instrumentalities required to be obtained, made or given by the Debtors in connection with the execution, delivery, performance, validity and enforceability of the DIP Loan Documents to which any Debtor is a party, which are required as a condition for the initial advance thereunder;

(ii)      in entering into the DIP Loan Documents and as consideration therefor, the Debtors hereby agree that until such time as all DIP Obligations are indefeasibly paid in full in cash, and the commitments are terminated in accordance with the terms of the DIP Credit Agreement, the Debtors shall not in any way prime or seek to prime (*i.e.,* cause to be subordinated) the liens and security interests provided to the DIP Agent and the DIP Lenders under this Interim Order by offering a subsequent lender or any party-in-interest a superior or *pari passu* lien or claim pursuant to section 364(d) of the Bankruptcy Code, or otherwise, other than with respect to Excepted Liens;

(iii)      as of the Petition Date, the aggregate principal amount and interest of the Existing Pre-Petition Secured Indebtedness was approximately $18,100,00, which also includes accrued and unpaid interest, fees, costs, and expenses.

G.      Cash Collateral.  For purposes of this Order, the term "Cash Collateral" shall mean and include all "cash collateral," as defined by section 363 of the Bankruptcy Code, in which the DIP Agent and the DIP Lenders have any  lien, security interest, or other interest

whether existing on the Petition Date, or arising pursuant to this Interim Order, the DIP Loan Documents or otherwise.

        H.    <u>Purpose and Necessity of Financing</u>.  The Debtors require the financing described in the Motion to fund, among other things, the Debtors' cash requirements for working capital and general corporate needs and for other purposes permitted by the DIP Loan Documents.  If Seahawk does not obtain authorization to borrow under the DIP Credit Facility and the DIP Loans are not approved, the Debtors will suffer immediate and irreparable harm.  The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503 of the Bankruptcy Code, or other financing under sections 364(c) or (d) of the Bankruptcy Code, on equal or more favorable terms than those set forth in the DIP Loan Documents.  A loan facility in the amount provided by the DIP Credit Agreement is not available to the Debtors without granting the DIP Lenders superpriority claims, liens and security interests, pursuant to sections 364(c)(1), (2), (3) and 364(d) of the Bankruptcy Code, as provided in this Interim Order and the DIP Loan Documents.  After considering all alternatives, the Debtors have concluded in the exercise of their prudent business judgment that the loan facility provided under the DIP Loan Documents represents the best working capital financing available to them at this time.

        I.    <u>Use of Cash Collateral</u>.  The Debtors also require the use of Cash Collateral to operate their businesses. Without the use of Cash Collateral, the Debtors will not be able to meet their cash requirements for working capital and general corporate needs.  The DIP lenders consent to the use of Cash Collateral on the terms specified herein and in the DIP Credit Agreement.

J.    <u>Good Cause</u>.  The ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Loan Documents and use of Cash Collateral is vital to the Debtors' estates and creditors.  The liquidity to be provided under the DIP Loan Documents and through the use of the Cash Collateral will enable the Debtors to continue to operate their businesses in the ordinary course and preserve the value of the Debtors' businesses.  The Debtors' estates will be immediately and irreparably harmed if this Interim Order is not entered.  Good cause has, therefore, been shown for the relief sought in the Motion.

K.    <u>Good Faith</u>.  The DIP Loan Documents have been negotiated in good faith and at arms' length by and among the Debtors, the DIP Agent and the DIP Lenders.  Any DIP Loans and/or other financial accommodations made to the Debtors by the DIP Agent and the DIP Lender pursuant to this Interim Order and/or the DIP Loan Documents shall be deemed to have been extended by the DIP Agent and the DIP Lenders in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders shall be entitled to all protections afforded thereunder.  The terms of the credit facility provided under the DIP Loan Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.

L.    <u>Consideration</u>.  All of the Debtors will receive and have received fair and reasonable consideration in exchange for the access to the DIP Loans, the use of Cash Collateral and all other financial accommodations provided under the DIP Loan Documents and this Interim Order.

M.    <u>Immediate Entry of Interim Order</u>.  The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  The permission granted herein to enter into the DIP Loan Documents and to obtain funds thereunder is necessary to avoid

immediate and irreparable harm to the Debtors.  This Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued flow of supplies and services to the Debtors necessary to sustain the operation of the Debtors' existing businesses and further enhance the Debtors' prospects for a successful restructuring.

Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED:**

2.     <u>Disposition</u>.  The Motion is granted on an interim basis.  Any objections to the Motion that have not previously been withdrawn or resolved are hereby overruled on their merits.  This Interim Order shall be valid, binding on all parties-in-interest, and fully effective immediately upon entry notwithstanding the possible application of Bankruptcy Rules 6004(h), 7062, and 9014.  The terms and provisions of the DIP Loan Documents are approved.

3.     <u>Term of DIP Loan</u>.  The term of this Interim Order, the DIP Loan Documents authorized hereunder shall expire, and the DIP Loans made pursuant to the DIP Loan Documents and this Interim Order will mature and, together with all interest thereon and other DIP Obligations, become due and payable (unless such DIP Loans and other DIP Obligations become due and payable earlier pursuant to the terms of the DIP Loan Documents and this Interim Order by way of acceleration or otherwise) on the earlier of (a) forty-five (45) days after the commencement of the Debtor's Chapter 11 cases if the Final Order (which shall be in form and substance satisfactory to the DIP Agent) has not been entered by this Court on or prior to such date and (b) such other applicable date that is set forth in the definition of the term "Maturity Date" in the DIP Credit Agreement.

4.     Interim Borrowing.   The Debtors are hereby authorized and directed to immediately negotiate, prepare and execute DIP Loan Documents and all such documents previously executed are hereby approved.  The Debtors are authorized to immediately obtain interim DIP Loans, pursuant to the terms of the DIP Loan Documents and this Interim Order, in the aggregate principal amount of up to $25.8 million upon the terms set forth in the DIP Credit Agreement.  Available financing and advances under the DIP Credit Facility will be made to fund, in accordance with the DIP Credit Agreement, the Debtors' ordinary working capital needs (including amounts allowed to be paid under any orders of the Court granting the Debtors' "first day" motions), general corporate needs, fees and expenses of attorneys, accountants, and other professionals retained in these Chapter 11 Cases pursuant to sections 327, 328, 330, 331 and 1103 of the Bankruptcy Code, and other amounts required or allowed to be paid in accordance with this Interim Order and the DIP Credit Agreement, in each case as provided above.

5.     Payment of Pre-Petition Secured Indebtedness.   Upon the funding of the Initial Draw, the Debtors are hereby authorized and directed to immediately pay the sum of $18,150,445.88 in complete and full satisfaction and discharge of the Pre-Petition Secured Indebtedness as of February 15, 2011 (as specified and in accordance with the Payoff Letter dated February 15, 2011, the "Payoff Letter," attached as Exhibit B hereto).  The Debtors are authorized and directed to execute the Payoff Letter.  Furthermore, the terms and provisions of the Payoff Letter are hereby incorporated in this order by reference as if fully restated herein and such terms and provisions have the effect of being "So Ordered" by the Court.  Upon payment as specified in the Payoff Letter, all liens/security interests or other encumbrances in and to any property of the Debtors to secure the Pre-Petition Secured Indebtedness shall be deemed released, cancelled or otherwise terminated and no longer be of any force and effect.  Upon such

payment or, as agreed by the DIP Agent, from time to time after such payment, the Existing Senior Agent and/or the Existing Senior Lenders, as applicable, shall take such action and execute any and all documents deemed reasonably necessary or appropriate to evidence such release, cancellation or termination of such indebtedness, liens, security interests or other encumbrances and the Debtors and/or the DIP Lenders are hereby authorized to file such documents in the appropriate filing records for such documents.

6.      <u>Authorization to Use Cash Collateral</u>.  Subject to the terms of this Interim Order and the Budget, the Debtors are authorized to use Cash Collateral in which the DIP Lenders may have an interest, in accordance with the terms, conditions, and limitations set forth in this Interim Order and the DIP Credit Agreement.  Any dispute in connection with the use of Cash Collateral in accordance with the DIP Credit Agreement and the Interim Order shall be heard by the Court. Notwithstanding anything in this Interim Order to the contrary, the Debtors' authority to use Cash Collateral shall automatically terminate without any further action by this Court or the DIP Lenders, upon the earliest to occur of (the "<u>Cash Collateral Termination Date</u>"):  (i) the Debtors' breach of any negative covenant or affirmative covenant under the DIP Credit Agreement or if an Event of Default shall have occurred under the DIP Credit Agreement; (ii) 45 days after the commencement of the Debtors' Chapter 11 cases if the Final Order (which shall be in form and substance satisfactory to the DIP Agent) has not been entered by this Court on or prior to such date; and (iii) such other applicable date that is set forth in the definition of the term "Maturity Date" in the DIP Credit Agreement.

7.      <u>Fees and Deposit</u>.   All fees paid and payable and costs and/or expenses reimbursed, as set forth in the DIP Loan Documents, by the Debtors to the DIP Lenders or the DIP Agent, are hereby approved.   All fees paid and costs and/or expenses reimbursed or

reimburseable to the DIP Lenders and the DIP Agent pursuant to the provisions of the Work Fee Letter and the Commitment Letter previously executed by and between Seahawk and Direct Capital prior to the date of this Order are hereby also ratified and approved.  The Debtors are hereby authorized and directed to pay all such fees, costs and expenses in accordance with the terms of the DIP Credit Agreement, the Work Fee Letter, the Commitment Letter and this Interim Order, without the necessity of the Debtors, the DIP Lender or the DIP Agent filing any further application with the Court for approval or payment of such fees or expenses.

        8.     <u>Authority to Execute and Deliver Necessary Documents</u>.

        (a)     The form of the DIP Credit Agreement attached hereto as Exhibit A is hereby approved.  Each of the Debtors is authorized and directed, as applicable,  to negotiate, prepare, enter into and deliver the DIP Credit Agreement and the other DIP Loan Documents in each case including any amendments thereto, and including UCC financing statements, pledge and security agreements and mortgages or deeds of trust encumbering all of the Collateral and securing all of the Debtors' obligations under the DIP Loan Documents, including repayment of all DIP Obligations.

        (b)     Each of the Debtors is hereby further authorized and directed to (i) perform all of its obligations under the DIP Credit Agreement, other DIP Loan Documents and such other agreements as may be required by the DIP Loan Documents to give effect to the terms of the financing provided for therein and in this Interim Order and (ii) perform all acts required under the DIP Credit Agreement, other DIP Loan Documents and this Interim Order, including, without limitation, the payment of fees and the reimbursement of present and future reasonable costs and expenses (including without limitation, reasonable attorneys' fees and legal expenses) paid or incurred by the DIP Lenders or the DIP Agent as provided for in this Interim

Order and the DIP Loan Documents.  All such unpaid fees, commissions, costs and other expenses shall be included and constitute part of the principal amount of the DIP Obligations and be secured by the Post-Petition Liens (as defined in paragraph 10(a)(i) hereof).

(c)     Upon the request of the DIP Agent, the Existing Senior Agent and the Existing Senior Lenders are authorized to make, execute and deliver such instruments (in each case without representation or warranty of any kind) to enable the DIP Agent to further perfect, preserve and enforce the Post-Petition Liens (as defined in paragraph 10(a)(i) hereof).

(d)     All obligations under the DIP Credit Agreement and the other DIP Loan Documents shall constitute valid and binding obligations of each of the Debtors enforceable against each of them, and each of their successors and assigns, in accordance with their terms and the terms of this Interim Order.

9.     <u>Amendments, Consents, Waivers, and Modifications</u>.  The Debtors, with the express written consent of the DIP Lenders, may enter into any amendments, consents, waivers or modifications to the DIP Credit Agreement and the other DIP Loan Documents without the need for further notice and hearing or any order of this Court, provided that such amendments, consents waivers or modifications do not materially and adversely affect the rights of any creditor or other party in interest unless any such affected creditor or party in interest consents to such modification or amendment.

10.     <u>DIP Lenders Superpriority Claim</u>.  The DIP Lenders and the DIP Agent are hereby granted an allowed superpriority administrative expense claim (the "<u>Superpriority Claim</u>") pursuant to section 364(c)(1) of the Bankruptcy Code for all of the DIP Obligations, having priority over any and all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726 and 1114 of

the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. The Superpriority Claim granted in this paragraph shall be subject and subordinate in priority of payment only to the Carve-Out (as defined in paragraph 11 hereof).  Except as set forth herein, no other superpriority claims shall be granted or allowed in these cases.

      11.    <u>DIP Lenders' Lien Priority</u>.

      (a)    To secure the DIP Obligations, the DIP Agent and the DIP Lenders, as applicable, are hereby granted, for the benefit of the DIP Agent and the DIP Lenders:

      (i)    a first priority, perfected priming security interest in, and lien, under section 364(c)(2) and 364(d)(1) of the Bankruptcy Code (the "<u>Post-Petition Liens</u>"), upon all of the Collateral and any and all post-petition assets of the estates but excluding certain Excluded Contract Collateral and Excluded Equity (as each such term is defined in the Security Agreement, as such term "Security Agreement" is defined in the DIP Credit Agreement), subject only to Excepted Liens and the Carve-Out.

      (b)    The Post-Petition Liens shall be effective immediately upon the entry of this Interim Order and subject only to the (i) Excepted Liens and (ii) payment of the Carve-Out.

      (c)    The Post-Petition Liens shall not at any time be (a) made subject or subordinated to, or made *pari passu* with any other lien, security interest existing as of the Petition Date, or claim or created under sections 363 or 364(d) of the Bankruptcy Code or otherwise (except with respect to the Excepted Liens), or (b) subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code.

(d)     The Post-Petition Liens shall be and hereby are fully perfected liens and security interests, such that no additional steps need be taken by the DIP Lenders or the DIP Agent to perfect such interests.  Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document or other instrument or agreement that requires the consent or approval of one or more landlords, licensors or other parties, or requires the payment of any fees or obligations to any governmental entity, non governmental entity, or any other person, in order for any of the Debtors to pledge, grant, mortgage, sell, assign or otherwise transfer any fee or leasehold interest or the proceeds thereof or other Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code and shall have no force or effect with respect to the transactions granting the DIP Lenders or the DIP Agent a priority security interest in such fee, leasehold or other interest or other Collateral or the proceeds of any assignment, sale or other transfer thereof by any of the Debtors in favor of the DIP Lenders and the DIP Agent in accordance with the terms of the DIP Credit Agreement and the other DIP Loan Documents.

(e)     The Post-Petition Liens, Superpriority Claim and other rights and remedies granted to the DIP Lenders and the DIP Agent under this Interim Order shall continue in this and in any superseding case or cases under the Bankruptcy Code and such liens and security interests shall maintain their first priority as provided in this Interim Order until all the DIP Obligations have been indefeasibly satisfied in full in cash, and the DIP Lenders' commitments have been terminated in accordance with the DIP Credit Agreement.

12.     Priority Professional Expenses & UST/Clerk Fees Carve-Out.

Notwithstanding anything to the contrary contained herein or in any DIP Loan Document: (a) the super-priority claim status and first priority liens granted to secure DIP

Obligations shall be subject only to Excepted Liens (as defined in the DIP Credit Agreement) and to a fund for post-petition fees of professional persons retained in the Debtors' Chapter 11 cases by Seahawk or any official committee of unsecured creditors with the approval of this Court pursuant to Bankruptcy Code sections 327, 328, 330, 331, 363, 503 and/or 1103, to the extent such fees (including, without limitation, any interim or final payments of such fees) have been approved by this Court and do not exceed, in the aggregate, $3,000,000 (the "Professional Expense Cap") and the payment of fees pursuant to 28 U.S.C. § 1930 (the "Carve-Out"), and (b) so long as no Event of Default (as defined in the DIP Credit Agreement) shall have occurred, to the extent that the payment thereof of post-petition fees of professional persons retained in the Debtors' Chapter 11 Cases by Seahawk or any official committee of unsecured creditors with the approval of this Court pursuant to Bankruptcy Code sections 327, 328, 330, 331, 363, 503 and/or 1103 is consistent with the Budget (subject to the Variances), Seahawk shall be permitted to pay compensation and reimburse expenses allowed and payable on an interim basis under 11 U.S.C. § 331, as the same are due and payable.

13. Use of DIP Loan Proceeds. The proceeds from the DIP Loans shall be used only for the purposes permitted under the DIP Credit Agreement and, as applicable, must comply in all respects with the Budget (subject to permitted Variances) as provided in the DIP Credit Agreement. The proceeds of the DIP Loans shall not be used for the payment or reimbursement of any fees or disbursements of the Debtors or any committees or trustee appointed in the Debtors' bankruptcy cases, or their professionals, incurred in connection with the investigation, assertion and prosecution of, or joinder in, any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief: (A) commencing or prosecuting any

action asserting claims pursuant to sections 510, 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code or other cause of action (whether arising under state law, the Bankruptcy Code or other applicable law) of the Debtors against, in any capacity, the DIP Lenders or the Administrative Agent with respect to any transaction, occurrence, omission, or action, including without limitation the validity and extent of the DIP Obligations or the extent and validity of the Post-Petition Liens; (B) invalidity, setting aside, avoiding or subordinating, in whole or part, the Post-Petition Liens; or (c) preventing, binding or delaying (whether directly or indirectly) the DIP Agent or the DIP Lenders in respect of their liens and security interests in the Collateral.

    14.   <u>Limitation On Surcharges</u>.

    (a)   No action, inaction, or acquiescence by the DIP Lenders or the DIP Agents, including funding the Debtors' ongoing operations under this Interim Order, shall be deemed to be or shall be considered as evidence of any alleged consent by the DIP Lenders or the DIP Agents to a charge against the Collateral pursuant to sections 506(c) or 105(a) of the Bankruptcy Code. The DIP Lenders and the DIP Agents shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

    (b)   No liens, claims, interests or priority status, other than Excepted Liens and the Carve-Out, having a lien or administrative priority superior to or *pari passu* with that of the Post-Petition Liens and the Superpriority Claim granted by this Interim Order, shall be granted while any portion of the DIP Obligations remains outstanding or any Commitment under the DIP Credit Agreement remains in effect without the written consent of the requisite DIP Lenders under the DIP Credit Agreement.

(c)     Effective upon entry of the Final Order, no party shall be entitled, directly or indirectly, to charge the Collateral, whether by operation of sections 105, 506(c) or 552(b) of the Bankruptcy Code or otherwise.

(d)     Effective upon entry of this Interim Order, no party shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of Collateral after an Event of Default, termination or breach under the DIP Loan Documents.

15.     Additional Perfection Measures.

(a)     The Post-Petition Liens shall be perfected by operation of law immediately upon entry of this Interim Order.  None of the Debtors, the DIP Lenders or the DIP Agent shall be required to enter into or obtain landlord waivers, mortgagee waivers, bailee waivers, warehouseman waivers or other waiver or consent, to enter into deposit account control agreements, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, vessel mortgages, notices of lien or similar instruments in any jurisdiction (including, trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property, or filings with any other federal agencies/authorities), or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and to perfect the Post-Petition Liens.

(b)     If the DIP Lenders or the DIP Agent, in their sole discretion, choose to obtain consents from any landlord, licensor or other party in interest, to enter into deposit account control agreements, to file mortgages, financing statements, vessel mortgages, notices of lien or similar instruments, or to otherwise record or perfect such security interests and liens:

(i)      all such documents shall be deemed to have been recorded and filed as of the time and on the date of entry of this Interim Order and

(ii)      no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder.

(c)      In lieu of obtaining such consents or filing any such mortgages, financing statements, vessel mortgages, notices of lien or similar instruments, the DIP Lenders or DIP Agent may, in their sole discretion, choose to file a true and complete copy of this Interim Order in any place at which any such instruments would or could be filed, together with a description of Collateral located within the geographic area covered by such place of filing, and such filing by the DIP Lenders or the DIP Agent shall have the same effect as if such mortgages, deeds of trust, vessel mortgages, financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Interim Order.

16.      Application of Collateral Proceeds.  To the extent required by this Interim Order and the DIP Credit Agreement, the Debtors are hereby authorized and directed to remit to the DIP Lenders or the DIP Agent, as the case may be, one-hundred percent (100%) of all collections on, and proceeds of, the Collateral (subject to the satisfaction of any Excepted Liens), including all accounts receivable collections, proceeds of sales of inventory, fixed assets and any other assets, including sales in and outside the ordinary course of business, and all other cash or cash equivalents which shall at any time on or after the Petition Date come into the possession or control of the Debtors, or to which Debtors shall become entitled at any time, and the automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to permit the DIP Lenders or the DIP Agent to retain and apply all collections, remittances and proceeds of the

Collateral in accordance with this Interim Order, and the DIP Credit Agreement to the DIP Obligations in accordance with the provisions of the DIP Loan Documents.

17.     <u>Access to Information</u>.  The Debtors shall permit representatives, agents and/or employees of the DIP Lenders and the DIP Agent to have access to their facilities, books and records and shall cooperate, consult with, and provide to such persons all such non-privileged information as required or allowed under the DIP Credit Agreement.

18.     <u>Access to Collateral</u>.

Notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Lenders or the DIP Agent contained in this Interim Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents, upon three (3) business days' written notice to the landlord, lienholder, licensor or other third party owner of any leased or licensed premises or intellectual property that an Event of Default or a default by any of the Debtors of any of their obligations under this Interim Order has occurred and is continuing, the DIP Lenders or the DIP Agent (i) may, subject to any separate agreement by and between such landlord or licensor and the DIP Lenders or DIP Agent, enter upon any leased or licensed premises of any of the Debtors for the purpose of exercising any remedy with respect to Collateral located thereon and (ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under such lease or license and to use any and all leases, trademarks, tradenames, copyrights, licenses, patents or any other similar assets of Debtors, which are owned by or subject to a lien of any third party and which are used by Debtors in their businesses, in either the case of subparagraph (i) or (ii) of this paragraph without interference from the landlords, lienholders or licensors thereunder, <u>provided</u> that the DIP Lenders or DIP Agent shall pay only rent and additional rent, fees, royalties or other

obligations of the Debtors that first arise after the DIP Lenders' or DIP Agent's written notice referenced above and that are payable during the period of such occupancy or use by the DIP Lenders or the DIP Agent, as the case may be, calculated on a per diem basis. Nothing herein shall require the Debtors, the DIP Lenders or the DIP Agent to assume any lease or license under section 365(a) of the Bankruptcy Code as a precondition to the rights afforded to the DIP Lenders and DIP Agent in this paragraph.

19.   <u>Cash Management Systems</u>.  The Debtors are authorized to maintain their cash management system in a manner consistent with the DIP Loan Documents, this Interim Order and the order of this Court approving the maintenance of the Debtors' cash management system, provided such order is on terms and conditions acceptable to the DIP Lender or the DIP Agent, as applicable, and to the extent that it is not inconsistent with the terms specified herein and/or the DIP Loan Documents.

20.   <u>Automatic Stay Modified</u>.

(a)   Subject to the provisions of subparagraphs (b) and (c) hereof, the automatic stay provisions of section 362 of the Bankruptcy Code hereby are, to the extent applicable, vacated and modified to the extent necessary:

(i)   whether or not an Event of Default or a default by any of the Debtors of any of their obligations under this Interim Order has occurred, to require all cash, checks or other collections or proceeds from Collateral received by any of the Debtors to be deposited in accordance with the requirements of the DIP Loan Documents, and to apply any amounts so deposited and other amounts paid to or received by the DIP Lenders or the DIP Agent, under the DIP Loan Documents, in accordance with any requirements of the DIP Loan Documents;

(ii)     upon the occurrence of an Event of Default or a default by any of the Debtors of any of their obligations under this Interim Order, and subject to five (5) business days prior written notice (the "Waiting Period") to the Debtors, their counsel, counsel for the Committees, counsel for Hercules Offshore, Inc. (provided the Asset Purchase Agreement dated February 11, 2011 between the Debtors and Hercules has not terminated and the sale contemplated therein has not closed), and the U.S. Trustee (except as provided in this clause (b) or clause (e) of this paragraph), to exercise all rights and remedies provided for in the DIP Loan Documents, this Interim Order or under other applicable bankruptcy and non-bankruptcy law to the extent permitted under the DIP Loan Documents and this Interim Order without requiring prior authorization of this Court in order to exercise such rights and remedies; and

(iii)     immediately upon the occurrence of an Event of Default or a default by any of the Debtors of any of their obligations under this Interim Order or the DIP Loan Documents, without providing any prior notice thereof (i) the DIP Agent, for the benefit of the DIP Lenders, may charge interest at the default rate set forth in the DIP Credit Agreement, (ii) none of the DIP Agent or DIP Lenders shall have any further obligation to provide financing under the DIP Loan Documents, this Interim Order or otherwise and may, at their discretion, terminate all commitments with respect to the DIP Loans, and (iii) any authorization to use Cash Collateral shall terminate.

(b)     During the Waiting Period, the Debtors shall not use any Cash Collateral or any DIP Loan proceeds to pay any expenses except those reasonably necessary to preserve the Debtors' going concern value as approved by the requisite DIP Lenders or the DIP Agent, as applicable.  The Debtors, any official committee of unsecured creditors, and/or the United States Trustee shall have the burden of proof at any hearing on any request by them to re-impose or

continue the automatic stay of section 362(a) of the Bankruptcy Code or to obtain any other injunctive relief, and the only issue that may be raised at any such hearing shall be whether, in fact, an Event of Default or default under this Interim Order has occurred and is continuing.

(c)     Notwithstanding the preceding clauses (a) and (b), if the DIP Loans mature as a result of one of the events described in the clauses (e) or (f) in the definition of the term "Maturity Date" in Section 1.01 of the DIP Credit Agreement, then the lifting of the automatic stay as described in the clause (a) above shall be delayed for thirty (30) days during which time period the Debtors would either (i) develop a plan to liquidate the Debtors' cold stacked rig assets and reduce the Debtors' ongoing expenditures (which plan shall be subject to the approval of the DIP Agent, in its sole and absolute discretion, in which case the DIP Lenders would allow the liquidation of the Debtors' cold stacked rig assets in accordance with such plan), or (ii) close and fund a credit facility with other lenders at which closing and funding the loan facility provided for in this Agreement would be terminated and all of the Indebtedness would be paid in full in cash and in immediately available funds.  If by the end of such thirty (30) day period, the Debtors have not complied with clause (i) or clause (ii), then the automatic stay shall (without further action) be automatically lifted so that the DIP Agent and the DIP Lenders can exercise then their remedies against their Collateral without any further notice to or approval of this Court.

(d)     This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Interim Order and relating to the application, re-imposition or continuance of the automatic stay of section 362(a) of the Bankruptcy Code, or other injunctive relief requested.

21.     <u>No Responsible Person</u>.   In making the decision to make the DIP Loans, administering the DIP Loans and extending other financial accommodations to the Debtors under the DIP Loan Documents, or making the decision to collect the indebtedness and obligations of the Debtors, neither the DIP Lenders nor DIP Agent shall be considered to be exercising control over any operations of the Debtors or acting in any way as a responsible person, an owner or operator under any applicable law, including without limitation, any environmental law (including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, *et seq.,* the Resource Conservation and Recovery Act, 42 U.S.C. 6901, *et seq.,* as either may be amended from time to time, or any similar federal or state statute).

22.     <u>Successors and Assigns</u>.   The DIP Loan Documents and the provisions of this Interim Order shall be binding upon the DIP Lenders, the DIP Agents, the Debtors, and each of their respective successors and permitted assigns, and shall inure to the benefit of the DIP Lenders, the DIP Agent, the Debtors, and each of their respective successors and permitted assigns including, without limitation, any trustee, responsible officer, or representative, or similar person appointed in a case for any Debtor under any chapter of the Bankruptcy Code.

23.     <u>Binding Nature of Agreement</u>.   Each of the Term Sheet relating to the DIP Loans and the DIP Loan Documents to which any of the Debtors are or will become a party shall constitute legal, valid and binding obligations of the Debtors party thereto, enforceable in accordance with their terms.   The DIP Loan Documents have been or will be properly executed and delivered to the DIP Lenders or the DIP Agent by the Debtors.   The rights, remedies, powers, privileges, liens and priorities of the DIP Lenders and the DIP Agent provided for in this Interim Order and in the DIP Loan Documents shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation order) or by any plan of

reorganization or liquidation in these cases or in any subsequent case under the Bankruptcy Code unless and until the DIP Obligations have first been indefeasibly paid in full in cash and completely satisfied and the commitment terminated in accordance with the DIP Credit Agreement.

24.   <u>Subsequent Reversal or Modification</u>.  This Interim Order is entered pursuant to section 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), granting the DIP Lenders all protections afforded by section 364(e) of the Bankruptcy Code.  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, that action will not affect (i) the validity of any obligation, indebtedness or liability incurred hereunder by any of the Debtors to the DIP Lenders or the DIP Agent prior to the date of receipt by the DIP Lenders and the DIP Agent of written notice of the effective date of such action or (ii) the validity and enforceability of any lien or priority authorized or created under this Interim Order or pursuant to the DIP Loan Documents.  Notwithstanding any such reversal, stay, modification or vacatur, any post-petition indebtedness, obligation or liability incurred by any of the Debtors to the DIP Lenders and the DIP Agent prior to written notice to the DIP Lenders and the DIP Agent of the effective date of such action shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lenders and the DIP Agent shall be entitled to all the rights, remedies, privileges and benefits granted herein and the DIP Loan Documents with respect to all such indebtedness, obligations or liability.

25.   <u>Restriction on Use of Lenders' Funds</u>.  Notwithstanding anything herein to the contrary, no Collateral, proceeds thereof, Cash Collateral, or any portion of the Carve-Out may be used by any of the Debtors, the Committees or any other person or entity to (a) request authorization to obtain post-petition loans or other financial accommodations pursuant to section

364(c) or (d) of the Bankruptcy Code, or otherwise, other than from the DIP Lenders, or use Cash Collateral pursuant to section 363(c) without the DIP Lenders' prior written consent unless such loans or financial accommodations are sufficient and are used, immediately upon their effectiveness, to indefeasibly pay all DIP Obligations in full in cash and terminate the commitments in accordance with the DIP Credit Agreement, (b) assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, the DIP Lenders or the DIP Agent, any of their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, including, without limitation, any actions under chapter 5 of the Bankruptcy Code or any so-called "lender liability" claims and causes of action, and/or (c) pay any Claim of a Creditor (as such terms are defined in the Bankruptcy Code), without the prior written consent of the DIP Lenders, unless such Claim was approved by the Court in one of the "first day" orders on terms acceptable to the DIP Lenders.

26.    <u>Priming and Subordination of Liens</u>.  For avoidance of doubt, all liens on the Collateral in existence on the date hereof, prior the entry of this order, that are not Excepted Liens shall be primed by the Post-Petition Liens and shall be subordinate to the Post-Petition Liens.

27.    <u>Collateral Rights</u>.  In the event that any party who holds a lien or security interest in Collateral that is junior and/or subordinate to the Post-Petition Liens in such Collateral receives or is paid proceeds of such Collateral prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Loan Documents and termination of the commitments in accordance with the DIP Loan Documents, such junior or subordinate lienholder shall be deemed

to have received, and shall hold, the proceeds of any such Collateral in trust for the DIP Lenders and shall immediately turnover such proceeds for application to the DIP Obligations under the DIP Loan Documents in accordance with the DIP Loan Documents and this Interim Order.

28.     <u>Prohibition</u>.  Except as provided in the DIP Loan Documents and/or this Interim Order, the Debtors shall be and hereby is, prohibited from, at any time during the Chapter 11 Cases, (a) granting liens on the Collateral or any portion thereof to any other parties, pursuant to section 364(d) of the Bankruptcy Code or otherwise, which liens are senior to, *pari passu* with or junior to the liens granted to the DIP Agent or DIP Lenders for the benefit of the DIP Agent and the DIP Lenders, (b) granting liens in the Collateral or any portion thereof to any other parties, pursuant to section 364(d) of the Bankruptcy Code or otherwise, and/or (b) applying to the Court for an order authorizing the use of any Cash Collateral or other cash comprising Collateral, except in accordance with the DIP Credit Agreement and this Interim Order; <u>provided</u>, <u>however</u>, that if the DIP Lenders provide three (3) business days' written notice of their intent to terminate the facility, the Debtors may seek to impose liens and gain the nonconsensual use of Cash Collateral in connection with replacement financing, but solely if the proceeds of such replacement financing will be sufficient and used, immediately upon the effectiveness of such replacement financing, to indefeasibly pay all DIP Obligations in full in cash, and terminate the commitments in accordance with the DIP Credit Agreement.

29.     <u>No Waiver</u>.  This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lenders or the DIP Agent may have to bring or be heard on any matter brought before this Court.

30.     <u>Sale/Conversion/Dismissal</u>.

(a)     No order providing for either the sale of the ownership of the stock of the Debtors or the sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code shall be entered by the Court unless, in connection and concurrently with any such event, (i) the proceeds of such sale are or will be sufficient to indefeasibly pay all DIP Obligations and such DIP Obligations are indefeasibly paid in full in cash and the commitments under the DIP Credit Agreement are terminated in accordance with the DIP Credit Agreement on the closing date of such sale; (ii) the requisite DIP Lenders or the DIP Agent, as applicable, expressly consent in writing to any such transaction; or (iii) such sale is expressly permitted under the DIP Credit Agreement.  Without limiting the generality of the foregoing, the Debtors shall not sell either the stock of any of the Debtors or substantially all of the assets of any of the Debtors under section 363 of the Bankruptcy Code unless, in connection and concurrently with any such event, (i) the proceeds of such sale are or will be sufficient to indefeasibly pay all DIP Obligations and such DIP Obligations are indefeasibly paid in full in cash and the commitments under the DIP Credit Agreement are terminated in accordance with such DIP Credit Agreement on the closing date of such sale; (ii) the requisite DIP Lenders or the DIP Agent, as applicable, expressly consent in writing to any such transaction; or (iii) such sale is expressly permitted under the DIP Credit Agreement.

(b)     No order dismissing or converting these Chapter 11 Cases under sections 305 or 1112 of the Bankruptcy Code, or appointing a chapter 11 trustee or an examiner with expanded powers, shall be entered or motion filed by any of the Debtors for any such relief unless and until (i) the DIP Obligations are indefeasibly paid in full in cash, and the commitments under the DIP Credit Agreement are terminated in accordance with such DIP

Credit Agreement or (ii) the requisite DIP Lenders or the DIP Agent, as applicable, expressly consent in writing.  If an order dismissing any of these cases under sections 305 or 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide that (i) the Post-Petition Liens, the Superpriority Claim granted hereunder and the DIP Credit Agreement shall continue in full force and effect, shall remain binding on all parties-in-interest and shall maintain their priorities as provided in this Interim Order until all DIP Obligations are indefeasibly paid in full in cash and the commitments under the DIP Credit Agreement are terminated in accordance with such DIP Credit Agreement, and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the Post-Petition Liens and the Superpriority Claim.

31.     Any amounts actually paid prior to the Maturity Date (as defined in the DIP Credit Agreement) or the date of the written notice of an Event of Default delivered to the Debtors, Debtors' counsel and the U.S. Trustee within the limits set forth in the Budget with the DIP Lenders' consent shall not be subject to a disgorgement motion (or the granting of such relief) on the grounds that the DIP Lenders were not paid in whole or in part with respect to the DIP Obligations.  The DIP Lenders and the DIP Agent shall retain their rights to object to any claim of a professional for payment of fees or reimbursement of expenses.

32.     Limits on DIP Lenders' Liability.  Nothing in this Interim Order or in any of the DIP Loan Documents or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent or the DIP Lenders of any liability for any claims arising from the post-petition activities by the Debtors or any of their subsidiaries or affiliates in the operation of their businesses, or in connection with their restructuring efforts.

33.     Priority of Terms.  Prior to entry of the Final Order, to the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Loan Documents, the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as more fully described in" the DIP Loan Documents, the terms and provisions of this Interim Order shall govern.

34.     No Third Party Beneficiary.  Except with respect to any of the DIP Agent, the DIP Lenders, their delegates, successors and permitted assigns, and as otherwise expressly provided in Section 12.03 of the DIP Credit Agreement, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

35.     Survival.   Except as otherwise provided herein, unless and until all DIP Obligations are indefeasibly paid in full in cash, and the commitments under the DIP Credit Agreement are terminated in accordance with such DIP Credit Agreement, (a) the protections afforded to the DIP Lenders and the DIP Agent under this Interim Order, and any actions taken pursuant thereto shall survive the entry of an order (i) confirming a plan of reorganization; (ii) dismissing any of these cases or (iii) converting any of these cases into a case pursuant to chapter 7 of the Bankruptcy Code and (b) the Post-Petition Liens and the Superpriority Claim shall continue in the Chapter 11 Cases, in any such successor case or after any such dismissal. Except as otherwise provided herein, the Post-Petition Liens shall maintain their validity and priority as provided by this Interim Order or the Final Order and not be modified, altered or impaired in any way by (i) any other financing, extension of credit, incurrence of indebtedness, except with respect to any additional financing to be provided by the DIP Lender and the DIP Agent in accordance with the Final Order, or (ii) any conversion of any of these Chapter 11

Cases into a case pursuant to chapter 7 of the Bankruptcy Code or dismissal of any of these Chapter 11 Cases, (iii) any act or omission until the all DIP Obligations and Existing Pre-Petition Secured Lender Indebtedness are indefeasibly paid in full in cash and the commitments under the DIP Credit Agreement are terminated in accordance with such DIP Credit Agreement.

36.     <u>Final Hearing Date</u>.  The Final Hearing to consider the entry of the Final Order approving the relief sought in the Motion shall be held on February 22, 2011 at 2:00 p.m. (as the same may be adjourned or continued by the Court) before the Honorable Richard S. Schmidt, United States Bankruptcy Judge, United States Courthouse, 1133 North Shoreline Boulevard, Corpus Christi, Texas 78401.

37.     <u>Adequate Notice</u>.  The notice given by the Debtors of the Interim Hearing was given in accordance with Bankruptcy Rules 2002 and 4001(c)(2) and the local rules of this Court.  Under the circumstances, no further notice of the request for the relief granted at the Interim Hearing is required.  The Debtors shall promptly mail copies of this Interim Order and notice of the Final Hearing to the Notice Parties, any known party affected by the terms of the Final Order and any other party requesting notice after the entry of this Interim Order.  Any objection to the relief sought at the Final Hearing shall be made in writing setting forth with particularity the grounds thereof, and filed with the Court and served so as to be actually received no later than five (5) days prior to the Final Hearing by the following:  (i) counsel to the Debtors, Fulbright & Jaworski L.L.P., 1301 McKinney, Suite 5100, Houston, Texas 77010 (Attn: Berry D. Spears and Johnathon C. Bolton) and (ii) counsel to D. E. Shaw Direct Capital Portfolios, L.L.C., Vinson & Elkins LLP, 2500 First City Tower, 1001 Fannin, Houston, Texas 77002-6700, Attn: Steven Tarry and John West.

38.    Entry of Order; Effect.  This Interim Order shall take effect immediately upon execution hereof, notwithstanding the possible application of FED. R. BANKR. P. 6004(g), 7062, 9014, or otherwise, and the Clerk of the Court is hereby directed to enter this Interim Order on the Court's docket in these cases.

39.    Binding Effect of Order.  The terms of this Interim Order shall be binding on any trustee appointed under chapter 7 or chapter 11 of the Bankruptcy Code.

Dated:    February 15, 2011          February 15, 2011
          Corpus Christi, Texas.

_____
UNITED STATES BANKRUPTCY JUDGE