**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **In re:** | * | **Chapter 11** |
| | * | |
| **Seahawk Drilling, Inc., *et al.*,** | * | **Case No.: 11-20089-RSS** |
| | * | |
| **Debtors.** | * | **Jointly Administered** |
| | * | |

**LIMITED RESPONSE / OBJECTION TO DEBTORS'**
**(1)  EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS  (I)**
**AUTHORIZING POST-PETITION, SECURED FINANCING,**
**(II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, AND**
**(III) SCHEDULING A FINAL HEARING PURSUANT TO 11 U.S.C. §§ 105(a),**
**361, 362, 364(c), 503, AND 507 AND RULES 2002, 4001, AND 9014 OF THE**
**FEDERAL RULES OF BANKRUPTCY PROCEDURE [P-9] and [P-10], AND**
**INCORPORATED MEMORANDUM IN SUPPORT THEREOF**

---

**NOW INTO COURT,** through undersigned counsel, comes the Official Committee of Unsecured Creditors (the "UCC") who files this Limited Response / Objection ("Response") to the *Debtors' Emergency Motion for Interim and Final Orders: (I) Authorizing Post-Petition, Secured Financing, (II) Authorizing the Debtors to Use Cash Collateral, and (III) Scheduling a Final Hearing Pursuant to 11 U.S.C. §§105(a), 361, 362, 364(c), 503, and 507 and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure* [P-9] and [P-10] ("DIP Motion").

1.     The Debtors seek final approval under Federal Rule of Bankruptcy Procedure 4001 of the DIP Motion and the related Debtor-in-Possession Credit Agreement ("Credit Agreement") with D.E. Shaw Direct Capital Portfolios, LLC (the "DIP Lender"). The Debtors have obtained debtor-in-possession financing of up to $35 million ("DIP Loan") to pay off the first lien prepetition creditors ($18.2 million), pay up to $2.2 million to employees under certain agreements, fund negative cash flow for operating expenses and pay administrative expenses

{00313970-6}

incurred during the case.  On February 15, 2011, this Court granted an interim order approving the DIP Motion [P-54] and, based on the Interim Order, the Debtors have drawn down funds to pay off the Pre-Petition Secured Indebtedness of $18,150,445.08, for general working capital needs, and to pay certain severance payments, change of control payments and 2009 Long Term Incentive Plan payments.

2.      The UCC fully understands the Debtors need for debtor-in-possession funding, and encourages the efforts of the Debtors (and more recently, the efforts of other parties in interest) to obtain such funding.  Based on the Debtors' dismal *pro forma* operating projections, without such funding, the Debtors' operations would probably cease and the Debtors' assets might be liquidated in a disadvantageous manner.

3.      Notwithstanding the Debtors' obvious need for debtor-in-possession funding, the UCC does feel compelled to note that there are certain especially- unfavorable aspects of the DIP Credit Agreement and the proposed Final DIP Order.  The UCC has raised these concerns with the Debtors, the DIP Lender and certain other parties in interest, and is attempting to work through these concerns.  However, to the extent the UCC is not able to do so, the UCC respectfully requests the Court to consider these concerns when it takes up the proposed Final Order.

### TIMING OF ENTRY OF FINAL ORDER ON DIP MOTION

4.      The UCC understands that substantial efforts are presently underway to determine if alternative debtor-in-possession financing is available on more favorable terms than those offered under the proposed Final Order and Credit Agreement.  Those efforts are spearheaded by the Official Committee of Equity Security Holders appointed in this case on February 19, 2011 (the "Equity Committee).

5.      Although the Equity Committee is diligently exploring whether more favorable financing can be timely obtained, in view of the very recent appointment of an Equity Committee, it may take some additional time to understand whether better financing is actually available on a timely basis.

6.      The UCC suggests that a brief delay in entering the proposed Final Order in order to allow the Equity Committee additional time to complete its inquiry into the availability of alternative funding would be in order. The Credit Agreement contains a deadline of *forty-five* (45) days from the Petition Date for the entry of a Final Order on the DIP Motion (Credit Agreement, Section 1.01).  This allows the Court until March 28, 2011 to enter a Final Order on the DIP Motion.  Rather then entering the proposed Final Order now, almost three weeks before the established deadline of March 28, 2011, the entry of the Final Order should be delayed to see if a more attractive financing package can be obtained from a new lender (or perhaps improvements made to the existing proposed Credit Agreement).

7.      There is another reason that supports a delay in approving the Final DIP Order until closer to the March 28, 2011 deadline for entry of a final order.

8.      The status of the proposed sale to Hercules Offshore, Inc. ("Hercules") [P-19], and the timing thereof, are matters which directly relate to the reasonableness of certain terms of the proposed Credit Agreement.

9.      At present, the proposed sale to Hercules is set for a final hearing on March 22, 2011 [P-124].  If this proposed sale is approved, and is consummated as expeditiously as many suggest that it may be, the debtor-in-possession financing loans by the DIP Lenders will be repaid very soon.

10.     For example, if the sale to Hercules closes by April 11, 2011, then the DIP Lenders will be paid off on April 11, 2011 for funds first advanced approximately 58 days earlier. As presently proposed, the DIP Lenders would then be entitled, in addition to the approximately $1.505 million in fees they have already been paid, and 15% interest on their advances, to an "Exit Fee" of 6% of the $35 million DIP Facility (i.e., an additional fee of $2.1 million).

11.     Obviously, the magnitude and reasonableness of the proposed fees to the DIP Lender is a factor the Court should consider in connection with the proposed financing. *See In re Mid-State Raceway, Inc.*, 323 B.R. 40, 60 (Bankr. N.D.N.Y. 2005) (one factor courts should consider in determining whether to approve debtor in possession financing is whether "the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender").

12.     If the DIP Lenders are to be repaid in full this quickly (and more information will be known about this possibility as early as the March 22 hearing on the proposed sale to Hercules), the reasonableness of the over- all costs of borrowing (i.e., the proposed so-called "exit fee" of $ $2.1 million combined with the already- paid fees of approximately $1,505 million plus 15% interest) for a 60 day loan is brought into sharper focus.  Assuming that the DIP Loan is paid off by April 11, 2011, and by that date the DIP Lenders have advanced $30 million to the Debtors, the annualized internal rate of return to the DIP Lenders on the funds advanced to the Debtors would exceed 205%.

13.     As noted, the UCC has concerns about the over-all costs of the proposed DIP Loan.  These bankruptcy cases thus far demonstrate every indication of becoming liquidating cases, and the fees will come out of the pockets of stakeholders.  To the extent that concessions

in the proposed fees can be obtained, either through alternative financing, or negotiated (or judicially-suggested) reductions in fees payable to the current DIP Lender, then the estates will be benefited.

14.     In addition to the high costs associated with the proposed financing, there are several other unfavorable features which should be highlighted. While other aspects of the proposed DIP Loan will undoubtedly be discussed in more detail by the Equity Committee, the UCC would highlight a few:

(a)     *there is no demonstrated funding of the wind down costs of the estates-* assuming the proposed sale to Hercules is consummated and the DIP Loan is paid off,  it is unclear if the Debtors will have  cash to pay their wind down costs.  While the Debtors will hold stock in Hercules, the terms of the proposed sale indicate that the stock will be held and distributed only through a plan of reorganization, which will take months to implement.  There is no indication, at least yet, how wind down costs will be financed and/or paid in these cases, and the proposed DIP Credit Agreement does not provide for any such financing;

(b)     *there is a proposed lien on Chapter five actions of the estates-* the Debtors seek authority to grant the DIP Lenders a lien on all actions arising under Chapter  Five of Title 11 of the Bankruptcy Code (or "Avoidance Actions") [See DIP Motion, P-9, ¶3(i)].This Court's complex rules specifically require that DIP financing motions explain why certain "significant provisions", such as the granting of a lien on a debtors' chapter 5 causes of action, should be approved. *See*, Complex Rules Southern District of Texas, Section (4)(c)(vii). The Debtors do not provide any explanation as to why this Court should authorize liens on their Avoidance Actions, and the UCC contends that there is no justification given the other protections and terms provided to the DIP Lender in the Credit Agreement; and

(c)     *the Carve Out is too low*-the proposed Credit Agreement has a Carve Out for the payment of professional fees during the case of $3 million. Based on the various applications filed for retention of the Debtors' professionals alone, this proposed Carve Out is too low to cover the estimated administrative costs of the estate.

15.     The UCC respectfully suggests that final approval of the  DIP Loan and Credit Agreement be postponed pending (a) the efforts of the Equity Committee to seek alternative financing and (b) the results of the March 22, 2011 hearing on the proposed sale to Hercules of the Debtors' assets. These are both important initiatives which will significantly inform the Court in its decision on whether to grant final approval of the proposed DIP Loan and Credit Agreement.

Dated:  March 4, 2011.

Respectfully Submitted,

*/s/Tristan E. Manthey*
William H. Patrick ,III
Tristan E. Manthey (Texas Bar No. 24042731)
Heller, Draper, Hayden, Patrick & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130-6103
Telephone: (504) 299-3300
Fax: (504) 299-3399
**Counsel for Official Committee of Unsecured Creditors**