| | |
|---|---|
| Charles R. Gibbs (TX Bar No. 07846300) | David H. Botter (*pro hac vice* pending) |
| Michael P. Cooley (TX Bar No. 24034388) | AKIN GUMP STRAUSS HAUER & FELD LLP |
| AKIN GUMP STRAUSS HAUER & FELD LLP | One Bryant Park |
| 1700 Pacific Avenue, Suite 4100 | New York, New York  1036 |
| Dallas, Texas  75201 | Telephone: 212.872.1000 |
| Telephone: 214.969.2800 | Facsimile: 212.872.1002 |
| Facsimile: 214.969.4343 | |

*Proposed Counsel to the*
*Official Committee of Equity Security Holders*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| SEAHAWK DRILLING, INC., *et al.*, | § | Case No. 11-20089 |
| | § | |
| Debtors. | § | Jointly Administered |

**OBJECTION TO THE DEBTORS' EMERGENCY MOTION
FOR AN ORDER APPROVING THE PAYMENT OF CONTINGENT
TERMINATION FEE PAYABLE TO HERCULES OFFSHORE, INC.
AS AN ADMINISTRATIVE EXPENSE OF THE DEBTORS' ESTATES IN
ACCORDANCE WITH THE TERMS OF THE ASSET PURCHASE AGREEMENT**

The Official Committee of Equity Holders (the "Equity Committee") appointed in the above-captioned chapter 11 cases hereby files this limited objection (the "Objection") to the *Debtors' Emergency Motion for an Order Approving the Payment of Contingent Termination Fee Payable to Hercules Offshore Inc. as an Administrative Expense of the Debtors' Estates in Accordance with the Terms of the Asset Purchase Agreement* (the "Termination Fee Motion"). In support thereof, the Equity Committee respectfully states as follows:

1

# I.
# PRELIMINARY STATEMENT

> *Breakup fees and other strategies may "be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking."…but if such a fee is too large, it may chill the bidding to the detriment of shareholders.*[1]

1. Breakup fees—or termination fees—have become a common part of the typical § 363 sale process,[2] in which a debtor seeks approval of a breakup fee to entice a potential buyer to serve as the "stalking horse" bidder and compensate that buyer for accepting the risk and expense of subjecting its offer to the risk of being outbid in the course of a competitive auction process. But the Debtors are not proposing to conduct such an open auction process, nor are they seeking approval of the Termination Fee (defined below) to entice Hercules Offshore, Inc. ("Hercules") to fill the role of stalking horse bidder. To the contrary, the proposed Termination Fee—particularly when viewed in concert with the no-shop provisions of the Hercules APA—is designed to chill bidding and make it as difficult, and as expensive, as possible for the Debtors to contemplate a sale to anyone other than Hercules. This is squarely contrary to the fundamental purpose of a breakup fee, and equally contrary to the Debtors' fundamental duty to maximize the value of their estates for the benefit of creditors and equity security holders. For the reasons stated herein, the Termination Fee Motion should be denied.

# II.
# BACKGROUND

2. On February 11, 2011 (the "Petition Date"), the debtors in the above-captioned cases (the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

---

[1] *In re 995 Fifth Avenue Associates, L.P.*, 96 B.R. 24, 28 (Bankr. S.D. N.Y. 1989).
[2] Unless otherwise noted, section (§) references herein are to the Bankruptcy Code.

490005.0006 WEST 200405989 v1

3. On February 18, 2011, the Court entered an order instructing the United States Trustee (the "Trustee") to appoint an official committee of equity security holders. The Equity Committee was subsequently formed on February 24, 2011, and retained the undersigned counsel on February 25, 2011.

4. Upon information and belief, the Debtors commenced these chapter 11 cases in order to fast-track a proposed sale of substantially all the Debtors assets to Hercules Offshore Inc. As the Debtors and their counsel have stated in their filings and on the record at hearings before this Court, the proposed sale is expected to result in payment of secured and unsecured claims in full. Accordingly, equity holders, as the "fulcrum" security holders, have a tangible economic interest in the direction and outcome of these cases.

5. On February 12, 2011, the Debtors filed an emergency motion for approval of the Proposed Sale to Hercules (the "Sale Motion"). (Doc. No. 19). The Sale Motion provides that the Debtors, pursuant to an executed Asset Purchase Agreement (the "APA"), intend to sell substantially all of their assets, including the Debtors' jackup rigs and all cash, to Hercules for total consideration of (i) 22,321,425 shares of Hercules common stock, and (ii) $25,000,012 in cash. The Debtors estimate that, based on the then-current value of Hercules stock, the total consideration to be paid to the Debtors pursuant to the proposed sale would be approximately $105 million.

6. According to the Sale Motion, the proposed sale to Hercules on the terms contained in the APA "was the highest and best offer received" and "further marketing efforts would not likely result in any offers superior to the Hercules APA." Sale Motion, at 7. However, few details are provided regarding the extent of the Debtors' marketing efforts. To the contrary, the terms of the proposed sale appear to have been negotiated near the bottom of the

market, and there are recent signs that market conditions may be improving. The Debtors' rig utilization has increased and oil prices continue to climb on fears of further turmoil in the Middle East. At the close of the market on February 22, 2011, oil was trading at over $93.50 per barrel on the New York Mercantile Exchange, reaching a 52-week high. These signs indicate that the Debtors (and their shareholders) are being prejudiced by the doubly-restrictive provisions of the Termination Fee and no-shop provisions of the APA, which prevent the Debtors from taking advantage of the increasing value of their assets.

7.  Rather that submit Hercules's APA as a "stalking horse" bid in connection with a competitive auction process, the Debtors committed themselves to the proposed sale to Hercules. The APA contains a "no-shop" clause to expressly prohibit the Debtors from soliciting alternative proposals, negotiating with or providing information to other prospective purchasers, or otherwise seeking higher and better offers for the Debtors' assets. APA § 6.5. Section 6.5 provides, in relevant part:

> [From the date of the APA until the earlier of the closing of the transaction or termination of the APA] none of Sellers, or any agent or advisor to any Seller, or any Affiliate of any Seller shall, directly or indirectly, through any officer, director, employee, agent, professional, advisor, other representative or otherwise, (A) solicit, initiate, knowingly encourage or knowingly facilitate any proposal or offer from any third party (other than Purchasers or any Affiliate of Purchasers) relating to any acquisition, . . . (B) enter into discussions or negotiations regarding a Competing Transaction, (C) furnish any information with respect to, enter into any agreement or understanding with respect to, otherwise assist or participate in, or facilitate in any other manner any Competing Transaction . . . (D) waive any rights under any existing standstill or waiver agreements, or (E) seek or support Bankruptcy Court approval of a motion regarding bid procedures or expense reimbursement or break up or termination fee for the benefit of any other party with respect to a Competing Transaction or take any action inconsistent in any way with this Agreement . . . .

4

8. The APA also provides for the payment of a termination fee in the amount of $3 million, plus payment of all of Hercules' costs and expenses incurred in connection with the proposed sale, the preparation and negotiation of the APA and the chapter 11 cases, including the fees of legal and financial advisors (such costs and expenses, collectively with the $3 million fee, the "Termination Fee"). *See* APA § 11.2(d) & Schedule 1.1 (definitions). The Termination Fee becomes payable to Hercules in the event that the Debtors ultimately decide to sell the assets to someone other than Hercules (notwithstanding the no-shop provision) or if Hercules terminates the APA under certain circumstances. *See* APA § 11.2(d).

9. On February 12, 2011, the Debtors filed the Termination Fee Motion, seeking emergency approval of the Termination Fee. Notably, the Termination Fee Motion fails to mention the Debtors' "no-shop" agreement with Hercules and fails to disclose to this Court the amount of the Termination Fee for which they are seeking approval. Rather, to determine the amount of the Termination Fee, one must review the APA and the Schedules thereto.

### III.
### OBJECTION

10. The Debtors argue that "courts within and outside the Fifth Circuit have approved termination and break-up fees where the proposed fees are consistent with market practices, good faith, and an honest judgment under the 'business judgment rule'." Termination Fee Motion, at 9. What the Debtors fail to observe, however, is that the cases cited in their papers involved the approval of a breakup fee *for a stalking horse bidder as part of a competitive auction process*. These cases are therefore materially distinguishable from the instant case, and utterly fail to support the Debtors' request to pay the Termination Fee to Hercules. Accordingly, the Termination Fee Motion should be denied.

5

11. To be sure, the provision of such bid protections have become relatively commonplace in § 363 sale transactions involving an auction and bidding procedures designed to encourage competitive bidding and maximize the value of a debtor's assets. *See In re ASARCO LLC*, — B.R. —, 2010 WL 3452384, at *11-*12 (S.D. Tex. Aug. 20, 2010); *see also Official Comm. of Subordinated Bondholders v. Integrated Res., (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("By design, a 'break-up fee' is an incentive payment to an unsuccessful bidder who placed the estate property in a sales configuration mode…to attract other bidders to the auction." (internal quotation marks omitted)).

12. In that context, many courts have approved such bid protections for the "stalking horse bidder" who invests time and effort in performing due diligence and negotiating a sale agreement with the debtor precisely because the stalking horse then subjects its own proposal to the market to allow the debtor to use that offer to solicit higher and better offers through a competitive auction process. *See In re Integrated Res., Inc.*, 147 B.R. at 659. In all of these cases, however, the common thread has been the finding of the court that the proposed breakup fee was necessary to preserve and maximize the value of the debtor's estate—typically through a competitive auction process. *See*, *e.g.*, *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999) (collecting cases and affirming the bankruptcy court's refusal to approve a proposed breakup fee in the absence of evidence showing the fee was necessary to preserve the value of the debtor's estate); *Official Committee of Subordinated Bondholders v. Integrated Resources, Inc.*, 147 B.R. 650 (S.D. N.Y. 1992) (focusing the inquiry on whether the proposed fee hampered, rather than encouraged, bidding).

13. Similarly, the bankruptcy court in *In re Hupp Industries., Inc.*, enumerated several factors as being significant in determining the propriety of a proposed breakup fee, including

(i) whether the fee correlated with the maximization of value to the debtor's estate, (ii) whether official committees were supportive of the proposed fee, and whether the proposed fee provided a "chilling effect" on other bidders. *In re Hupp Inds., Inc.*, 140 B.R. 191, 193-94 (Bankr. N.D. Ohio 1992).

14. In the instant case, however, the Debtors do not propose to conduct such a process, nor does Hercules propose to allow them to use its bid to solicit higher and better offers. Instead, eschewing any competitive process whatsoever, the Debtors have moved directly to seek approval of the proposed sale to Hercules on the terms set forth in the APA. To ensure the Debtors do not solicit better offers, the "no-shop" provision contained in the APA expressly prohibits the Debtors from soliciting higher or better offers that might compete with the Hercules bid. In this fashion, the proposed Termination Fee is a classic example of trying to "have your cake and eat it, too," as Hercules is not asked to bear the traditional risks that a breakup fee is designed to compensate—*i.e.*, Hercules's offer is not subject to any auction process or risk of being outbid. In the absence of the risk traditionally assumed by a bidder in agreeing to serve as a stalking horse bidder, there is no justification for affording such "bid protections."

15. Moreover, even assuming the propriety of some manner of breakup fee, $3 million is excessive under any circumstances. In the Termination Fee Motion, the Debtors characterize the Termination Fee as approximately 3% of the total purchase price—well within the range of breakup fees approved in this and other courts. The Equity Committee submits that the proper calculation is of the Termination Fee as a percentage of the *cash* consideration being paid, which is consistent with the typical use of a breakup fee to compensate a stalking horse for having committed capital during the pendency of the auction process that could otherwise have been deployed to other uses. With only $25-45 million of the purchase price proposed to be paid

7

in cash, that equats to a Termination Fee of 6.7% to 12% *plus expenses*. This is an astoundingly high percentage that is unjustified under any circumstances.

16. "When a debtor desires to sell an asset, its main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold." *See In re Big Rivers Elec. Corp.*, 233 B.R. 739, 751-52 (W.D. Ky. 1998) (collecting cases). Instead, the Debtors in these cases are determined to make it as difficult as possible for themselves (via the "no-shop" clause) and others (via the exorbitant Termination Fee) to challenge the assumption that the Hercules APA represents "the maximization of the value of the asset sold."

## IV.
## CONCLUSION

For the foregoing reasons, the Equity Committee respectfully requests that the Court deny the relief requested in the Termination Fee Motion and grant such other and further relief as the Court may deem just and proper.

490005.0006 WEST 200405989 v1

Dated: March 4, 2011

        **AKIN GUMP STRAUSS HAUER & FELD LLP**

By:   */s/ Charles R. Gibbs*
     Charles R. Gibbs (TX Bar No. 07846300)
     Michael P. Cooley (TX Bar No. 24034388)
     1700 Pacific Avenue, Suite 4100
     Dallas, Texas 75201
     Telephone: 214.969.2800
     Facsimile: 214.969.434

     -and-

     David H. Botter (*pro hac vice* pending)
     One Bryant Park
     New York, New York 10036
     Telephone: 212.872.1000
     Facsimile: 212.872.1002

*Proposed Counsel to the
Official Committee of Equity Security Holders*

## CERTIFICATE OF SERVICE

    I hereby certify that, on March 4, 2011, a true and correct copy of the foregoing document was served via email on the parties entitled to receive service through the Court's Electronic Case Filing system.

                      */s/ Machir Stull*
                      Machir Stull

490005.0006 WEST 200405989 v1