Charles R. Gibbs (TX Bar No. 07846300)
Michael P. Cooley (TX Bar No. 24034388)
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Telephone: 214.969.2800
Facsimile: 214.969.4343

David H. Botter (*pro hac vice* pending)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 1036
Telephone: 212.872.1000
Facsimile: 212.872.1002

*Proposed Counsel to the
Official Committee of Equity Security Holders*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| SEAHAWK DRILLING, INC., *et al.*, | § | Case No. 11-20089 |
| | § | |
| Debtors. | § | Jointly Administered |

**OBJECTION TO THE DEBTORS' EMERGENCY MOTION FOR
FINAL ORDER (I) AUTHORIZING POST-PETITION, SECURED
FINANCING, (II) AUTHORIZING THE DEBTORS TO USE
CASH COLLATERAL, AND (III) SCHEDULING A FINAL HEARING**

The Official Committee of Equity Holders (the "Equity Committee") appointed in the Chapter 11 cases of the above-captioned debtors and debtors in possession (the "Debtors") hereby files this objection to the *Debtors' Emergency Motion for Final Order (I) Authorizing Post-Petition, Secured Financing, (II) Authorizing the Debtors to use Cash Collateral, and (III) Scheduling a Final Hearing Pursuant to 11 U.S.C. §§ 150(a), 361, 362, 364(c), 503, and 507 and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedures* (the "DIP Motion").[1] In support thereof, the Equity Committee respectfully states as follows:

I.
**PRELIMINARY STATEMENT**

1. On less than one business day's notice, the Debtors obtained authority to borrow $25 million, of which $18.1 million of that was used to pay down the Debtors' substantially

---

[1] Capitalized terms used but not defined herein have the meanings assigned to them in the DIP Motion.

oversecured prepetition secured revolving credit facility and another $1.55 million was to pay the DIP Lenders' commitment and "up front" fees. The Debtors' obligated themselves to a nondefault interest rate of no less than 15%. If approved, and depending on when the DIP Credit Facility matures, the Debtors will pay an additional exit fee equal to 3-6% of the outstanding balance. In support of their request for approval of this DIP Credit Facility, the Debtors offered little more than the statement that "the company canvassed the market to obtain a suitable DIP financing arrangement." Another declaration offered by the Debtors clarified that the Debtors contacted only seven sources for financing.

2. The Equity Committee was formed and retained advisors barely a week ago, and has already identified several other unsolicited lenders willing to provide the Debtors with postpetition secured financing on more favorable terms than those provided by Direct Capital and the other DIP Lenders. More remarkably, the Equity Committee is informed that at least some of these interested lenders attempted to contact the Debtors or their professionals to discuss potential financing terms and were rebuffed.

3. The Debtors have a duty to their creditors and shareholders to *actually* shop around for the best deal possible, and then to *actually* present evidence to support their ultimate choice. Before asking the Court to authorize $25 million in new borrowings and $1.55 million in new fees on an interim basis, it is the duty of the Debtors and their professionals to properly shop for the best financing terms available, and then to present the Court with clear evidence of (i) the need for the financing, (ii) that, as required by § 364(c) and (d), they were "unable to obtain such credit otherwise," and (iii) the irreparable harm that will befall the Debtors if the financing is not approved. Anything less is to fall short of their fiduciary responsibilities to their estates, creditors and shareholders. Anything less requires denial of the DIP Motion.

200405988 v5

4. Accordingly, the Equity Committee requests that the Court adjourn a final hearing on the relief requested in the DIP Motion until the Debtors have properly investigated and considered, consistent with their fiduciary duties, the alternative financing proposals now available to them. Failing that, the Equity Committee submits that the Court must deny the Debtors' request for final approval of the DIP Credit Facility. The Debtors have failed to demonstrate that the decision to enter into the DIP Credit Facility offered by Direct Capital and the other DIP Lenders was a proper exercise of the Debtors' reasonable business judgment, and have failed to demonstrate that they were "unable to obtain such credit otherwise," as required by § 364(d)(2).

## II.
## BACKGROUND

### A. The Equity Committee

5. On February 11, 2011 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").[2]

6. On February 18, 2011, the Court entered an order instructing the United States Trustee (the "Trustee") to appoint an official committee of equity security holders. The Equity Committee was subsequently formed on February 24, 2011, and retained the undersigned counsel on February 25, 2011.

7. Upon information and belief, the Debtors commenced these chapter 11 cases in order to fast-track a proposed sale of substantially all the Debtors assets to Hercules Offshore Inc. ("Hercules"). As the Debtors and their counsel have stated in their filings and on the record at hearings before this Court, the proposed sale is expected to result in payment of secured and

---

[2] Unless otherwise noted, section (§) references herein are to the Bankruptcy Code.

unsecured claims in full. Accordingly, shareholders, as the "fulcrum" security holders, have a tangible economic interest in the direction and outcome of these cases.

**B.     The Interim Hearing**

8.     On Saturday, February 12, 2011, the Debtors filed the DIP Motion requesting approval of the $35 million DIP Credit Facility from Direct Capital and the other DIP Lenders. At the Debtors' request, the Court held a hearing (the "Interim Hearing") on the DIP Motion on Monday, February 14, 2011—half a business day after the DIP Motion was filed and without any actual notice of its terms to equity holders.

9.     In support of the request for interim relief, the Debtors offered little more than the general statements contained in two supporting affidavits. According to the *Declaration of Randall D. Stilley in Support of First Day Motions* (the "First Day Affidavit")—

> Based on information provided to me by the Company's advisors, the Company canvassed the market to obtain a suitable DIP financing arrangement. For a variety of reasons, the Debtors' pre-petition lenders were generally unwilling to provide such a facility. The negotiations with the DIP Agent were arms' length, and I am convinced that the Company could not have obtained better terms elsewhere under the circumstances.

First Day Affidavit, at 21. The *Declaration of Dean E. Swick* (the "Swick Declaration") filed in support of the DIP Motion provided a little added color, noting that the Debtors' representatives contacted a total of seven potential financing sources. Swick Declaration, at 5.

10.     No evidence appears to have been offered to demonstrate the immediate and irreparable harm that would befall the company if interim financing were not approved, or to identify precisely what payments were actually necessary to be paid pending a final hearing.

11.     At the conclusion of the Interim Hearing, the Court entered an order (the "Interim DIP Order") pursuant to Bankruptcy Rule 4001(c)(2) and § 364(e), approving the Proposed DIP Financing on an interim basis and authorizing the Debtors to obtain up to $25.8 million in initial

4

draws on the DIP Credit Facility. In fact, very little, if any, of the DIP Credit Facility will be used to fund immediate operational needs of the Debtors. Of the initial $25.8 million draw, $18.1 million has been used to repay in full the Debtors' prepetition secured revolving credit facility, and another $1.55 million was used to pay up front and commitment fees to the DIP Lenders.

## III.
## OBJECTION

12. The Equity Committee objects to the entry of an order granting final approval of the DIP Credit Facility. The DIP Credit Facility is significantly over-market, and imposes harsh restrictions on the Debtors' ability to manage these chapter 11 cases. Moreover, based on the Equity Committee's brief investigation since its formation, the Equity Committee has already received five proposals from other lenders willing to provide postpetition financing to the Debtors on terms more favorable than those offered by the current DIP Lenders. Based on the relative ease with which the Equity Committee located these offers, the Equity Committee has reason to believe that the Debtors did not "shop" the loan as aggressively as they could or should have.

13. The Equity Committee expects that the DIP Lenders (and the Debtors) will argue that, given the terms of the Interim Order, the Debtors are already too far invested in the current DIP Credit Facility to change course midstream. The Equity Committee respectfully submits that notwithstanding the Interim Order, meaningful relief can still be fashioned for the benefit of the Debtors' estates, their creditors and shareholders. Accordingly, the Equity Committee requests that the Court deny final approval of the DIP Motion and strictly limit the scope of the Interim Order in accordance with Bankruptcy Rule 4001(c)(2) and § 364(e).

A. **The Debtors do not appear to have adequately "shopped" for postpetition financing**

14. Pursuant to § 364, in order to obtain credit secured by a senior or equal lien on property of the estate, the Debtors must demonstrate, among other things, that they "are unable to obtain such credit otherwise." 11 U.S.C. § 364(d)(1). Where options are limited, a debtor may be compelled to accept more onerous terms, and there may be little basis for creditors or interest holders to object to such terms.

15. The affidavits filed in support of the DIP Motion are short on detail regarding the extent of the Debtors' marketing efforts, and appear to comprise the sole evidence offered to substantiate those efforts. The First Day Affidavit offers nothing more than the general statement that, "[b]ased on information provided to [the affiant] by the Company's advisors, the company canvassed the market to obtain a suitable DIP financing arrangement." First Day Affidavit, at 21. Providing slightly more detail, the Swick Declaration filed in support of the DIP Motion affirms that the Debtors' financial advisor sought postpetition financing from seven (unidentified) sources, of which only one was willing to offer terms for financing. Swick Declaration, at 5. Notably, the Swick Declaration indicates that the Debtors' solicitation efforts predated the execution of the asset purchase agreement with Hercules, and it does not appear that the Debtors re-tested the market after the asset purchase agreement was signed to see whether (as the Equity Committee believes) the existence of a signed asset purchase agreement might have generated more interest.

16. The Equity Committee finds this to be incredible. The Equity Committee was formed and retained advisors barely one week ago. Almost immediately thereafter, the Equity Committee began to solicit (and receive) inquiries from parties interested in providing postpetition secured financing to the Debtors. In less than ten days, the Equity Committee has received five firm offers to provide postpetition secured financing to the Debtors. Each of the

firm offers received by the Equity Committee provides more favorable economic terms—in some cases, significantly more favorable terms—and offers additional flexibility in the form of extended maturity dates and relaxed (or nonexistent) milestone dates. More importantly, these offers demonstrate the existence of a wider interest in providing financing to these Debtors—interest that could have been used to drive the bargain with the DIP Lenders closer to market terms.

17. The existence of these offers and the speed with which the Equity Committee was able to obtain them leads the Equity Committee to believe that the Debtors did not adequately market the deal before settling on the terms offered by the DIP Lenders. Had they done so, they would have either selected an offer with more favorable terms, or used the existence of such competing offers to drive a more favorable bargain with the DIP Lenders.

18. With respect to the existing prepetition secured lenders, the Debtors offered little more than the general statement that "[f]or a variety of reasons, the Debtors' pre-petition lenders were generally unwilling to provide such a facility." First Day Affidavit, at 21. That may be the case, but what the Debtors have left unsaid is whether they considered priming the existing lender, which would have substantially reduced the Debtors' need for postpetition financing and correspondingly reduced the magnitude of the percentage-based fees being charged on it. Given the potentially significant equity cushion in this case, the Debtors should have considered (and possibly sought) to simply prime the existing lenders under § 364(d)(1) rather than roll up their secured debt into the DIP Credit Facility.

19. Numerous court have considered the question of whether the existence of an equity cushion may provide sufficient adequate protection to meet the requirements of § 364(d). One of the seminal cases on this point, *In re McKillips*, surveyed then-existing case

law and concluded that (i) an equity cushion of 20% or more constitutes adequate protection, (ii) an equity cushion under 11% does not, and (iii) caselaw is divided on an equity cushion falling between 12% and 20%. *In re McKillips*, 81 B.R. 454, 458 (Bankr. N.D. Ill. 1987) (denying request for § 364(d) financing based upon an eroding equity cushion of 15%). Since then, numerous other courts have referred to the *McKillips* study as a starting point for their own consideration of the sufficiency of proposed equity cushions to adequately protect an existing lender in the face of a § 364(d) priming lien. *See, e.g., In re Utah 7000, L.L.C.*, 2008 WL 2654919 (Bankr. D. Utah 2008) (granting § 364(d) priming lien based upon a 20% equity cushion plus grant of junior lien on additional collateral and imposition of plan and disclosure statement milestones); *In re C.B.G. Limited*, 150 B.R. 570 (Bankr. M.D. Pa. 1992) (denying § 364(d) priming lien based upon eroding 16% equity cushion).

20. In this case, the existing offer from Hercules suggests a total asset value (and, by extension, total collateral value) of $105 million, which is almost *three times* the $35 million in total financing ultimately sought by the Debtors and more than *five times* the total secured debt on the Petition Date.

21. In some cases where the prepetition secured lenders are unwilling or unable to provide additional postpetition secured financing, a debtor may have no choice but to find a new lender willing to both pay off the existing lenders and provide new money. This does not appear to be one of those cases. Based on the substantial apparent equity cushion, it could have been entirely possible for the Debtors to prime the existing prepetition lender by providing "adequate protection of the interest of the holder of the lien on the property of the estate on which such equal or senior lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Had they done so, the resulting DIP Credit Facility (and associated fees) would have been substantially lower.

Alternatively, if there were other reasons why the DIP Lenders preferred not to engage in a priming fight, the Debtors' agreement not to pursue that strategy should have been reflected in more favorable pricing.

22. Accordingly, the Equity Committee respectfully requests that the Court deny the Debtors' request for entry of a final order approving the DIP Credit Facility, and direct the Debtors to consider alternative financing proposals that may provide the necessary financing on more favorable terms. The Equity Committee further asks the Court to direct a strict evidentiary showing from the Debtors of (i) the actual marketing efforts undertaken by the Debtors in searching for postpetition financing, including a summary of other offers that were rejected in favor of the proposed DIP Credit Facility, (ii) the necessity of the proposed DIP Credit Facility, and (iii) the necessity of repaying the Debtors' prepetition secured indebtedness at this early stage of the case.

**B.  The Court may still deny final approval of the DIP Credit Facility.**

23. At the risk of stating the obvious, an interim order grants only interim relief. Prior to a final hearing, Bankruptcy Rule 4001(c)(2) permits a court to "authorize the obtaining of credit *only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.*" Fed. R. Bankr. P. 4001(c)(2). At the interim hearing stage, the Court's authority does not extend beyond that point. An interim order authorizing postpetition financing is not a final order, and by definition remains subject to further proceedings. Nor does the entry of an interim order guarantee subsequent entry of a final order. This much is indisputable.[3]

---

[3] In accordance with Supreme Court precedent, the Court should apply the plain meaning rule in construing provisions of the Bankruptcy Code: if the statute is clear and unambiguous, absent an absurd result, it must be applied as written. *See Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004) ("It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'") (citations omitted).

9

200405988 v5

24. Notwithstanding the limited nature of an interim order, § 364(e) offers certain basic assurances designed to provide the "comfort" necessary to induce lenders to lend on the basis of a court's order. Specifically, § 364(e) insulates from subsequent judicial review (i) the validity of any debt incurred in reliance on a court's order authorizing such financing and (ii) any priority status or liens granted in respect of such indebtedness. Section 364(e) provides, in relevant part, that—

> [t]he reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect *the validity of any debt so incurred, or any priority or lien so granted*, to an entity that extended such credit in good faith…

11 U.S.C. § 364(e). The logic underpinning the safe harbor provisions of § 364(e) extends to interim orders as well as final orders; indeed, the Interim Order in this case expressly states that it is grants the DIP Lenders "all protections afforded by section 364(e) of the Bankruptcy Code." In the context of an interim order, however, § 364(e) cuts two ways: while it operates to protect the lender against the subsequent reversal or modification of an order authorizing postpetition financing, it only does so to the extent delineated within its terms. *See, e.g., In re Visionaire Corp*, 299 B.R. 530, 535 (8th Cir. B.A.P. 2003) ("We recognize that [the postpetition lender] anticipated that it would be granted priority as to all of its advances before it committed to make the loan. The Federal Rules of Bankruptcy Procedure, however, are clear. Interim lending orders only allow debtors to borrow a sum sufficient to prevent immediate harm within 15 days of obtaining a final order."); *see also In re M4 Enter., Inc.*, 183 B.R. 981, 984 (Bankr. N.D. Ga. 1995) (holding that the court may modify interim financing orders).[4]

---

[4] The notion that "interim" orders remain subject to further review and final approval occurs in numerous instances throughout the Bankruptcy Code, perhaps most notably in the context of the fees and expenses of estate-paid

25. In light of the existence of the firm offers received by the Equity Committee to provide financing on more favorable terms than those provided in the DIP Credit Facility, the Equity Committee submits that the Court can—and should—limit the scope of the interim relief granted in the Interim Order strictly in accordance with Bankruptcy Rule 4001(c)(2) and § 364(e) to permit the Debtors to reap the full benefit of the more favorable terms that may be made available to it.

C. **Additional objections**

26. The Equity Committee objects to the following additional terms, among others, of the proposed DIP Credit Facility:

>   (a) The DIP Credit Facility purports to terminate upon consummation of the Proposed Sale, with cash consideration from the Proposed Sale being used to satisfy the balance of the DIP loan. Because the stock portion of the Purchase Price cannot be liquidated except in a confirmed plan, *see, e.g.*, Sale Motion at ¶ 31(v), and because Hercules is purchasing the Debtors' existing cash, the Debtors may have no ready access to cash for some period following consummation of the Proposed Sale to pursue operating the estates and seeking approval of a plan. It is imprudent for the Debtors to seek approval of a post-petition financing arrangement that is likely to leave the Debtors with no cash to prosecute the balance of these cases and related litigation after the consummation of the sale.[5]

>   (b) In its current form, the proposed $3 million carve-out for professional fees (the "Carve-Out") purports to exclude the fees and expenses of the Equity Committee. By its terms, the "post-petition fees of professional persons retained in the Debtors' Chapter 11 cases by Seahawk or any official committee of unsecured creditors." DIP Motion, at 18. At a minimum, the Carve-Out must be amended to reflect the appointment of the Equity Committee to represent the interests of the real stakeholders in these cases, and provide for the payment of the reasonable fees and expenses of the Equity Committee's professionals. Moreover, the Equity Committee believes the Carve-Out is inadequate in its current form, and should be

---

professionals, which may be approved on an interim basis, but always remain subject to final approval by the court at a later date.

[5] Based on the size of the DIP Credit Facility and the Debtors' Proposed Budget, it is also possible—if not probable—that the balance of the DIP Credit Facility could exceed the Cash Payment portion of the proposed Transaction with Hercules.

amended to include all incurred and unpaid allowed fees of the Debtors' and official committees' professionals in the case.

(c) The DIP Credit Facility terminates if the Debtors' proposed sale is not approved within 60 days or consummated within 120 days. This imposes on the Debtors and the Equity Committee a timetable that is both unnecessary (given the substantial equity cushion that protects the DIP Lenders) and unreasonable (given the substantial concerns the Equity Committee has about the proposed sale process).

(d) It is an event of default under the DIP Loan Agreement for the Debtors to "sell all or a substantial part of the Collateral on terms that are not acceptable to the Administrative Agent in its sole discretion." This grants the DIP Lenders a *de facto* veto right over any proposed sale transaction whatsoever—even one proposing to pay the DIP Lenders in full. As such, this default provision grants the DIP Lenders a dangerous level of control over the course of these chapter 11 cases.

27. Given that the Equity Committee was only formed a few days ago, the Equity Committee has not had sufficient time to review in detail the terms of the proposed DIP Credit Facility. The Equity Committee may therefore have additional objections to the proposed DIP Credit Facility, and reserves the right to assert additional objections beyond those stated herein.

**D. Selection of alternate DIP financing**

28. As previously discussed herein, the Equity Committee received five firm offers to provide postpetition secured financing to the Debtors. Upon a thorough review of the offers, the Equity Committee has selected, what it considers to be, the most competitive alternative to the current DIP financing arrangement (the "Alternative DIP Lender"). The basic terms of the offer advanced by the Alternative DIP Lender, as compared to the current financing, are as follows:

| Term | Current DIP (D.E. Shaw) | Alternative DIP Lender |
|---|---|---|
| **Facility Size & Type** | $35 million senior secured loan | $35 million revolving credit facility ("Facility A") <br><br> $5 million multiple draw term loan facility ($2.5 million available upon repayment of Facility A) ("Facility B") |

200405988 v5

| | | |
|---|---|---|
| **Interest** | 30-day LIBOR + 12% with a LIBOR floor of 3% | Facility A: 11%<br><br>Facility B: LIBOR + 9.5% with a 3% LIBOR floor |
| **Milestones** | Final DIP Order: March 28, 2011<br><br>Binding APA: April 12, 2011 (60 days)<br><br>Sale Close: June 12, 2011 (120 days) | Final DIP Order: March 28, 2011<br><br>Binding APA: June 12, 2011 (120 days)<br><br>Sale Close: August 11, 2011 (180 days) |
| **Total Implied Fees** | Cash: $3.48 million (upfront fee + commitment fee + est. 5.5% exit fee)<br><br>Equity: None | Cash: $875,000 (Facility A upfront fee + Facility A closing fee)<br><br>Equity: None |

## IV.
## CONCLUSION

For the foregoing reasons, the Equity Committee respectfully requests the Court to (i) deny the Debtors' request for final approval of the DIP Credit Facility, (ii) authorize the Debtors to obtain postpetition financing from the Alternative DIP Lender pursuant to the terms discussed herein, and (iii) grant such other and further relief as the Court may deem just and proper.

200405988 v5

Dated: March 9, 2011

                         **AKIN GUMP STRAUSS HAUER & FELD LLP**

                         By: */s/ Charles R. Gibbs*

                              Charles R. Gibbs (TX Bar No. 07846300)
                              Michael P. Cooley (TX Bar No. 24034388)
                              1700 Pacific Avenue, Suite 4100
                              Dallas, Texas 75201
                              Telephone: 214.969.2800
                              Facsimile: 214.969.434

                              -and-

                              David H. Botter (*pro hac vice* pending)
                              One Bryant Park
                              New York, New York 1036
                              Telephone: 212.872.1000
                              Facsimile: 212.872.1002

                              *Proposed Counsel to the*
                              *Official Committee of Equity Security Holders*

## CERTIFICATE OF SERVICE

     I hereby certify that, on March 9, 2011, a true and correct copy of the foregoing document was served via email on the parties entitled to receive service through the Court's Electronic Case Filing system.

                              */s/ J. Machir Stull*
                              Machir Stull