UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Seahawk Drilling, Inc., *et al.*, | § | Case No. 11-20089-RSS |
| | § | |
| Debtors. | § | Jointly Administered |

**DEBTORS' RESPONSE TO THE OBJECTION FILED BY THE EQUITY
COMMITTEE TO THE DEBTORS' EMERGENCY MOTION FOR FINAL ORDER
(I) AUTHORIZING POST-PETITION, SECURED FINANCING,
(II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, AND
(III) SCHEDULING A FINAL HEARING PURSUANT TO 11 U.S.C. §§ 150(A),
361, 362, 364(C), 503, AND 507 AND RULES 2002, 4001, AND 9014
OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

TO THE HONORABLE RICHARD SCHMIDT, UNITED STATES BANKRUPTCY JUDGE:

Seahawk Drilling, Inc. ("**Seahawk**" or the "**Company**") and its above-captioned affiliated debtors (collectively, the "**Debtors**"), file this Response to the Objection [Dkt. No. 249] (the "**Objection**") filed by the Official Committee of Equity Security Holders (the "**Equity Committee**") to the Debtors' Emergency Motion for Final Order (I) Authorizing Post-Petition, Secured Financing, (II) Authorizing the Debtors to use Cash Collateral, and (III) Scheduling a Final Hearing Pursuant to 11 U.S.C. §§ 150(a), 361, 362, 364(c), 503, and 507 and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**DIP Motion**"). In support of this Motion, the Debtors respectfully state as follows:

**PRELIMINARY STATEMENT**

1.    The Equity Committee's request that the Court deny final approval of the Debtors' DIP Financing is based on two arguments: (i) unsubstantiated allegations regarding the Debtors' lack of diligence in obtaining its financing pre-petition; and (ii) alleged "offers" from

alternative lenders that have surfaced post-petition who have suggested a willingness to lend on more favorable terms than the existing DIP Financing.[1]

2. As discussed herein, the Equity Committee's first argument has no evidentiary support and is false. As to the second argument, the fact that there are post-petition "offers" to finance the Debtors on more favorable terms is of no consequence to the validity of the financing already obtained. As explained herein, at the time it was obtained, the DIP Financing from Direct Capital was the best (and only) source of funding that would allow the Debtors to file these jointly-administered bankruptcy cases and sell their assets to Hercules.

3. The Equity Committee appears intent on disrupting the delicate balance of this chapter 11 case, which involves the sale of substantially all of the Debtors' assets to Hercules Offshore, Inc., which is being facilitated by the existing debtor-in-possession financing. As discussed below, at the time of the filing of this case, Seahawk was in dire financial straits and had a realistic concern that it would not meet payroll and be able to fund insurance payments in the weeks following the Petition Date. However, hindsight is 20/20.

4. On information and belief, the Equity Committee is being controlled by certain members who acquired their equity positions <u>after</u> the filing of these bankruptcy cases and who may have an investment strategy that differs greatly from the Bankruptcy Code's goal of maximizing the recovery for the benefit of all creditors and interestholders through chapter 11. The Debtors fear that the agenda of certain members of the Equity Committee, in pursuing the Objection, may be for a financial goal unique to themselves that is inapposite to the goals that Congress intended.

---

[1] Furthermore, the objection is misleading in numerous respects, including the statement that the Equity Committee had "barely a week" to review the terms of the DIP Financing.

5.     The Debtors believe, and intend to prove, that the DIP Financing from Direct Capital was the best financing available to the Debtors at the time it was obtained.  Furthermore, although the credit risk factors are now greatly reduced, and other lenders are now coming forward with various alleged "offers" of post-petition financing, the Debtors have no assurances that any of these "offers" will actually come to fruition and believe these last-minute offers are not economical in light of the Court's approval of the DIP Financing from Direct Capital.

6.     As explained below, because the current DIP Financing from Direct Capital was the best available financing option for the Debtors at the time it was obtained, and because there currently is no commitment by any third party to pay off the interim borrowing from Direct Capital and provide additional liquidity to the Debtors, and because Direct Capital is entitled to rely on the terms of the Interim DIP Order approved by the Court, the Court should approve the existing DIP Financing on a final basis as requested.

### DEBTORS' RESPONSE TO THE OBJECTIONS

7.     The Debtors filed their voluntary petitions on Friday, February 11, 2011, following intensive negotiations with Hercules Offshore, Inc. ("**Hercules**") culminating in the signing of an asset purchase agreement (the "**APA**") and after finalizing the documentation of $35 million in post-petition financing (the "**DIP Credit Facility**"), subject to the terms and conditions of the Debtor-in-Possession Credit Agreement (the "**DIP Credit Agreement**" and collectively with all agreements, documents, and instruments delivered or executed in connection therewith, the "**Financing Documents**") between the Debtors and D.E. Shaw Direct Capital Portfolios, L.L.C. ("**Direct Capital**") or its affiliates or designees selected in its sole discretion (the "**DIP Lenders**").

8.  As of the Petition Date, the Debtors were facing a severe liquidity crisis and were risking being in default of their pre-petition secured indebtedness. Pre-petition, the Debtors' representatives sought debtor-in-possession financing from nine (9) separate sources. Seven (7) of the nine (9) sources declined to provide debtor-in-possession financing to the Debtors due to concerns regarding (i) the contract drilling industry; (ii) the questionable value of the drilling rigs if no plan of reorganization could be developed; (iii) uncertain permitting conditions in the U.S. Gulf of Mexico; and/or (iv) the Debtors' negative cash flow condition. While one source indicated that it might be interested in evaluating the prospects of providing the Debtors with debtor-in-possession financing, that source ultimately could not respond to Seahawk within a reasonable time.

9.  As explained at the February 14, 2011 hearing, on January 21, 2011, when Seahawk's Board terminated discussions with Company A because it had dramatically reduced its previously negotiated deal value, Seahawk had less than three (3) weeks of liquidity remaining, had a negative cash flow of ranging from $3 million to $5 million per month, and had incurred a substantial amount of legal and professional fees in connection with the failed transaction with Company A. At that time, the Debtors neither had a capital partner in place nor a buyer for the assets. Indeed, the situation was dire.

10. As soon as exclusivity was terminated with Company A, A&M immediately reinitiated DIP financing discussions with three (3) previously-contacted parties that (a) had expressed an interest in providing DIP financing; (b) were experienced DIP lenders; (c) were experienced in the offshore contract drilling business; and (d) understood the Debtors background regarding a request for $45 million DIP, with the understanding that the facility needed to be available for a filing without a buyer or capital partner being in place if the pending

Transaction could not be arranged, took longer to be arranged or some alternative restructuring transaction was arranged post-filing.  Only one (1) of the parties contacted came forward with an indication of interest in providing DIP financing.  The DIP Lenders responded with a proposal to provide $35 million of debtor-in-possession financing under this range of conditions.  While the amount was less than requested, the size of the DIP Financing was adequate to meet the Debtors' need.  This flexibility was vitally important to the Debtors as the Asset Purchase Agreement ("**APA**") with Hercules was not executed until Friday, February 11, 2011, and the Debtors needed to file for bankruptcy relief on or about that date to avoid exhausting their liquidity.

11.     In fact, as the filing date approached, the Debtors anticipated only $4 million of cash on hand (without utilization of the DIP Financing) post-filing to fund first week operating disbursements of $6.2 million, (including a quarterly insurance payment of $3.5 million that was due after exhausting its 45-day grace period on payment and $.7 million payroll for rig-based employees, without whose continuing services a sale or reorganization would not be possible), leaving the Debtors unable to meet liquidity needs through use of cash collateral and necessitating the utilization of the DIP Credit Facility.

12.     The Debtors sought interim approval of their DIP Loan on Monday, February 14, 2011, along with several other of their first day motions and applications (the **"First Day Hearings"**).[2]  Appropriate notice of the First Day Hearings was given to significant creditors and registered shareholders.  In fact, Peter Sakon of HSBC Distressed Opportunities Fund ("**HSBC**") (the Chair of the Equity Committee), in addition to other equity holders and representatives, was present and participated in the First Day Hearings and stated on the record that he had reviewed the DIP financing motion and had a chance to study it.  *See* Transcript of Hearing of February

---

[2] Although the interest rate of the DIP Financing appears high, these terms were the best terms available at the time the DIP Financing was obtained.

Seahawk Response.doc

14, 2011, p. 28, lines 13-15.  The Equity Committee's claim of lack of notice is, at best, disingenuous.

13. The DIP Financing permitted the Debtors to borrow $25.8 million, of which $18.2 million of that was used to pay down the Debtors' prepetition secured revolving credit facility, which was a <u>requirement</u> of the DIP Financing.  Understandably, the DIP Lenders did not want liens that were junior to the existing pre-petition lenders, therefore, the DIP Lenders would have to be granted priming, superpriority liens or the pre-petition lenders would have to be paid in full.  Subject to Court approval, the parties agreed that the latter course of action was the best course of action.

14. The Equity Committee claims there are "several other unsolicited lenders willing to provide the Debtors with postpetition secured financing on more favorable terms than those provided by Direct Capital and the other DIP Lenders."  Objection at ¶2.  Surprisingly, other than the Hayman Capital proposal, the Debtors have never been provided copies of or access to any of these alleged "offers."  While the Debtors did receive inquiries directly from Hayman Capital, CRT, Ableco and Ore Hill (prior to the Equity Committee having been formed), no proposal was a formal commitment, each required completion of due diligence (among other factors) and none provided an economic incentive to the Debtors given the contractual obligations under the Financing Documents.  Upon information and belief, none of the current form of "offers" received by the Equity Committee (other than the Hayman Capital proposal) is an actual commitment and the Equity Committee's financial advisors have informed the Debtors that the Hayman Capital proposal was the most attractive of these "offers," even though it is premised on the misplaced notion that the Debtors are not obligated to pay the exit fee to Direct Capital.  Furthermore, the Equity Committee's claim that some of the interested lenders

"attempted to contact the Debtors or their professionals" is simply not true.  Nonetheless, the Debtors evaluated and responded to each of these parties.

15.     The Debtors' financial advisors *did* seek the best deal possible, and the Debtors did *provide evidence* to the Court, in the form of proffered testimony of two declarants[3], that of need for the financing, that they were unable to obtain such credit otherwise, and that irreparable harm would have occurred if the Debtors had not received the interim DIP financing. Interestingly, none of the interestholders now on the Equity Committee who were present at, and participated in, the First Day Hearings asked any questions of the proffered witnesses.

16.     At the time the DIP Credit Facility was obtained, the possibility of a "naked" chapter 11 filing without a buyer was very real; in other words, there was no sale with which to backstop or guarantee the repayment of any DIP financing.  As in most cases, there was uncertainty regarding how the Debtors' customers and vendors would perform post-filing, meaning a lack of support from these parties could negatively impact the Debtors' business. Furthermore, at the time, Hercules required credit approval from its lenders to consummate the Transaction.[4]  The Equity Committee's suggestion that (with the public disclosure of the DIP Financing and conditions, dramatically lower and less risky DIP credit factors) the "offers" received by the Equity Committee post-filing can be fairly and appropriately evaluated against the current DIP Financing, represents a fundamental lack of understanding of the Debtors' pre-filing conditions and credit risk factors (that have been fully disclosed and discussed with the Equity Committee and it advisors) and the fundamentals of risk assumption and compensation that is a key credit market condition.  The terms and conditions of the DIP Credit Facility were

---

[3] *See* Declaration of Randy D. Stilley in Support of First Day Motions [Dkt. No. 4] and Declaration of Dean E. Swick in Support of DIP Financing [Dkt. No. 35].
[4] This has now been obtained and is no longer a contingency.

fair and reasonable under the circumstances and were negotiated by the parties in good faith and at arms' length, with all parties ably represented by counsel.

17. The Equity Committee's claim that the DIP Credit Facility "imposes harsh restrictions on the Debtors' ability to manage these chapter 11 cases" could not be further from the truth. The Debtors have enjoyed a good working relationship with the DIP Lenders who have indicated a willingness to permit the Debtors flexibility, to the extent needed, regarding the original deadlines and milestones set forth in the Financing Documents.

18. The Equity Committee argues that the Debtors have failed to prove that they were unable to obtain credit on terms superior to those in the Financing Documents, although the Equity Committee admits the Debtors submitted declarations in support of this proposition. Further, the Equity Committee's argument that the Debtors should have "re-tested the market after the asset purchase agreement was signed to see whether (as the Equity Committee believes) the existence of a signed asset purchase agreement might have generated more interest" is preposterous in view of the fact that the APA was signed on the evening of February 11, 2011, literally minutes before the Debtors sought bankruptcy protection.

19. The Equity Committee's arm-chair Monday morning quarterbacking at this late date and chest thumping that it has received "firm offers" with "more favorable economic terms" than the existing DIP Financing does not change the fact that the DIP Financing obtained by the Debtors pre-petition was the best financing available to the Debtors at the time and the decision to enter into the agreement was an exercise of their sound business judgment. Furthermore, continued discussions with Direct Capital has evidenced their willingness to, among other things, provide additional flexibility in the form of the release of liens on chapter 5 causes of action, exit fee concessions, extended maturity dates and relaxed milestone dates.

20. Based on prior dealings and a long experience with the Debtors' pre-petition senior lenders, the Debtors' management and professionals believed (i) they would not or could not extend additional credit to the Debtors on a post-petition basis; (ii) if approached, the pre-petition senior lenders past conduct led management to believe they would pursue unreasonable actions, including sweeping or off-setting demand deposit accounts; and (iii) based on the circumstances of the cases, and in particular, the pending sale to Hercules, it would have been improvident to have proceeded with a priming fight. Based on all these issues, it was determined that the pre-petition senior lenders were not a suitable candidate or group to provide DIP financing in these bankruptcy cases.

21. For all of these reasons, the Objection filed by the Equity Committee should be denied and the requested DIP Financing should be approved on a final basis.

## LEGAL AUTHORITIES

### A. The DIP Financing Must Be Viewed As of the Time it was Obtained.

22. The Equity Committee's notion that the Debtors' request for final approval of the DIP Financing should be denied because the Debtors failed to contact every *possible* DIP lender pre-petition in order to obtain financing, is not the standard Courts use to determine whether a debtor has diligently sought financing on the best possible terms. *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (emphasizing that section 364 of the Bankruptcy Code does not require a debtor to seek credit from every possible lender, but requires only a good faith effort for favorable terms); *see also In re Sky Valley, Inc.*, 100 B.R. 107 (Bankr. N.D. Ga. 1988) (stating that a debtor's attempt to contact three (3) different lenders was sufficient).

23. Rather, courts have explained that the relevant time period for determining whether the Debtors have taken reasonable steps to secure the best financing possible is at the

time the financing was obtained. *See In re Adelphia Commc'ns Corp.*, No, 02-41729REG, 2004 WL 1634538, at *4 (Bankr. S.D.N.Y. Jun. 22, 2004) ("The Debtors took reasonable steps to secure the best fees available, by solicitation of competing proposals and by negotiation, and I find, as a fact, that their efforts in that regard were satisfactory, even though we now know in hindsight that the Debtors were able to secure even better terms after they thought they had done the best they could. Until parties in negotiations choose or are obligated to put all of their cards on the table and to spill their guts to their negotiating adversaries, we will always have uncertainties in this regard, and once more that's why we measure these things by a business judgment standard.") (emphasis added); *In re Farmland Indus., Inc.*, 294 B.R. 855, 884 (Bankr. W.D. Mo. 2003) ("The fact that the Committees and their experts disagree with the decisions made does not mean that those decisions were unsound or unreasonable. 'A reasonable business judgment, based at the time on adequate information, becomes no less reasonable merely by contrary insights gained through hindsight.'") (citations omitted); *Aks v. Southgate Trust Co.*, No. 92-2193-JWL, 1994 WL 171537, at *10 (D. Kan. Mar. 31, 1994) (same); *In re Local Union 722 Int'l Bhd. of Teamsters*, 414 B.R. 443, 451 (Bankr. N.D. Ill. 2009) ("Hindsight and the Court's judgment cannot be substituted for the Debtor's business judgment at that time.").

**B.     The Equity Committee's Last-Minute "Offers" Are of No Consequence.**

24.     As discussed above, the Equity Committee's objection that new "offers" obtained since the Petition Date have more favorable terms than the current DIP Financing does not change the fact that the Debtors' business judgment, as of the time the financing was obtained, is the proper timeframe to judge whether the Debtors' actions were reasonable. As discussed below, available jurisprudence suggests that courts have been reluctant to disturb a debtor's negotiated financing.

Seahawk Response.doc

-10-

25. For example, in the case of *In re Yellowstone Mountain Club, LLC*, No. 08-61570-11, 2008 WL 5869859 (Bankr. D. Mont. Nov. 26, 2008), the Court considered two competing DIP proposals. Credit Suisse and CrossHarbor both proposed credit facilities for the Debtors' consideration. Although Credit Suisse's proposal appeared to contain better financial terms, such financing was offered for a term of 21 days. Notwithstanding its concern over several aspects of Credit Suisse's DIP financing proposal, the court "reluctantly" approved the Debtors' proposed DIP financing order on an interim basis. *Id.* at *2. On the eve of the final hearing, Credit Suisse indicated that it was not able to secure its members' approval to offer the Debtors continued DIP financing, which all parties assumed would be provided by Credit Suisse. While obtaining several recesses from the Court, the Debtors negotiated a DIP financing agreement with CrossHarbor. Immediately before the hearing to consider CrossHarbor's offer, Credit Suisse reversed course and once again agreed to provide the Debtor with additional finding. The Court determined that Credit Suisse's proposal was

> not a viable option and appears to have been proposed at the last minute in an effort to frustrate the Debtors' efforts to secure DIP financing from CrossHarbor. As such, the Court concludes that the Debtors have been unable, despite tremendous effort, to obtain any feasible operating credit, other than that proposed by CrossHarbor, that would prevent the Debtors from closing their doors, either now or in the near future.

*Id.* at *4 (emphasis added).

26. Similarly, in the case of *In re Adelphia Communications Corp.*, No, 02-41729REG, 2004 WL 1634538 (Bankr. S.D.N.Y. Jun. 22, 2004) cited above, the Court considered a situation where statutory committees and other parties in interest objected to the debtor's proposed $8.8 billion exit financing agreement, arguing, among other things, that the terms were not the best the debtor could have obtained. The court overruled the objections and

approved the exit financing agreement as a reasonable exercise of the debtor's business judgment. *Id.* at *1. The Court noted:

> <u>The Debtors took reasonable steps to secure the best fees available, by solicitation of competing proposals and by negotiation, and I find, as a fact, that their efforts in that regard were satisfactory, even though we now know in hindsight that the Debtors were able to secure even better terms after they thought they had done the best they could.</u>  Until parties in negotiations choose or are obligated to put all of their cards on the table and to spill their guts to their negotiating adversaries, we will always have uncertainties in this regard, and once more that's why we measure these things by a business judgment standard.

*Id.* at *4 (emphasis added).

27. Finally, in the case of *In re ION Media Networks, Inc.*, No. 09-13125JMP, 2009 WL 2902568 (Bankr. S.D.N.Y. July 6, 2009), the Court looked at several factors, such as timing and certainty of closing, in considering a proposed DIP financier's motion for reconsideration of the court's bench ruling approving DIP financing offered by the Debtors' prepetition lenders. Essentially, the movant reconsidered its own stated position during the hearing and subsequently removed a due diligence contingency applicable to its own competing financing proposal. Although the court's decision was based on Rule 9023 of the Federal Rules of Bankruptcy Procedure, the court emphasized the following concepts:

- "the desire to secure financing without further delay and uncertainty, combined to support the business decision of the Debtors to seek approval of the DIP Financing." *Id.* at *1.

- The movant could have acted earlier. *Id.*

- "Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization." *Id.* at *4.

28.     Because the Debtors acted within their reasonable business judgment in seeking and obtaining the DIP Financing from Direct Capital, which was the only available source of financing at the time it was obtained, the last-minute offers obtained by the Equity Committee are of no consequence and the Objection should be overruled.

**C.     The DIP Lenders acted in "good faith" and are entitled to Reliance on the Terms of the Interim Order.**

29.     Finally, the Equity Committee argues that since there is only an interim order now in place, the Court may decline to approve the DIP Financing on a final basis.  What this simplistic argument ignores is the well-settled law that a lender who extends credit in good faith is entitled to rely on the terms and provisions approved by the Court in the interim order.  This means that Direct Capital is entitled to the benefit of its bargain.  *See In re Fleetwood Enters., Inc.*, 427 B.R. 852, 859-61 (stating that "[l]enders who deal with debtors and request and receive court approval for interim financing arrangements rely on provisions contained in interim orders just as they would rely on provisions contained in a final, appealable order.").

30.     At the hearing on February 14, 2011, the Court found the Credit Agreement to be in all manners valid, enforceable and binding.  Furthermore, it was a condition precedent to funding of the Credit Agreement, and the Court expressly found, that the Debtors and DIP Lenders acted in good faith and the application of section 364(e) of the Bankruptcy Code applied to all relief and provisions of the DIP Credit Agreement.[5]  To this end, the Court held as follows:

---

[5] Section 364(e) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e). Section 364 was enacted to provide incentives for lenders to engage in bankruptcy lending.  *See e.g., In re Fla. W. Gateway, Inc.*, 147 B.R. 817, 819 (Bankr. Fla. 1992).

> Good Faith. The DIP Loan Documents have been negotiated in good faith and at arms' length by and among the Debtors, the DIP Agent and the DIP Lenders. Any DIP Loans and/or other financial accommodations made to the Debtors by the DIP Agent and the DIP Lender pursuant to this Interim Order and/or the DIP Loan Documents shall be deemed to have been extended by the DIP Agent and the DIP Lenders in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders shall be entitled to all protections afforded thereunder. The terms of the credit facility provided under the DIP Loan Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.

*See* Interim Order (Exhibit B), ¶ K. The Court further ordered the incorporation of section 364(e) of the Bankruptcy Code into the Interim DIP Order as follows:

> Subsequent Reversal or Modification. This Interim Order is entered pursuant to section 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), granting the DIP Lenders all protections afforded by section 364(e) of the Bankruptcy Code. If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, that action will not affect (i) the validity of any obligation, indebtedness or liability incurred hereunder by any of the Debtors to the DIP Lenders or the DIP Agent prior to the date of receipt by the DIP Lenders and the DIP Agent of written notice of the effective date of such action or (ii) the validity and enforceability of any lien or priority authorized or created under this Interim Order or pursuant to the DIP Loan Documents. Notwithstanding any such reversal, stay, modification or vacatur, any post-petition indebtedness, obligation or liability incurred by any of the Debtors to the DIP Lenders and the DIP Agent prior to written notice to the DIP Lenders and the DIP Agent of the effective date of such action shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lenders and the DIP Agent shall be entitled to all the rights, remedies, privileges and benefits granted herein and the DIP Loan Documents with respect to all such indebtedness, obligations or liability.

Interim Order (Exhibit B), ¶ 24.

31. Courts have repeatedly held that, when credit is extended in good faith and with authority from the bankruptcy court, section 364(e) of the Bankruptcy Code protects the lender from later challenges to the terms of that financing. *See e.g., In re EDC Holding Co.*, 676 F.2d 945, 947 (7th Cir. 1982); *In re General Growth Props., Inc.*, 412 B.R. 122 (Bankr. S.D.N.Y.

2009) (emphasizing that when lenders are deemed to extend financing in good faith, they are entitled to protections under section 364 of the Bankruptcy Code, and a debtor's decision to obtain financing orders to pay prior indebtedness and for operations reflects the exercise of its own business judgment); *In re Cooper Commons, LLC*, 430 F.3d 1215, 1219 (9th Cir. 2005) (stating that section 364 of the Bankruptcy Code is meant to provide a debtor with a means to obtain credit and "therefore any agreements or conditions necessary to obtain that credit were protected by § 364(e).").

32.     Furthermore, Courts are generally unwilling to unwind a financing order absent some "bad faith" on the part of the lender. *See, e.g., Kham & Nates Shoes No. 2, Inc.*, 908 F.2d 1351, 1355 (7th Cir. 1990) ("Although § 364(e) speaks only of modifications on appeal, it instantiates the principle that bankruptcy judges may make binding commitments to give priority to new credit. If creditors fear that that the rug will be pulled out from under them, they will hesitate to lend. So § 364(e) and companion provisions, e.g., 11 U.S.C. § 363(m), former Bankruptcy R. 8-703(a)(6), disable courts from backtracking on promises in the absence of bad faith, which is a very narrow exception . . . [section 364(e)'s] principle applies through the law of the case. A judge lacks the power to undo the priority granted by a financing order without finding that the creditor acted in bad faith."); *see also In re Arlington Hospitality, Inc.*, No. 08 C 5098, 2009 WL 3055350, at *4 (N.D. Ill. Sept. 18, 2009) ("The Committee was barred from arguing against the Interim Order because the law of the case doctrine allows a creditor to rely on a financing order if that creditor has already extended credit. A bankruptcy court can only undo the order if the lender acted in bad faith.") (citations omitted). Here, there has been no assertion, much less evidence demonstrating even so much as a hint of bad faith.

33. It is well-settled that the protections of section 364(e) of the Bankruptcy Code apply not only to a subsequent appeal of a financing order, but such protections also apply to any modification of an interim financing order by the bankruptcy court. *See, e.g., Kham & Nate's Shoes No. 2, Inc.*, 908 F.2d at 1355 (emphasizing that a bankruptcy court's modification of its own orders poses the same risks as does reversal on appeal, and section 364(e) of the Bankruptcy Code also applies to the modification of a relied-upon financing order through the law of the case doctrine); *In re Fleetwood Enters., Inc.*, 427 B.R. at 857-60 (stating that the court was not required to find that fees for a DIP lender were a necessary expense that actually benefitted estate – even though final approval of the DIP loan was not obtained, it was enough that interim approval was granted with a finding of good faith, and the lender was therefore entitled to its bargained-for rights under credit agreement); *In re Revco D.S., Inc.*, 901 F.2d 1359, 1364 (6th Cir. 1990) (specifically includes protections as to the provisions in interim orders); *Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.)*, 829 F.2d 1484, 1489 (9th Cir. 1987) ("Lenders who deal with debtors and request and receive court approval for interim financing arrangements rely on provisions contained in interim orders just as they would rely on provisions contained in a final").

34. Moreover, no lender would provide DIP financing in a bankruptcy case if it was determined that the bargained-for rights upon which a lender relies to extend funding may later be changed, to the lender's detriment. The necessity of upholding the incorporation of section 364(e) of the Bankruptcy Code in interim orders was succinctly reiterated by the court in *Fleetwood*:

> [L]enders commonly seek, and obtain, § 364(e) protection for transactions in court-approved interim orders. Under these circumstances, to allow an interim financing order which is non-modifiable on its face to be modified subsequent to its issuance is inconsistent with the protection given to

> …[the] DIP lender under § 364(e). Put simply, § 364(e) would offer little incentive to lenders if its protection was limited only to appeals since the bankruptcy court's modification of its own orders during the interim period "poses the same risks as does reversal on appeal." *See Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting (In re Kham & Nate's Shoes No. 2, Inc.)*, 908 F.2d 1351, 1355 (7th Cir. 1990).

*Fleetwood Enters. Inc.*, 427 B.R. at 859-860.

35. Courts have explained that "any provisions of the financing agreement that [the lender] might have bargained for or that helped to motivate its extension of credit are protected by § 364(e)." *In re Cooper Commons, LLC*, 430 F.3d at 1219-20; *see also, Boullioun Aircraft Holding Co.*, 181 F.3d at 1195; *In re Clinton St. Food Corp.*, 170 B.R. 216, 220 (S.D.N.Y. 1994); *Kham & Nate's Shoes No. 2*, 908 F.2d at 1355; *In re Highway Truck Drivers & Helpers Local Union No. 107*, 888 F.2d 293, 297 (3d Cir. 1989). Here, the Interim Order contains a finding that the Financing Documents are binding obligations of the Debtors, enforceable in accordance with such terms, and that the rights, remedies, powers, privileges, liens and priorities of the DIP Lenders and DIP Agent shall not be modified or impaired by subsequent order. *See Interim Order*, at ¶¶ 23 and 24. *See also Unsecured Creditors' Comm. v. First Nat'l. Bank & Trust Co.* (*In re Ellingsen MacLean Oil Co., Inc.*), 834 F.2d 599, 600-01 (6th Cir. 1987) (bank extended post-petition financing in return for the waiver of any right to challenge its pre-petition liens, extending the protection of § 364(e) relating to both the post-petition debt and the waiver); *In re Revco D.S., Inc.*, 901 F.2d 1359, 1364 (6th Cir. 1990) (protections as to the provisions in interim orders included); *Boullioun Aircraft Holding Co. v. Smith Mgmt.* (*In re W. Pac. Airlines, Inc.*), 181 F.3d 1191, 1195 (10th Cir. 1999).

36. Finally, courts hold that the protections and bargained-for rights under section 364 of the Bankruptcy Code include incentives, fees, and consideration agreed upon to the lender. *See, e.g., Fleetwood Enters. Inc.*, 427 B.R. at 561 (finding that, notwithstanding the fact that only

Seahawk Response.doc

interim approval was obtained and that the DIP loans were never funded and were found to be unnecessary, the payment of fees to the lender was appropriate); *In re Defender Drug Stores, Inc.*, 126 B.R. 76, 81 (Bankr. D. Ariz. 1991) (enforcing additional 10% enhancement fee to post-petition lender under section 364 of the Bankruptcy Code); *In re Ellingsen MacLean Oil Co., Inc.*, 834 at 603; *In re Four Seasons Nursing Ctrs. of Am., Inc.*, 483 F.2d 599, 603 (10th Cir. 1973) (stating that a fee was fully earned when the loan commitment agreement was signed and the fact that the debtor did not borrow the full amount was of no consequence).

37. Based on the foregoing, the Equity Committee's request that the Court limit the scope of the Final DIP Order "in light of the existence of the firm offers received by the Equity Committee" are disingenuous and nonsensical based on the facts and circumstances of these cases. As explained above, the DIP Financing was the best offer obtained at the time and none of the new alleged "offers" other than one, have submitted an actual commitment to lend and even the Equity Committee's lone commitment attempts to have this Court reform the Direct Capital contract by, among other things, eliminating the contractual fee. With all due respect, the Equity Committee should focus on completing the proposed transaction with Hercules and assist in preserving the value that has been created for distribution to their constituency.

WHEREFORE, PREMISES CONSIDERED, the Debtors respectfully requests that the Court (i) overrule the Objection filed by the Equity Committee; (ii) approve the DIP Financing on a final basis; and (iii) grant the Debtors all further relief to which they are entitled, either at law or in equity.

Dated: March 10, 2011.

        Respectfully submitted,

        **FULBRIGHT & JAWORSKI L.L.P.**

        By: */s/ Berry D. Spears*
           Berry D. Spears
           State Bar No. 18893300
           Johnathan C. Bolton
           State Bar No. 24025260
        1301 McKinney, Suite 5100
        Houston, Texas 77010-3095
        Telephone: (713) 651-5151
        Facsimile:  (713) 651-5246
        bspears@fulbright.com
        jbolton@fulbright.com

        and

        **JORDAN, HYDEN, WOMBLE,**
        **CULBRETH & HOLZER P.C.**
        Shelby A. Jordan
        State Bar No. 11016700
        Nathaniel Peter Holzer
        State Bar No. 00793971
        500 N. Shoreline Blvd., Suite 900
        Corpus Christi, Texas 78401-0341
        Telephone: (361) 653-6624
        Facsimile:  (361) 888-5555
        sjordan@jhwclaw.com
        pholzer@jhwclaw.com

        **ATTORNEYS FOR THE DEBTORS**
        **AND THE DEBTORS-IN-POSSESSION**