UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re | § | Chapter 11 |
| | § | |
| Seahawk Drilling, Inc. et al., | § | CASE NO. 11-20089-RSS |
| | § | |
| Debtors | § | (Jointly Administered) |
| | § | |

**RESPONSE TO EQUITY COMMITTEE'S OBJECTIONS TO DIP FINANCING AND BENCH BRIEF BY D.E. SHAW DIRECT CAPITAL AS DIP AGENT AND DIP LENDERS**

**A. Preliminary Statement**

1. The Equity Committee, through its objections, apparently now seeks to supplant the current DIP Agent and DIP Lenders with others of its own choosing (its mysterious "Alternative Lender," upon information and belief, is a member of the Equity Committee). Because the transaction costs caused by such a refinancing would exceed the benefit, to manufacture the incentive for such a replacement, the Equity Committee seems to hope that this Court will rewrite material terms of the current Credit Agreement and DIP Credit Facility under which $25.8 million funded to the Debtors on February 15, 2011. Without directly saying it, the Equity Committee wants this Court to re-draft and impose different material terms to the Credit Agreement (precedent which would likely cause the demise of DIP financiers ever providing credit, on an emergency basis, to chapter 11 debtors in the Southern District of Texas again).

2. Chapter 11 debtors often need new credit to reorganize. After an arms-length process, the Debtors, in their business judgment, selected D. E. Shaw Direct Capital Portfolios, L.L.C. ("DEShaw") as their DIP Agent[1] and DIP Lender to provide such credit, and the selection and all material terms were approved by the Court. The loan documents executed by DEShaw

---

[1] Capitalized terms herein are defined the same way as in the Order, Dkt No. 54.

US 775816v.1

and the Debtors were approved by the Court and determined not to be subject to modification. Based upon all of the bargained for rights, DEShaw, as DIP Agent, was obligated to fund, and did in fact fund, approximately 75% of the capital committed under the Credit Facility to the Debtors on February 15, 2011. DEShaw has continued at all times to fully comply with its obligations as DIP Agent and DIP Lender. The Committee now requests, however, that DEShaw's bargained for rights in extending such credit be rewritten to remove portions of the consideration owing to DEShaw, the very consideration that DEShaw relied upon in committing and extending credit. If the Committees' objections are entertained, prospective financiers will never want to provide capital to a debtor filing bankruptcy in Texas again, because such financier would be at risk, through the precedent of this case, of having its bargained for consideration stripped away after being found to commit or extend credit in good faith. To incentivize lenders for the credit risks with providing financing to bankrupt debtors, courts hold that modifications to a credit agreement in these circumstances should not be tolerated. Requests that this Court rule differently from clear precedent (and thereby become the aberration) cannot withstand serious scrutiny.

**B.   Facts**

3.   As the evidence, declarations, affidavits and presentation by the Debtors at hearing on February 14, 2011 demonstrated, after pursuing DIP financing prior to the commencement of these cases, the Debtors agreed upon terms and selected DEShaw as its DIP Agent and DIP Lender.

4.   After negotiations between the Debtors (and their counsel and advisors, including Alvarez & Marsal) and DEShaw (and its counsel) regarding material terms, on February 3, 2011, DEShaw provided a draft commitment letter and term sheet to the Debtors. After further

negotiations, the following week (and three days before the Debtors' bankruptcy filings), DEShaw submitted its revised written Commitment (signed by DEShaw and the Debtor), dated February 8, 2011, for the $35 million DIP Credit Facility and its material terms.[2] Subsequently, and through further negotiations, the Debtors and DEShaw executed the full DIP Credit Agreement. After hearings on February 14, 2011 on the Debtors' Approval Motion for such DIP Credit Facility with DEShaw, on February 15, 2011, the Court executed the Interim Order, attached as Exhibit B. The Interim Order authorized and directed the Debtors to make certain payments and obligated DEShaw to fund up to $25.8 million (not the full $35 million under the DIP Credit Agreement) and otherwise approved and ordered binding the DIP Credit Facility, the DIP Credit Agreement and all terms within. Later on the same day of February 15, 2011, DEShaw, at the Debtors' request and per the terms of the Interim Order, funded the entirety of the $25.8 million.

5. With the upcoming further hearing scheduled regarding the DIP Credit Facility, the Debtors now seek the Court's authorization to extend its facility with DEShaw to the full $35 million (an additional $9.2 million beyond the $25.8 funding which was already approved and made on February 15, 2011). By this further hearing, the Debtors do not seek to provide DEShaw with any *additional* fees or consideration; all such fees and consideration were already approved by the Interim Order. The expansion of the facility from $25.8 to the full committed $35 million would only provide higher interest accruals to the extent of the Debtors' draws beyond the current $25.8 million capacity.

---

[2] The Debtors' critical need to satisfy the market, its vendors and customers that it would have sufficient liquidity for a proposed restructuring was of paramount importance, and before its bankruptcy filing, Seahawk sent announcements to the public that "**Seahawk has obtained a $35 million debtor-in-possession credit facility to support its business and liquidity needs from the D.E. Shaw group's direct capital unit.**" *See* press releases, Reuters and AP articles attached as Exhibit A.

6.      The Court has previously found the Credit Agreement to be in all manners valid, enforceable and binding. In funding the DIP Credit Facility, it was a condition precedent to funding, and the Court expressly found that the Debtors, DIP Agent and DIP Lenders acted in good faith and that the application of Bankruptcy Code § 364(e) applied to all relief and provisions of the DIP Credit Agreement.[3] To this end, after the presentation, submission of evidence and hearing, the Court held as follows:

> Good Faith. The DIP Loan Documents have been negotiated in good faith and at arms' length by and among the Debtors, the DIP Agent and the DIP Lenders. Any DIP Loans and/or other financial accommodations made to the Debtors by the DIP Agent and the DIP Lender pursuant to this Interim Order and/or the DIP Loan Documents shall be deemed to have been extended by the DIP Agent and the DIP Lenders in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders shall be entitled to all protections afforded thereunder. The terms of the credit facility provided under the DIP Loan Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.

*See* Interim Order (Exhibit B), ¶ K.[4] The Court further ordered the incorporation of Bankruptcy Code § 364(e) into the Interim DIP Order and held that any post-petition indebtedness,

---

[3] It is well-settled that the overall policy behind § 364 is to encourage lenders to provide financing by offering them incentives for their risk taking. *Wash. Bank*, 829 F.2d 1484, 1488 (9th Cir. 1987); *In re Ellingsen MacLean Oil Co.*, 834 F.2d 599 (6th Cir. 1987) *cert. denied*, 488 U.S. 817 (1988) (purpose of 364 is to induce banks to lend credit to chapter 11 debtors by protecting the conditions and consideration for such lender); *In re Florida West Gateway, Inc.*, 147 B.R. 817, 819 (Bankr. Fla. 1992) (§364 was enacted to provide incentives for lenders to engage in bankruptcy lending). To change the terms of an Interim Order authorizing and directing funding, such order must be stayed before funding occurs. Otherwise, with a finding of good faith and funding actually occurring, the lender is entitled all of its bargained for rights provided in consideration of the committed credit, including the interim order's protections and its bargained for fee and entitlements. *Fleetwood* at 859. Lenders receiving court approval for interim financing are entitled to rely upon the provisions contained in Interim Orders. *Wash. Bank*, 829 F.2d at 1489.

[4] Courts typically approve a debtor's business judgment unless that decision is a product of bad faith or gross abuse of discretion. *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992); (quoting *Smith v. Van Gorkom*), 488 A.2d 858, 872 (Del. 1985)).

obligation or liability incurred by any of the Debtors to the DIP Lenders and the DIP Agent shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lenders and DIP Agent shall be entitled to all the rights, remedies, privileges and benefits granted herein and within the DIP Loan Documents. *See* Interim Order (Exhibit B), ¶ 23-24.

7.  After the February 15, 2011 execution and entry of the Interim Order by the Court, as requested by the Debtors and as authorized and directed by the Court, the DIP Agent and DIP Lender funded the full $25.8 million. The DIP Lenders provided financing to the Debtors in reliance upon the terms of the Interim Order, including the incorporation of Bankruptcy Code § 364(e).

**C.  The Law**

8.  As long as a lender extends credit in good faith under the authority of an "un-stayed" court order, it need not worry that a creditor is objecting to the transaction or seeking reversal. *See, e.g., In re EDC Holding Co.*, 676 F.2d 945, 947 (7th Cir. 1982); *In re General Growth Prop.'s, Inc.*, 412 B.R. 122 (Bankr. S.D.N.Y. 2009), *appeal dismissed as moot*, 2010 WL 532504 (2010) (when lenders are deemed to extend financing in good faith, they are entitled to 364 protections, and the debtors' decision to obtain financing orders to pay prior indebtedness and for operations reflects an exercise of the debtors' own business judgment); *Weinstein, Eisen & Weiss*, 430 F.3d 1215, 1219 (9th Cir. 2005) (364 is to provide a debtor a means to obtain credit and "therefore *any* agreements or *conditions* necessary to obtain that credit were protected by § 364(e).") (italics added); *In re Texaco, Inc., et. al.*, 92 B.R. 38, 51-52 (Bankr. S.D.N.Y. 1988) (holding that change of control clause as part of financing agreement could not be modified because, under § 364, it would undermine part of the bargained for consideration upon which lender was willing to extend credit).

9. It is well accepted that Bankruptcy Code § 364(e) applies to any modification of a bankruptcy court's own interim financing order. *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1355 (7th Cir. 1990) (a bankruptcy court's modification of its own orders pose the same risks as does reversal on appeal, and § 364(e) also applies to the modification of a relied upon financing order through the law of the case); *see also, In re Fleetwood Enter., Inc.*, 427 B.R. 852 (Bankr. C.D. Cal. 2010) (the court is not required to find fees for DIP Lender were a necessary expense that actually benefitted estate – even though final approval of DIP was not obtained, it is enough that interim approval was granted with a finding of good faith, and lender is therefore entitled to its bargained for rights under its credit agreement); *In re Revco D.S., Inc.*, 901 F.2d 1359, 1364 (6th Cir. 1990) (rejecting arguments that portion of financing order may be severable).

10. Reliance on the protections of Bankruptcy Code § 364(e) in interim DIP orders is a customary practice, necessary to secure interim DIP financing. *Fleetwood*, 427 B.R. at 859-60; *In re Adams Apple, Inc.*, 829 F.2d 1484, 1489 (9th Cir. 1987) ("Lenders who deal with debtors and request and receive court approval for interim financing arrangements rely on provisions contained in interim orders just as they would rely on provisions contained in a final.").[5] No prospective lender would provide DIP financing in a bankruptcy case if it was determined that the bargained for rights upon which a lender relies to extend funding may later be modified against the lender's economic interests. The necessity of upholding the incorporation of Bankruptcy Code § 364(e) in interim orders was succinctly reiterated by the court in *Fleetwood*:

---

[5] "A claim is moot as soon as a lender has relied on the authorization [to lend]" and "to permit a court to impose a stay after a creditor has lent money to a debtor would intrude on a reorganization process already underway and would interfere with the lender's ability to plan for its outlay of funds." *Id.* at 1489.

> [T]o allow an interim financing order which is non-modifiable on its face to be modified subsequent to its issuance is inconsistent with the protection given to…[the] DIP lender under § 364(e). Put simply, § 364(e) would offer little incentive to lenders if its protection was limited only to appeals since the bankruptcy court's modification of its own orders during the interim period "poses the same risks as does reversal on appeal." Citing *In re Kham & Nate's Shoes*, 908 F.2d 1351, 1355 (7th Cir. 1990).

*Fleetwood Enter. Inc.*, 427 B.R. at 859-860.

11. The Interim Order found that the DIP Loan Documents are binding obligations of the Debtors, enforceable in accordance with such terms, and that the rights, remedies, powers, privileges, liens and priorities of the DIP Lenders and DIP Agent shall not be modified or impaired by subsequent order. *See, e.g.,* Interim Order (Exhibit B), ¶¶ 23 and 24. The rights and all consideration for the DIP Lenders under the DIP Loan Documents constitute the rights for which the DIP Agent and DIP Lenders bargained, and the protections of Bankruptcy Code § 364(e) extend to all rights for which the lender bargained. *E.g., Weinstein*, 430 F.3d 1215, 1219 (9th Cir. 2005). Bankruptcy Code § 364(e) "broadly protects any requirement or obligation that was part of a post-petition creditors' agreement to financing." *Id.* at 1219; *also citing, In re Ellingsen MacLean Oil Co., Inc.*, 834 F.2d 599, 600-01 (6th Cir. 1987), *cert. denied*, 488 U.S. 817 (1988) (where pre-petition bank extended post-petition financing in return for consideration including the making of pre-petition debt incontestable, upholding the protection of § 364(e) to the full package of consideration intended for bank because bank had been found to extend credit in good faith); *In re Revco*, 901 F.2d at 1364 (6th Cir. 1990) (these protections include the rights to the lender and package of deal granted by financing order); *Boullioun Aircraft Holding Co. v. Smith Mgmt. (In re Western Pac. Airlines, Inc.)*, 181 F.3d 1191, 1195 (10th Cir. 1999). "[A]ny provisions of the financing agreement that [the lender] might have bargained for or that helped to motivate its extension of credit are protected by § 364(e)." *Weinstein*, 430 F.3d at 1219-20 (9th

Cir. 2005); *see also, Western Pac.*, 181 F.3d at 1195 (10th Cir. 1989); *In re Clinton Street Food Corp.*, 170 B.R. 216, 220 (S.D.N.Y. 1994); *Nate's Shoes*, 908 F.2d at 1355 (7th Cir. 1990); *In re Highway Truck Drivers & Helpers Local Union No. 107*, 888 F.2d 293, 297 (3rd Cir. 1989).[6]

12. The fees which the Debtors agreed to pay to DEShaw as DIP Agent and DIP Lender were fully disclosed in multiple and repeated manners prior to the Court's holding and findings that such fees were approved, would constitute part of the principal amount of the DIP Obligations, and are secured by first priority priming liens and a superpriority claim.[7] Courts specifically hold that those protected bargained-for rights under Bankruptcy Code § 364 include incentives such as fees. *See, e.g., Fleetwood*, 427 B.R. at 561 (notwithstanding that only interim approval was obtained and DIP loans never funded and were found to be unnecessary, payment

---

[6] Indeed, the protections of Bankruptcy Code § 364(e) are so strong, courts hold and explain that after a lender begins advancing funds in reliance of the financing order, if the lender is acting in good faith, any appeal of a financing order is moot. *E.g., In re Clinton Street Food Corp.*, 170 B.R. 216, 220 (S.D.N.Y. 1994) (proper course is to dismiss such an appeal as moot); *see also Texaco*, 92 B.R. 51-52. Other courts find that funding is not even necessary; the finding of good faith in an interim financing order coupled with a commitment to fund may be enough. *E.g., Fleetwood*, 427 B.R. at 859.

[7] In the case at bar, all of the fees paid and payable to the DIP Agent and the DIP Lenders were fully disclosed in detail in at least *three (3)* different ways, including (i) the Debtors' Motion filed on February 11, 2011 to approve the DIP Financing (p.5-6), (ii) the Credit Agreement referenced and attached thereto, and again (iii) disclosed orally to the Court by counsel for the Debtors at the February 14, 2011 DIP hearing. After all such disclosures, the Court held, "all fees paid and payable and costs and/or expenses reimbursed, as set forth in the DIP Loan Documents, by the Debtors to the DIP Lenders or the DIP Agent, are hereby approved." *See* Interim Order, ¶ 7. The Interim Order further provides that "all such unpaid fees, commissions, costs and other expenses shall be included and constitute part of the principal amount of the DIP Obligations and be secured by the Post-Petition Liens." *See* Interim Order, ¶ 8. Moreover, fees including the exit fee were included in the DIP Loan Documents and are unambiguously DIP Obligations as defined by the Interim Order, and all DIP Obligations were approved by the Interim Order and deemed to be secured by priming liens and a superpriority claim. *See* Interim Order, ¶¶ 10-11. The DIP Agent and the DIP Lenders funded under the Credit Agreement, including the initial $25.8 million, based upon these approvals and directives, and in consideration of such bargained for rights.

of fees to lender was appropriate);[8] *In re Defender Drug Stores, Inc.*, 126 B.R. 76, 81 (Bankr. D. Ariz. 1991) (enforcing additional 10% enhancement fee to post-petition lender under Bankruptcy Code § 364); *see also, In re Ellingsen MacLean Oil Co., Inc.*, 834 at 603; *In re Four Seasons Nursing Ctrs. of Am., Inc.*, 483 F.2d 599, 603 (10th Cir. 1973) (fee fully earned when loan commitment agreement was signed and fact that debtor did not borrow full amount was of no consequence); *In re Korea Chosun Daily*, 337 B.R. 773, 778-81 (Bankr. S.D.N.Y. 2005).

13. Finally, the Equity Committee cites only two cases in its briefing relating to financing orders, and both cases are inapplicable and readily distinguishable from the facts at hand. The first, *Visionaire,* was a case converted to chapter 7 and the terms of an interim order did not make the order binding, nor was there any term or survival clause. The Court found the advances under the interim order protected, but post-conversion, it allowed trustee fees to be paid over objection. No court has ever cited *Visionaire* for the proposition that interim orders expire after 15 days.[9] The second case, *In re M4 Enter., Inc.*, actually involved only a cash collateral order which allowed ongoing post-petition interest to a pre-petition over-secured creditor. Days after the order was entered, the 11th Circuit, sitting above the *M4* court, found agreements for such types of post-petition payments unenforceable, and the bankruptcy court found the new supervening controlling law binding and applicable to the cash collateral order provision. In the case at bar, there is no new post-ruling intervening controlling law and there is no cash collateral order or such a provision at issue. With the actual cases similar to the facts at hand, the support

---

[8] As is common is these cases, the Committee in this opinion argued that the debtors did not need to borrow the money and that the fees to the lender were not earned and were "outrageous" and "obscenely high." *Id.* at 855-56.

[9] Indeed, case law holds that the court's role in approving interim financing is to approve the credit agreement presented, and it is the credit agreement which then becomes the binding contract. *See Fleetwood Enters.*, 427 B.R. at 861, citing *In re Arlington Hospitality, Inc.*, 368 B.R. 702, 713 (Bankr. N.D. Ill. 2007).

is abundant for the Debtors' exercise of its business judgment and broadly supports the enforcement of the rights and obligations to DEShaw.

## D. Conclusion

14. Based on the foregoing, this Court should not allow the rewriting of the terms of the DIP Credit Agreement, and must protect the DIP Agent and DIP Lenders' bargained for rights. DEShaw is associated to these proceedings only because it was selected by the Debtors, and approved by the Court, to extend substantial new credit to these Debtors, which it has indeed done. After Court authorizations and directives, it extended all such credit in good faith and per the terms of fully disclosed and specifically approved Loan Documents. If the Loan Documents are now rewritten in any manner by the Court, precedent would be established of the most dangerous kind.

DATED: March 10, 2011.

Respectfully submitted,

**VINSON & ELKINS L.L.P.**

By: _/s/ Duston K. McFaul_
    Harry A. Perrin
    Texas Bar No. 1579800
    Duston K. McFaul
    Texas Bar No. 24003309
    John E. West
    Texas Bar No. 21202500
    1001 Fannin Street, Suite 2500
    Houston, Texas 77002-6760
    Tel. (713) 758-4740
    Fax: (713) 615-5777
    Email: dmcfaul@velaw.com
    Email: jwest@velaw.com

    **ATTORNEYS FOR DIP AGENT AND DIP LENDER**

## **CERTIFICATE OF SERVICE**

    I hereby certify that a true and correct copy of the foregoing instrument was served electronically on all parties entitled to receive service through the U.S. Bankruptcy Court's ECF system, on this 10th day of March, 2011.

                                         */s/ Duston K. McFaul*
                                         Duston K. McFaul