**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Seahawk Drilling, Inc., *et al.*, | § | Case No.: 11-20089-RSS |
| | § | |
| Debtors. | § | Jointly Administered |

**DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS
(I) AUTHORIZING POST-PETITION, SECURED WIND DOWN FINANCING
FROM HAYMAN CAPITAL MASTER FUND, L.P. AND (II) SCHEDULING
A FINAL HEARING PURSUANT TO SECTIONS 105(a), 361, 362, 363 AND 364
OF THE BANKRUPTCY CODE AND RULES 2002, 4001, AND 9014
OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

**NOTICE UNDER COMPLEX CASE ORDER**

**THE DEBTORS HAVE REQUESTED A HEARING ON THIS MATTER
ON APRIL 25, 2011 AT 3:00 P.M. AT THE UNITED STATES
BANKRUPTCY COURT, 1133 N. SHORELINE, 2ND FLOOR, CORPUS
CHRISTI, TEXAS 78401. IF YOU OBJECT TO THE RELIEF
REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY
ANSWERING EACH PARAGRAPH OF THIS PLEADING. UNLESS
OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR
RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT
WITHIN TWENTY-THREE DAYS FROM THE DATE YOU WERE
SERVED WITH THIS PLEADING. YOU MUST SERVE A COPY OF
YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE;
OTHERWISE, THE COURT MAY TREAT THE PLEADING AS
UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**EMERGENCY RELIEF HAS BEEN REQUESTED.  IF THE COURT
CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU
WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO
THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE
EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU
SHOULD FILE AN IMMEDIATE RESPONSE.**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Seahawk Drilling, Inc. ("**Seahawk**" or the "**Company**") and its above-captioned direct

and indirect subsidiaries (collectively, the "**Debtors**"), file this Emergency Motion (the "**Wind**

90430070.8

**Down DIP Financing Motion**") Pursuant to Sections 105(a), 362, 363 and 364 of the Bankruptcy Code and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of interim and final orders approving post-petition, secured financing in the aggregate amount of $14,250,000.00 (the "**Wind Down DIP Financing**").  In support of this Wind Down DIP Financing Motion, the Debtors respectfully state as follows:

**SUMMARY OF EMERGENCY RELIEF REQUESTED**

1.      Late in the evening on Wednesday, April 13, 2011, the Debtors received a draft term sheet from Hayman Capital Master Fund, L.P. ("**Hayman**" or "**Wind Down DIP Lender**") offering the Debtors post-petition, secured financing, (the "**Wind Down Facility**" or the "**Loans**") to fund the Debtors' operations during the period following the closing (the "**Closing**") of the sale of the Debtors' assets to Hercules Offshore, Inc. ("**Hercules**") through confirmation of a chapter 11 plan of reorganization in these jointly-administered cases (the "**Wind Down Period**").

2.      Although some of the conditions in the original term sheet from Hayman were not acceptable to the Debtors, over the past week, the Debtors and their advisors, along with counsel for the Official Committee of Equity Security Holders (the "**Equity Committee**") have negotiated with Hayman and its counsel regarding the terms and conditions of the proposed Wind Down Facility that would fund the Debtors' operations post-closing.  The form of Debtor-in-Possession Loan, Security and Guaranty Agreement (the "**Wind Down DIP Loan Agreement**"), is attached hereto, marked as **Exhibit A**, and incorporated herein by reference for all purposes.

3.      At the closing of the sale of their assets to Hercules (which is anticipated to occur next week), the Debtors intend to use the cash received from Hercules under the APA to pay off

- 2 -

the existing DIP Facility with D.E. Shaw Direct Capital, L.L.C. ("**D.E. Shaw**").  Immediately following the closing with Hercules, assuming Court approval is obtained, the Debtors will receive the first tranche under Wind Down Facility with Hayman upon satisfaction of the conditions in the Wind Down DIP Loan Agreement.[1]

4.      By this motion, the Debtors seek approval of an interim order, pursuant to sections 105(a), 361, 362, 363 and 364 of the Bankruptcy Code, authorizing the Debtors to obtain post-petition financing from Hayman, and scheduling a hearing for entry of a Final Order granting the motion.  Specifically, the Debtors seek authority, on an interim and final basis, to obtain post-petition, secured, term loan financing in the aggregate amount of up to $14,250,000.00 in two separate tranches:  Tranche A, consisting of an initial draw of up to $5.75 million upon interim approval of this motion; and Tranche B, consisting of a secondary draw of $8.5 million upon final approval of this motion.

5.      As explained above, the Wind Down Facility is necessary to fund the Debtors' operations during the period following the closing of the sale of the Debtors' assets to Hercules and will be paid with shares of Hercules Common Stock on the effective date of a confirmed chapter 11 plan of reorganization in these jointly-administered bankruptcy cases.

6.      Accordingly, t**he Debtors request that the Court grant the Wind Down DIP Financing Motion, on an interim basis, following a hearing on Monday, April 25, 2011 at 3:00 p.m.**

---

[1]The alternative to the Wind Down Facility would be to fund the Debtors' post-closing activities via a final draw under the Original DIP Credit Facility (as defined below).   A final draw in the approximate amount of $14.25 million, however, would create outstanding obligations under the Original DIP Credit Facility greater than the cash consideration received in the Seahawk Asset Sale (as defined below).  Pursuant to the APA (as defined below), any obligations to the DIP Lenders in excess of the cash consideration received in the Seahawk Asset Sale would have to be paid in cash at closing by converting Hercules Shares (as defined below) at a conversion rate established in the APA.  Because that conversion rate is currently unfavorable, the Debtors believe the Wind Down Facility is the superior alternative and estimate that the Wind Down Facility would result in savings of approximately $6.2 million over the anticipated term of the Loans.

## SUMMARY OF TERMS OF WIND DOWN DIP FINANCING

7.      In accordance with Bankruptcy Rule 4001, below is a summary of the terms of the proposed Wind Down Facility:[2]

a.      **Borrower:**  Seahawk Drilling, Inc., as a debtor-in-possession together with the subsidiary-debtors in this jointly-administered case.

b.      **Guarantors:**  All debtors-in-possession in these chapter 11 cases, other than the Borrower (the "**Guarantors**," or each individually, a "**Guarantor**").

c.      **Lender:**  Hayman or one of its affiliates.

d.      **Term Loan Facility:**  The Wind Down Lender will lend up to $14,250,000 in the form of two term loans as follows: (i) a term loan of up to $5,750,000 (the "**Tranche A Loan**") in a single draw upon satisfaction of the conditions precedent to the Tranche A Loan and (ii) a term loan of up to $8,500,000 (the "**Tranche B Loan**") in a single draw upon satisfaction of the conditions precedent to the Tranche B Loan.

e.      **Maturity:** The Loans shall mature upon the earlier of (i) January 31, 2012 and (ii) the second Business Day after the effective date of a confirmed plan of reorganization or liquidation.

f.      **Interest Rate:**  The Loans shall bear interest at 13% per annum unless an Event of Default, as hereinafter defined, shall have occurred, in which case the Loans shall bear interest at 15% per annum.

g.      **Interest Payments/PIK:**  Accrued interest on the Loans shall be payable in arrears on the last day of each calendar month and on the Maturity Date and, if not paid in cash, then to the extent not so paid, shall be payable in kind by adding such accrued interest not paid in cash to the unpaid principal balance of the Loans. All such capitalized interest so added shall be treated as principal of the Loans.

h.      **Use of Proceeds**:  Proceeds of the Loans may only be used for (i)(A) the orderly wind down of the Borrower's bankruptcy estate, including all costs, fees, expenses (including, without limitation, legal fees and expenses) payable to the Wind Down Lender and (B) the administration of claims and distributions to creditors and interest holders in accordance with a budget acceptable to the Lender (together with any and all updates, supplements and/or modifications to

---

[2] This summary is qualified in its entirety by reference to the Debtor-in-Possession Loan, Security and Guaranty Agreement attached hereto as **Exhibit A**.  To the extent that the terms of this summary conflict with the terms set forth on **Exhibit A**, the terms set forth in **Exhibit A** control.  All capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Wind Down DIP Loan Agreement.

such budget that have been approved in advance by the Bankruptcy Court and the Lender, collectively, the **"Wind Down Budget"**) and (ii) the Carve-Out.

i. **Out-of-Pocket Expenses**:  Borrower to reimburse all reasonable out-of-pocket expenses incurred by Wind Down DIP Lender and its Affiliates.

j. **Documentation**:  The Wind Down Facility is evidenced by a Debtor-in-Possession Loan, Security, and Guaranty Agreement.

k. **Payment at Maturity**:  The Borrower will repay the Loans no later than the Maturity Date, which shall be the earlier of:  (i) January 31, 2012 and (ii) the second Business Day after the effective date of the Reorganization Plan.

At such time as the Loans shall become due and payable, whether on the Maturity Date or, if earlier, upon acceleration, the Balance Due shall be payable by the transfer to the Wind Down DIP Lender, free and clear of all Liens, of a number of shares of common stock, par value $0.01 per share, of Hercules ("**Hercules Common Stock**") then owned by the Loan Parties and maintained pursuant to the Escrow Agreement as in effect on the date hereof (the "**Subject Hercules Common Stock**") having an aggregate value, when determined in accordance with the provisions of Section 3.02 of the Wind Down DIP Loan Agreement, equal to the Balance Due.

If the Borrower is unable to pay or satisfy in full the Balance Due because either (i) the Subject Hercules Common Stock does not constitute Released Hercules Stock or, (ii) after applying all Released Hercules Stock in accordance with Section 3.01(b) and Section 3.02, a Balance Due remains, such Balance Due shall be payable in full in dollars when due.

For purposes of Section 3.01 of the Wind Down DIP Loan Agreement and to the extent Subject Hercules Common Stock is sold, assigned, transferred, otherwise disposed of, or accepted in full or partial satisfaction of Indebtedness, Guaranteed Indebtedness or any other obligations owing under any of the Loan Documents as permitted under Section 4.04, Section 10.02 or elsewhere herein (each a **"Collateral Disposition"**), each share of Hercules Common Stock shall be valued at a price equal to the Applicable Percentage of the volume-weighted adjusted price on the NASDAQ Global Select Market (**"VWAP"**) for the 15 consecutive trading days immediately preceding the date such shares of Subject Hercules Common Stock are transferred to the Lender as payment under Section 3.01 or are transferred in connection with a Collateral Disposition. The term **"Applicable Percentage"** means (a) 90%, if (i) the transfer of the Subject Hercules Common Stock to the Lender or in connection with a Collateral Disposition is (A) registered under applicable federal and state securities laws or (B) not required to be registered under applicable federal and state securities laws as a result of the exemption from registration set forth in 11 U.S.C. § 1145, (ii) such transfer occurs on or before the Maturity Date and (iii) no Event of Default has occurred and is continuing on the date of such transfer or would result from the making of such

transfer; or (b) 80%, if (i) the transfer of the Subject Hercules Common Stock to the Lender or in connection with a Collateral Disposition is (A) not registered under applicable federal and state securities laws and (B) not exempt under 11 U.S.C. § 1145 from registration under applicable federal and state securities or (iii) an Event of Default has occurred and is continuing on the date of such transfer (irrespective of whether such transfer occurs on or before the Maturity Date) or would result from the making of such transfer. All shares of the Subject Hercules Common Stock shall upon transfer or delivery to the Lender be evidenced by duly executed share certificates and shall be accompanied by transfer powers duly executed in blank, which certificates and transfer powers shall be in form and substance satisfactory to the Lender.

l.  **Optional Prepayments**.  Upon one Business Days' prior written notice from the Borrower to the Lender, the Borrower may prepay in cash all or any portion of the Loans prior to the Maturity Date.

m.  **Mandatory Prepayments**.  Upon the receipt by any Loan Party of cash proceeds from any of the following events (net of reasonable fees and out-of-pocket expenses paid to third parties other than an Affiliate of a Loan Party in connection with such event determined reasonably and in good faith by a financial officer of the Borrower, but subject to the reasonable approval of the Lender): any asset sales, Casualty Events, condemnation proceedings, litigation or other legal recovery or settlement, which cash proceeds exceed $250,000 individually or in the aggregate for all such asset sales, Casualty Events, condemnation proceedings, litigation and other legal recoveries and settlements that have occurred after the Closing Date (such excess amount, the "**Excess Amount**"), the Borrower shall make a mandatory prepayment of the Loans within three days after receiving such cash proceeds in an amount equal to 100% of the Excess Amount.

n.  **Prepayment Premium**.  All prepayments of the Loans made at any time, whether voluntary or mandatory, shall be accompanied by a prepayment premium payable in cash in the amount of 5% of the principal amount of the Loans prepaid at such time.

o.  **Payments by the Borrower**.  The Borrower shall make each cash payment required to be made by it hereunder (whether of principal, interest, or fees, or otherwise) prior to 12:00 noon, Houston time, on the date when due, in immediately available funds, without defense, deduction, recoupment, set-off or counterclaim.  All interest capitalized hereunder shall be deemed timely paid upon it being capitalized pursuant to Section 3.03(c). Any amounts received after such time on any date may, in the discretion of the Wind Down DIP Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such cash payments shall be made to a bank account designated by the Wind Down DIP Lender.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment

accruing interest, interest thereon shall be payable for the period of such extension. All cash payments hereunder shall be in dollars.

p. **Collateral; Security Interest.** Pursuant to and as provided in the DIP Orders, as security for the full and timely payment of all of the Indebtedness or Guaranteed Indebtedness, as applicable, each Loan Party collaterally assigns, pledges and transfers and grants to the Wind Down DIP Lender a security interest in and to and Lien on all of its right, title and interest in, to and under all the Collateral, whether now owned or hereafter acquired, now existing or hereafter created and wherever located.

Pursuant to and as provided in the DIP Orders, the Loans, all Indebtedness and all Guaranteed Indebtedness shall at all times:

(i) *Super-priority*: pursuant to section 364(c)(1) of the United States Bankruptcy Code, constitute allowed superpriority administrative expense claims in the Chapter 11 Cases, having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all expenses and claims of the Borrower and the Guarantors, whether heretofore or hereafter incurred, including, but not limited to, the kind specified in sections 105, 326, 328, 506(c), 507(a) or 1114 of the Bankruptcy Code, subject only to the Carve-Out;

(ii) *Unencumbered property*: pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by valid, perfected, first-priority security interests in and liens on all of the Collateral that is not subject to non-avoidable, valid and perfected liens in existence as of the date on which the Interim Order is entered by the Bankruptcy Court, subject only to the Carve-Out; and

(iii) *Priming liens*: pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by valid priming perfected security interests in and liens on all property, senior in all respects to the security interests and Liens securing any Loan Party's obligations (other than the Indebtedness and the Guaranteed Indebtedness), subject only to the Carve-Out.

All Liens on the Collateral in favor of the Wind Down DIP Lender shall be senior in priority to any security interests in or Liens on the Collateral, except as otherwise permitted above. There shall be no liens or encumbrances on Collateral that secure indebtedness of any of the Loan Parties or their respective subsidiaries. Pursuant to and as provided in the DIP Orders, (i) the Liens and security interests granted herein shall be deemed valid, enforceable and perfected by entry of the Interim Order and the Final Order, as applicable, and (ii) no financing statement, notice of Lien, mortgage, deed of trust or similar instrument in any jurisdiction or filing office need be filed or any other action taken in order to validate and perfect the Liens and security interests granted by or pursuant to this Agreement or the DIP Orders.

q.      **Pledged Collateral**.  Upon request of the Wind Down DIP Lender, each Loan Party will (a) deliver to the Wind Down DIP Lender, all certificates, promissory notes or Instruments representing or evidencing any Subject Hercules Common Stock, Equity Interests in Subsidiaries or loans made by any of the Loan Parties to non-Loan Parties (collectively, the "**Pledged Collateral**"), whether now arising or hereafter acquired, in suitable form for transfer by delivery or, as applicable, accompanied by such Loan Party's endorsement, where necessary, or duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to the Lender or (b) register Pledged Collateral in the name of the Lender; provided, however, that no Loan Party will be required to deliver any certificates or Instruments representing or evidencing or register in the name of the Lender any Hercules Common Stock or Subject Hercules Common Stock until (i) the Reorganization Plan has been confirmed, (ii) such stock has been released from the Escrow Agreement in accordance with its terms as in effect on the date hereof and (iii) such Loan Party is otherwise so authorized by the Bankruptcy Court (any Hercules Common Stock satisfying each of the conditions in this proviso, the "**Released Hercules Stock**").

r.      **Carve Out:**  "**Carve-Out**" means, following the occurrence and during the continuance of an Event of Default, an amount sufficient for payment of (x) allowed professional fees and disbursements incurred by professionals retained by the Borrower and the Guarantors and the official committee of unsecured creditors and the official committee of equity holders appointed in the Chapter 11 Case in an aggregate amount not to exceed $2,250,000, and (y) fees pursuant to 28 U.S.C. § 1930 and any fees payable to the clerk of the Bankruptcy Court; *provided* that, so long as no Event of Default has occurred, the Borrower and the Guarantors shall be permitted to pay fees and expenses allowed and payable under 11 U.S.C. § 330 and § 331 to the extent such fees and expenses are specifically identified in the Wind Down Budget, as the same may become due and payable, and the same shall not reduce the Carve-Out.

s.      **Events of Default:**  One or more of the following events shall constitute an **"Event of Default"**:

(a)     the Borrower shall fail to pay any principal of the Loans when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration or otherwise;

(b)     the Borrower shall fail to pay any interest on the Loans or any fee or any other amount (other than an amount referred to in Section 10.01(a) of the Wind Down DIP Loan Agreement) payable under any Wind Down Loan Document, when and as the same shall become due and payable;

(c)     any representation or warranty made or deemed made by or on behalf of the Borrower or any Subsidiary in or in connection with any Loan Document or any amendment or modification of any Loan Document or waiver under such Wind Down Loan Document, or in any

report, certificate, financial statement or other document furnished pursuant to or in connection with any Wind Down Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)      the Borrower or any Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in the following provisions of the Wind Down DIP Loan Agreement:    Article III, Article IV, Section 8.01(a), Section 8.02 (other than Section 8.02(a)), Section 8.04, Section 8.05, Section 8.06 or Article IX;

(e)      the Borrower or any Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in (i) Section 8.02(a) of the Wind Down DIP Loan Agreement and such failure shall continue unremedied for a period of three days after the earlier to occur of (A) notice thereof from the Lender to the Borrower or (B) a Responsible Officer of the Borrower or such Subsidiary otherwise becoming aware of such default, or (ii) the Wind Down DIP Loan Agreement (other than those specified in Section 10.01(a), Section 10.01(b), Section 10.01(c), Section 10.01(d) or Section 10.01(e)(i) thereof) or any other Wind Down Loan Document, and such failure shall continue unremedied for a period of 30 days after the earlier to occur of (A) notice thereof from the Lender to the Borrower or (B) a Responsible Officer of the Borrower or such Subsidiary otherwise becoming aware of such default;

(f)      (i) the Borrower or any Subsidiary shall fail to comply with any of the provisions of any DIP Order or any Cash Collateral Order; (ii) a trustee shall be appointed in any Chapter 11 Case prior to the confirmation of a plan of reorganization (*provided, however*, that an Event of Default shall not be deemed to have occurred upon the appointment by the Borrower's board of directors or the Bankruptcy Court of any other Person appointed to manage the affairs of the Loan Parties); (iii) any Chapter 11 Case shall be dismissed or converted to a case under Chapter 7; (iv) there shall be filed by any Loan Party any motion to sell all or a substantial part of the Collateral on terms that are not acceptable to the Lender in its sole discretion; (v) without the Lender's prior written consent, the Borrower or any Subsidiary shall file any motion to alter, amend, vacate, supplement, modify, or reconsider, in any respect, any DIP Order or, without the Lender's prior written consent, any DIP Order is amended, vacated, stayed, reversed or otherwise modified; (vi) the Bankruptcy Court shall enter an order granting to any Person (other than the Lender) relief from the automatic stay to foreclose upon a Lien (or to accept a deed in lieu of foreclosure or the like) with respect to any property of the Borrower that has an aggregate book value in excess of $50,000 or to terminate or otherwise exercise remedies under any material agreement, document or instrument which is entered into after the Petition Date, whether or not it relates to any Debt; (vii) the Borrower or any Subsidiary shall file a

motion or other request with the Bankruptcy Court seeking authority to use any cash proceeds of the Collateral or to obtain any financing under Section 364(c) or Section 364(d) of the Bankruptcy Code or otherwise secured by a Lien upon any Collateral (in each case (A) without the Lender prior written consent or (B) if such motion fails to contemplate payment in full of the Indebtedness); (viii) the payment by the Borrower or any Subsidiary of any pre-petition Debt, other than as approved by the Bankruptcy Court; or (ix) the Borrower or any Subsidiary shall submit any motion or other pleading in any Chapter 11 Case attacking the validity or enforceability of any DIP Order or any of the Loan Documents;

(g)    the Loan Documents after delivery thereof shall for any reason, except to the extent permitted by the terms thereof, cease to be in full force and effect and valid, binding and enforceable in accordance with their terms against the Borrower or a Guarantor party thereto or shall be repudiated by any of them, or cease to create a valid and perfected Lien of the priority required thereby on any of the collateral purported to be covered thereby, except to the extent permitted by the terms of this Agreement, or the Borrower or any Subsidiary or any Guarantor shall so state in writing;

(h)    the allowance of any claim under Section 506(c) of the Bankruptcy Code against the Lender;

(i)    subject to the payments permitted by the Wind Down Budget, the payment by a Loan Party of, or application by any Loan Party for authority to pay, any claim without the consent of the Lender; or

(j)    the Bankruptcy Court shall not have entered the Final Order, in form and substance acceptable to the Wind Down DIP Lender, on or before May 10, 2011, which shall not have been stayed, reversed, vacated or otherwise modified or amended.

t.    **Remedies**:  In the case of an Event of Default, at any time thereafter during the continuance of such Event of Default, the Wind Down DIP Lender may by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate any further commitment to lend to the Borrower and (ii) declare the outstanding principal amount of the Loans to be due and payable, and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower and the Guarantors accrued hereunder and under the other Loan Documents, shall become due and payable immediately, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by the Borrower and each Guarantor.

In the case of the occurrence of an Event of Default, the Wind Down DIP Lender will have all other rights and remedies available at law and equity.

u.    **Conditions Precedent to Tranche A Loan:**

(i)    The Wind Down DIP Lender shall have received from each party hereto counterparts of this Agreement signed on behalf of such party.

(ii)    The Wind Down DIP Lender shall have received a copy of the Wind Down Budget, in form and substance satisfactory to the Wind Down DIP Lender.

(iii)    The Bankruptcy Court shall have entered an interim order, approving on an interim basis, among other things, the transactions outlined herein and granting the priority liens and administrative expense claims referred to above, which order shall be in form and substance acceptable to the Wind Down DIP Lender and shall not have been stayed, reversed, vacated or otherwise modified or amended.

(iv)    There shall have occurred no event or circumstance that has resulted in a Material Adverse Change.

(v)    All principal, interest, fees and other amounts owing under the DE Shaw DIP Facility shall have been repaid in full and all liens and security interests related thereto shall have been terminated or released, in each case, on terms satisfactory to the Wind Down DIP Lender.

(vi)    The closing of the sale of all or substantially all of the assets of the Borrower and its subsidiaries as contemplated pursuant to the asset purchase agreement dated February 11, 2011 by and among the Borrower, Seahawk Global Holdings LLC, Seahawk Mexico Holdings LLC, Seahawk Drilling Management LLC, Seahawk Offshore Management LLC, Energy Supply International LLC, and Seahawk Drilling LLC, as sellers, and SD Drilling LLC and Hercules Offshore, Inc., as purchasers (such sale, the "**Seahawk Asset Sale**") shall have occurred in accordance with the terms of the APA.

(vii)    All of the representations and warranties set forth herein or in the Interim Order shall be true and correct in all material respects.

(viii)    The absence of an Event of Default or any event or condition that with notice or the passage of time would become an Event of Default.

(ix)    Other than the Chapter 11 Cases, there shall exist no action, suit, investigation, litigation or proceeding pending in any court or before any arbitrator or governmental instrumentality that (i) could reasonably be expected to result in a Material Adverse Change or, if adversely

determined, could reasonably be expected to result in a Material Adverse Change or (ii) restrains or prevents, or imposes or could reasonably be expected to impose materially adverse conditions upon the Collateral, this Agreement, any of the other Loan Documents or the transactions contemplated hereby or thereby or threatens to do any of the foregoing.

(x)     The Lender shall have received such other documents as the Wind Down DIP Lender may reasonably request.

v.     **Conditions Precedent to Tranche B Loan**:  The obligation of the Wind Down DIP Lender to make the Tranche B Loan shall not become effective until the date on which each of the following conditions is satisfied:

(i)     All of the conditions set forth in Section 6.01 shall have been satisfied.

(ii)     The Bankruptcy Court shall have entered the Final Order, which shall not have been stayed, reversed, vacated or otherwise modified or amended.

(iii)     All of the representations and warranties set forth in the Loan Documents and in the DIP Orders shall be true and correct in all material respects.

(iv)     The absence of an Event of Default or any event or condition that with notice or the passage of time would become an Event of Default.

w.     **Indemnification:** Each Loan Party agrees to indemnify and hold harmless the Lender and each of its affiliates, partners, officers, directors, employees, agents, advisors, controlling persons, members and successors and assigns (each, an **"Indemnitee"**) from and against any and all losses, claims, damages, liabilities and expenses to which any such Indemnitee may become subject arising out of or in connection with this Agreement, the DIP Orders or any other Loan Document or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any such Indemnitee is a party thereto (and regardless of whether such matter is initiated by a third party or such Loan Party or any of its affiliates or shareholders), and to reimburse each such Indemnitee upon demand for any reasonable legal or other reasonable out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing; provided that the foregoing indemnity will not, as to any Indemnitee, apply to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the willful misconduct or gross negligence of such Indemnitee.  Notwithstanding any other provision of this Agreement, none of the Borrower, its Subsidiaries or any Indemnitee shall be liable for any indirect, special, punitive or consequential damages in connection with its activities related

to this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Loans or the use of the proceeds thereof.

x.   **Other Terms**: The terms and conditions of the Wind Down Facility shall be subject to the terms of the Interim Order and, upon entry by the Bankruptcy Court, the Final Order.  Both the Interim Order and the Final Order shall be in form and substance satisfactory to the Wind Down DIP Lender, otherwise the Wind Down DIP Lender shall have no obligation to make any Loans to the Borrower at any time.

y.   **Governing Law**: The Wind Down DIP Loan Agreement shall be governed by the laws of the State of New York, except as governed by the Bankruptcy Code.

## JURISDICTION AND PROCEDURAL STATUS

8.   This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of the Debtors' chapter 11 cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

9.   On February 11, 2011 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**").  Pursuant to this Court's Order Authorizing Joint Administration Pursuant to Federal Rule of Bankruptcy Procedure 1015, the Debtors' cases are being jointly administered.  *See* Dkt. No. 38.

10.   The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## FACTUAL AND PROCEDURAL BACKGROUND

11.   On February 12, 2011, the Debtors filed, *inter alia*, their Emergency Motion Seeking Interim and Final Orders, pursuant to Sections 105(a), 362, 364(c), 503, and 507 of the Bankruptcy Code, Authorizing the Debtors to, Among other Things, Obtain Post-Petition Financing (the "**Original DIP Financing Motion**") in the aggregate amount of up to $35,000,000 (the "**Original DIP Credit Facility**"), subject to the terms and conditions of the

Debtor-in-Possession Credit Agreement (the "**Original DIP Credit Agreement**" and collectively with all agreements, documents, and instruments delivered or executed in connection therewith, the "**Original DIP Financing Documents**") between the Debtors and D.E. Shaw or its affiliates or designees selected in its sole discretion (the "**DIP Lenders**").  *See* Dkt. No. 9.

12.     Also on February 12, 2011, the Debtors filed their Emergency Motion Pursuant to Sections 105, 363 and 365 of the  Bankruptcy Code and Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure, for an Order (i) Scheduling an Expedited Hearing To Approve The Sale of Substantially All of the Debtors' Assets; (ii) Setting Deadlines for Filing Objections To (1) the Proposed Sale and (2) the Proposed Assumption and Assignment of Executory Contracts and the Payment of Cure Claims in Connection Therewith; and (iii) Approving the Form and Manner of Notice Thereof (the "**Sale Motion**").  *See* Dkt. No. 19.  The Sale Motion contemplated the acquisition by Hercules or one or more of its subsidiaries of substantially all of the assets and jackup rigs of the Debtors (the "**Purchased Assets**") through a sale pursuant to an Asset Purchase Agreement ("**APA**") to be approved under section 363 of the Bankruptcy Code (the "**Transaction**").  The aggregate consideration for the Purchased Assets is (a) 22,321,425 shares of Hercules Common Stock (the "**Hercules Shares**") plus (b) cash in an amount equal to $25,000,012, subject to certain adjustments (defined in the APA as the "**Base Aggregate Consideration**").

13.     On February 14, 2011, the Court held a hearing (the "**First-Day Hearing**") to consider, *inter alia*, the interim relief requested in the Sale Motion and the DIP Financing Motion, and granted the relief requested in the Original DIP Financing Motion and the Sale Motion, on an interim basis.  *See* Dkt. Nos. 56 and 54, respectively.

14.     On March 11, 2011, the court granted the DIP Financing Motion on a final basis. *See* Dkt. No. 295.  On April 5, 2011, the Court granted the Sale Motion on a final basis and issued findings of fact and conclusions of law in support of the order granting the Debtors the authority to sell substantially all of their assets under the APA.  *See* Dkt. Nos. 489 and 488, respectively.  The transaction contemplated in the Sale Motion is scheduled to close during the week of April 24, 2011.

15.     As of April 21, 2011, the Debtors have drawn approximately $17.1 million of the $35.0 million available under the Original DIP Credit Facility, and intend to use a portion of the $25,000,012 in cash to be garnered from the transaction with Hercules to pay off the outstanding debt owed to the DIP Lenders under the Original DIP Credit Facility.

## RELIEF REQUESTED

16.     By this Wind Down DIP Financing Motion, the Debtors seek entry of the Interim Order and the Final Order, *inter alia*:

(a)     under sections 364(c), (d) and (e) of the Bankruptcy Code, authorizing the Debtors to obtain postpetition financing, as set forth below and in the Wind Down DIP Loan Agreement in the aggregate amount of $14,250,000.00 for use in accordance with the Wind Down Budget to fund the expenses associated with the orderly wind-down of the Debtors' bankruptcy estates through confirmation of a plan of reorganization in these jointly-administered cases;

(b)     under sections 361, 362, 364(c)(2) and (d) of the Bankruptcy Code, granting to the Wind Down DIP Lender certain liens upon the Collateral;

(c)     under section 364(c)(1) of the Bankruptcy Code, granting superpriority administrative claim status to the claims of the Wind Down DIP Lender under the Wind Down DIP Loan Agreement;

(d)     under sections 363 and 364 of the Bankruptcy Code, authorizing the Debtors to use the proceeds of the Wind Down Facility in a manner consistent with the terms and conditions of the Wind Down DIP Loan Agreement, and in accordance with the Wind Down Budget;

(e)        under section 362 of the Bankruptcy Code, modifying the automatic stay to the extent set forth in the Interim Order and the Final Order;

(f)        pursuant to Bankruptcy Rule 4001, scheduling a preliminary hearing on this Wind Down DIP Financing Motion for Monday, April 25, 2011 at 3:00 p.m. Central Time, and authorizing the Debtors from the closing of the Seahawk Asset Sale until the final hearing (the "Final Hearing") to obtain credit in an aggregate amount of $5.75 million under the terms contained in the Wind Down DIP Loan Agreement to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates; and

(g)        pursuant to Bankruptcy Rule 4001, scheduling a Final Hearing on this Wind Down DIP Financing Motion.

17.      The Wind Down Facility provides reasonable and the best available terms under the circumstances. The Debtors and the DIP Lender negotiated the terms of the Wind Down Facility at arm's-length. The Debtors solicited sources other than Hayman for a wind down facility and were unable to obtain better offers. The Debtors, in the exercise of their reasonable business judgment, are confident that in today's market the proposed secured, debtor-in-possession financing, as further described in this motion, would not be available from third-party lenders on the same or better terms.

18.      The Debtors seek, among other things, the Court's approval of the Wind Down Facility, as well as authority to execute all ancillary financing documents and grant security interests and liens attendant to the Wind Down Facility. The Debtors request that the Court enter an Interim Order pursuant to sections 105(a), 362, 364(c) and (d), 503, and 507 of the Bankruptcy Code authorizing the Debtors to obtain up to $5.75 million under the Tranche A Loan on a senior secured basis and, after appropriate notice, enter a Final Order, authorizing the Debtors to obtain an additional $8.5 million from Hayman pursuant to the Wind Down DIP Credit Agreement, each to be used in accordance with the Wind Down Budget attached as Exhibit A to the Wind Down DIP Loan Agreement hereto. The requested relief is necessary for

the Debtors to promulgate a plan of reorganization and distribute assets for the benefit of creditors and interestholders.

## ARGUMENT AND AUTHORITIES

**A.      Approval of the Wind Down Facility Under Bankruptcy Code § 364**

19.      Section 364 of the Bankruptcy Code allows debtors to: (a) obtain unsecured credit in the ordinary course of business, (b) obtain unsecured credit out of the ordinary course of business, and (c) obtain credit with specialized priority or with security.  If a debtor cannot obtain post-petition credit on an unsecured basis, a bankruptcy court may authorize the obtaining of credit or the incurring of debt, the repayment of which is secured by a lien on unencumbered property.  11 U.S.C. § 364(c).

20.      The statutory requirement for obtaining post-petition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor is "unable to obtain unsecured credit allowable under § 503(b)(1) of the [Bankruptcy Code]."  11 U.S.C. § 364(c).  In other words, such financing is appropriate when the debtor is unable to obtain unsecured credit allowable as an ordinary administrative claim.  *See In re Crouse Group, Inc.*, 71 B.R. 544, 549, *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (stating that secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Additionally, courts will generally accord deference to the necessity of the debtor obtaining post-petition financing to remain viable.  *See Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

21.      Given the facts of this case, the Debtors believe that the terms of the proposed Wind Down Facility from Hayman are more favorable then the terms of the existing Original DIP Facility from D.E. Shaw.  Additionally, the Debtors have been unable to procure the credit

required to fund the orderly wind-down of their estates in the form of unsecured credit or unsecured credit with an administrative expense priority under section 503(b)(1) of the Bankruptcy Code or on any better terms than those offered by Hayman. The Debtors, therefore, have no choice but to seek credit on a senior-secured basis in exchange for the granting of liens on the DIP Collateral.

22.     A debtor seeking financing under section 364(c) of the Bankruptcy Code must make a reasonable effort to seek other sources of unsecured credit available but "is not required to seek credit from every possible source," and is granted considerable deference in acting in accordance with his business judgment. *See Ames Dep't Stores,* 115 B.R. at 40; *In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). As stated above, the Debtors have no other financing source to fund the amounts needed to prosecute a plan of reorganization and wind down the Debtors' estates. Hence, only Hayman has agreed to provide the Debtors with sufficient credit to administer their estates during the Wind-Down Period. No other lender would provide comparable financing on similar, let alone better, terms.

**B.     Application of the Business Judgment Standard to the Wind Down Facility**

23.     Having determined that the proposed post-petition financing from Hayman was available only under section 364(c) of the Bankruptcy Code, the Debtors negotiated the Wind Down Facility at arm's length and in accordance with their sound business judgment. In negotiating post-petition financing arrangements, courts permit debtors "to exercise their basic business judgment consistent with their fiduciary duties." *Ames Dep't Stores,* 115 B.R. at 38 (citations omitted). Courts will evaluate the facts and circumstances of a debtor's case, and will accord significant weight to the necessity for obtaining financing, so long as it does not run afoul of the provisions of and policies underlying the Bankruptcy Code. *See, e.g., Snowshoe,* 789 F.2d

at 1088 (upholding post-petition financing necessary to sustain seasonal business); *Ames Dep't Stores,* 115 B.R. at 40 ("[C]ases consistently reflect that the court's discretion under § 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

24.     Courts generally will not override a debtor's prudent and responsible exercise of business judgment consistent with its fiduciary duties to the bankruptcy estate and its creditors in negotiating an appropriate financing package.  *See Ames Dep't Stores,* 115 B.R. at 38 (in examining requests by a trustee for interim financing, courts apply the same business judgment standard applicable to other business decisions*); In re Simasko Prod. Co.,* 47 B.R. 444, 449 (Bankr. D. Colo. 1985) (noting that business judgment should be left to the boardroom and not to the bankruptcy courts); *In re Lifeguard Indus. Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).  "More exacting scrutiny will slow the administration of the debtors' estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

25.     Specifically, a bankruptcy court should defer to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious.  *See In re Curlew Valley Assocs.*, 14 B.R. 507, 513 n.11a (Bankr. D. Utah 1981).  Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code."  *Id.* at 513-14 (footnotes omitted).

26.     The Debtors have exercised sound business judgment and have satisfied the legal prerequisites to borrow under the terms and conditions of the Wind Down Facility.  The Wind

Down Facility benefits these estates by providing the Debtors with the financing necessary for the Debtors to administer their estates through confirmation of a chapter 11 plan in these cases in accordance with the Wind Down Budget.  Without the requested financing, the Debtors will likely have insufficient liquidity to continue to administer their cases in chapter 11.  With the requested Wind Down DIP Financing, the Debtors expect to propose and confirm a chapter 11 plan that the Debtors' expect will provide full payment for all allowed creditor claims. Accordingly, post-petition financing consistent with the terms and provisions contained in the Wind Down Facility is a reasonable exercise of the Debtors' business judgment and in the best interest of the estates and all parties in interest.

**C.        Good Faith of Hayman and the Debtors**

27.     Section 364(e) of the Bankruptcy Code was designed to "encourage the extension of credit to debtors" by allowing lenders to "rely on a bankruptcy court's authorization of the transaction."  *See In re EDC Holding Co.*, 676 F.2d 945, 947 (7th Cir. 1982) (the purpose of § 364(e) is "to overcome people's natural reluctance to deal with a bankrupt firm whether as purchaser or lender by assuring them that so long as they are relying in good faith on a bankruptcy judge's approval of the transaction they need not worry about their priority merely because some creditor is objecting to the transaction and is trying to get the district court or the court of appeals to reverse the bankruptcy judge.").  *See also In re N. Atl. Millwork Corp.,* 155 B.R. 271, 279 (Bankr. D. Mass. 1993) ("The purpose of § 364(e) is to allow good-faith lenders to rely upon conditions at the time they extend credit and to encourage lenders to lend to bankrupt entities.") (citations omitted).

28.     The terms and conditions of the Wind Down Facility are fair and reasonable and were negotiated by the parties in good faith and at arm's length.  All parties were represented by

counsel.  The Debtors therefore request that Hayman be granted the protections of section 364(e) of the Bankruptcy Code.

**D.      Grant of a Priming Lien**

29.      The Debtors also seek approval of the Wind Down Facility under section 364(d)(1) of the Bankruptcy Code to permit the Debtors to grant priming liens on the Collateral.  The statutory requirement for obtaining post-petition credit under section 364(d)(1) of the Bankruptcy Code is a finding, made after notice and a hearing, that the debtors in possession are "unable to obtain such credit otherwise."  11 U.S.C. § 364(d)(1)(A).  In addition, the secured creditors whose liens are being "primed" by a new post-petition lender must be provided with adequate protection of their interests in collateral.  See *In re Swedeland Dev. Group, Inc.*, 16 F. 3d 552, 564 (3d Cir. 1994) (en banc) (noting that adequate protection is required under section 364(d)(l)(B) of the Bankruptcy Code to ensure that the creditor receives the value for which it bargained); *In re Dunes Casino Hotel*, 69 B.R. 784, 793 (Bankr. D.N.J. 1986) (noting that "[a]dequate protection is designed to preserve the secured creditor's position at the time of the bankruptcy").

30.      Both of these requirements are satisfied here.  First, as set forth above, only Hayman has agreed to provide the Debtors with sufficient credit to administer their estates during the Wind Down Period, and the Debtors have accordingly determined that no other financing is available on terms better than proposed under the Wind Down DIP Loan Agreement.

31.      In addition, the Debtors believe that any "primed" parties will be adequately protected by the substantial equity cushion in the Collateral.  The principal purpose of adequate protection is to safeguard the interests of secured creditors in the collateral against diminution in the value of that interest.  *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr.

S.D.N.Y. 1992); *In re Continental Airlines, Inc.*, 154 B.R. 176, 180 (Bankr. D. Del. 1993). Courts typically determine the means for providing adequate protection on a case-by-case basis. *See In re Beker Indus. Corp.*, 58 B.R. 725 (Bankr. S.D.N.Y. 1986); *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985). However, courts have consistently held that a substantial equity cushion can obviate the need for adequate protection. *In re Herman*, 315 B.R. 381, 396 (Bankr. E.D. Tex. 2004) ("Cause" did not exist to lift automatic stay where creditors appeared to be vastly oversecured and, thus, were protected by equity cushion existing in their collateral); *Pistole v. Mellor (In re Mellor)*, 734 F. 2d 1396, 1400 (9th Cir. 1984) (An equity cushion "is the classic form of protection for a secured debt," and "the existence of an equity cushion, standing alone, can provide adequate protection"); *In re Adams*, 218 B.R. 597, 602-3 (Bankr. D. Kan. 1998).

32.    In this case, the Debtors will not incur any obligations under the Wind Down DIP Loan Agreement until the Seahawk Asset Sale has closed. At that time, the Debtors will be holding Hercules Common Stock worth in excess of approximately $100 million — which is more than enough value to satisfy their obligations to all creditors and to provide a substantial return to equity interest holders, and far in excess of the amount of any secured claims against the Collateral.

## E.    Modification of the Automatic Stay

33.    Section 362 of the Bankruptcy Code imposes an automatic stay upon the filing of a bankruptcy petition. The proposed Wind Down Facility and the Interim Order contemplate the modification of the automatic stay to the extent necessary to: (1) permit the Debtors to grant the DIP Liens to Hayman and to incur all liabilities and obligations to the Wind Down Lender under the Wind Down Loan Documents, the Wind Down Facility and the Interim Order, (2) authorize

the Wind Down Lender to retain and apply all payments made by the Debtors under the Wind Down Facility in accordance with the provisions of the Wind Down Loan Documents and the Interim Order, and (3) if there is an Event of Default, authorize the Wind Down Lender to charge the default interest rate and pursue the remedies provided for in the Wind Down DIP Loan Agreement.

34.     Stay modification provisions of this type are standard features of post-petition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present facts and circumstances.  Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim Order and Wind Down DIP Loan Agreement.

**F.     Request for Immediate Interim Relief**

35.     Pending the Final Hearing, the Debtors will require interim and immediate use of $5.75 million in financing to be provided by the Wind Down Facility.  It is essential that the Debtors pay for post-petition wind down expenses, including the administrative expenses necessary for the Debtors to prosecute a chapter 11 plan.  The Debtors' interim financing in the amount of $5.75 million, subject to the Wind Down Budget which the Wind Down Lender has approved, is necessary to avoid immediate and irreparable harm to the Debtors' estates.

36.     As explained above, absent immediate use of $5.75 million from the Wind Down Facility, the Debtors will be unable to pay the ongoing expenses associated with winding down their bankruptcy cases.  Consequently, if interim relief is not obtained, the Debtors' assets will be immediately and irreparably jeopardized, to the detriment of the Debtors' estates, their creditors and all parties-in-interest.

37.     Accordingly, the Debtors request that, pending the Final Hearing, the Court schedule the Interim Hearing as soon as practicable to consider the Debtors' request for authorization to obtain interim credit in the amount of $5.75 million under the Wind Down Facility, in accordance with and pursuant to the terms and conditions contained in the Wind Down DIP Credit Agreement.  **The Debtors request that the Court grant the Debtors authority to enter into the Wind Down Facility, on an interim basis, following a hearing on April 25, 2011, at 3:00 p.m. Central Time.**

38.     Rule 4001(c) of the Federal Rules of Bankruptcy Procedure permits a court to approve a request for financing during the 14-day period following the filing of a motion requesting authorization to obtain post-petition financing, "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR. P. 4001(c)(2).   In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. at 38.  After the 14-day period, the request for financing is not limited to those amounts necessary to prevent destruction of the Debtors' business.  A debtor is entitled to borrow those amounts that it believes prudent in the operation of its business.  *See, e.g.*, *In re Simasko Prod. Co.,* 47 B.R. at 449; *In re Ames Dep't Stores, Inc.,* 115 B.R. at 36.

39.     Following the Interim Hearing, the Debtors respectfully request that this court set a Final Hearing, subject to the Court's calendar, for the next available setting after the expiration of the 14-day notice period required by Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure.   At such Final Hearing the Debtors will seek final approval of the Wind Down Facility.

**NOTICE**

40.    Notice of this Emergency Motion has been provided by overnight delivery and e-mail or facsimile to:  (a) Hayman; (b) counsel for Hayman; (c) 30 largest unsecured creditors of the Debtors on a consolidated basis; (d) Hercules Offshore, Inc., and its counsel; (e) D.E. Shaw Direct Capital Portfolios, L.L.C., and its counsel; (f) the U.S. Trustee's Office; (g) the United States Attorney's Office; (h) the Securities and Exchange Commission; (i) the Internal Revenue Service; (j) the Official Committee of Unsecured Creditors, and its counsel; (k) the Official Committee of Equity Security Holders, and its counsel; and (l) the Texas Taxing Authorities and all other known secured creditors.  The Debtors believe that the notice provided for herein is fair and adequate and no other or further notice is necessary.

**PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, the Debtors respectfully request that the Court consider this matter at an Interim Hearing on April 25, 2011 at 3:00 p.m. Central Time, that upon such Interim Hearing the Court enter an Interim Order:  (a) granting the Debtors the authority to enter into the Wind Down Facility and to draw $5.75 million to avoid immediate and irreparable harm; (b) granting the Debtors the authority to execute all related Wind Down Financing Documents; (c) granting perfected security interests in and liens on the Collateral to Hayman, effective as of the closing of the Seahawk Asset Sale, pursuant to sections 364(c)(2) and (d) of the Bankruptcy Code to secure the $5.75 million in interim financing; (d) granting a superpriority administrative claim to the claims of the Wind Down Lender under the Wind Down DIP Loan Agreement; (e) approving the terms and conditions of the Wind Down Facility on an interim basis; (f) setting this Emergency Motion for Final Hearing at the Court's earliest convenience after the lapse of 14 days from the date of filing hereof; and (g) granting the Debtors such other legal and equitable relief to which they are entitled.

90430070.8                                    - 25 -

Dated:  April 22, 2011.

Respectfully submitted,

**FULBRIGHT & JAWORSKI L.L.P.**

By:  _/s/  Johnathan C. Bolton_
      Berry D. Spears
      State Bar No. 18893300
      Johnathan C. Bolton
      State Bar No. 24025260
1301 McKinney, Suite 4100
Houston, Texas 77010-3095
Telephone:  713/651-5151
Telecopier:  713/651-5246
bspears@fulbright.com
jbolton@fulbright.com

and

**JORDAN, HYDEN, WOMBLE,
CULBRETH & HOLZER P.C.**
Shelby A. Jordan
State Bar No. 11016700
Nathaniel Peter Holzer
State Bar No. 00793971
500 N. Shoreline Blvd., Suite 900
Corpus Christi, Texas 78401-0341
Telephone: (361) 653-6624
Facsimile:  (361) 888-5555
sjordan@jhwclaw.com
pholzer@jhwclaw.com

**ATTORNEYS FOR DEBTORS AND
DEBTORS-IN-POSSESSION**